Vacated and remanded by the Supreme Court for dismissal as moot, March 6, 2009

**ON REHEARING EN BANC**
**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ALI SALEH KAHLAH AL-MARRI,
*Petitioner-Appellant,*

and

MARK A. BERMAN, as next friend,
*Petitioner,*

v.

COMMANDER JOHN PUCCIARELLI,
U.S.N., Consolidated Naval Brig.,
*Respondent-Appellee.*

SPECIALISTS IN THE LAW OF WAR;
PROFESSORS OF EVIDENCE AND
PROCEDURE; UNITED STATES CRIMINAL
SCHOLARS AND HISTORIANS; FORMER
SENIOR JUSTICE DEPARTMENT
OFFICIALS; CENTER FOR NATIONAL
SECURITY STUDIES; AMERICAN-ARAB
ANTI-DISCRIMINATION COMMITTEE;
ASIAN-AMERICAN JUSTICE CENTER;
NATIONAL IMMIGRANT JUSTICE
CENTER; HUMAN RIGHTS FIRST;
HUMAN RIGHTS WATCH;
PROFESSORS OF CONSTITUTIONAL
LAW AND FEDERAL JURISDICTION;

No. 06-7427

NATIONAL ASSOCIATION OF CRIMINAL
DEFENSE LAWYERS; HATE FREE ZONE;
MUSLIM ADVOCATES; WORLD
ORGANIZATION FOR HUMAN RIGHTS
USA; DAVID M. BRAHMS, Brigadier
General; DONALD J. GUTER, Rear
Admiral; MERRILL A. MCPEAK,
Retired General,
                    *Amici Supporting Appellant.*

Appeal from the United States District Court
for the District of South Carolina, at Charleston.
Henry F. Floyd, District Judge.
(2:04-cv-002257-HFF)

Argued: October 31, 2007

Decided: July 15, 2008

Before WILLIAMS, Chief Judge, and WILKINSON, NIEMEYER,
MICHAEL, MOTZ, TRAXLER, KING, GREGORY, and
DUNCAN, Circuit Judges.

Reversed and remanded by published per curiam opinion. Judge Motz
wrote an opinion concurring in the judgment, in which Judges
Michael, King, and Gregory joined. Judge Traxler wrote an opinion
concurring in the judgment, in Part II of which Judge Niemeyer
joined. Judge Gregory wrote an opinion concurring in the judgment.
Chief Judge Williams wrote an opinion concurring in part and dis-
senting in part, in which Judge Duncan joined. Judge Wilkinson wrote
an opinion concurring in part and dissenting in part. Judge Niemeyer
wrote an opinion concurring in the judgment in part and dissenting in
part. Judge Duncan wrote an opinion concurring in part and dissent-
ing in part. Judge Shedd did not participate in this case.

### COUNSEL

**ARGUED:** Jonathan L. Hafetz, BRENNAN CENTER FOR JUSTICE, New York University School of Law, New York, New York, for Appellant. Gregory George Garre, Deputy Solicitor General, Office of the Solicitor General, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Andrew J. Savage, III, SAVAGE & SAVAGE, P.A., Charleston, South Carolina; Lawrence S. Lustberg, Mark A. Berman, GIBBONS, DEL DEO, DOLAN, GRIFFINGER & VECCHIONE, P.C., Newark, New Jersey, for Appellant. Paul D. Clement, Solicitor General, Reginald I. Lloyd, United States Attorney, District of South Carolina, Eric D. Miller, Assistant to the Solicitor General, Kevin F. McDonald, Assistant United States Attorney, Claire J. Evans, UNITED STATES DEPARTMENT OF JUSTICE, Criminal Division, Appellate Section, Washington, D.C., for Appellee. Jenny S. Martinez, Stanford, California; Allison Marston Danner, Nashville, Tennessee; Valerie M. Wagner, Daniel B. Epstein, DECHERT, L.L.P., Palo Alto, California, for Specialists in the Law of War, Amicus Supporting Appellant. Jonathan M. Freiman, NATIONAL LITIGATION PROJECT of the Allard K. Lowenstein International Human Rights Clinic, Yale Law School, New Haven, Connecticut, for Professors of Evidence and Procedure, Amicus Supporting Appellant. Hope R. Metcalf, WIGGIN AND DANA, L.L.P., New Haven, Connecticut, for United States Criminal Scholars and Historians, Amicus Supporting Appellant. James C. Schroeder, Gary A. Isaac, Heather M. Lewis, MAYER, BROWN, ROWE & MAW, L.L.P., Chicago, Illinois, for Former Senior Justice Department Officials, Amicus Supporting Appellant. Kate Martin, Joseph Onek, CENTER FOR NATIONAL SECURITY STUDIES, Washington, D.C., Paul Smith, Joshua A. Block, JENNER & BLOCK, L.L.P., New York, New York, for Center for National Security Studies, Amicus Supporting Appellant; Lema Bashir, AMERICAN-ARAB ANTI-DISCRIMINATION COMMITTEE, Washington, D.C., for American-Arab Anti-Discrimination Committee, Amicus Supporting Appellant; Aimee J. Baldillo, ASIAN AMERICAN JUSTICE CENTER, Washington, D.C., for Asian-American Justice Center, Amicus Supporting Appellant; Mary Meg McCarthy, Tara Magner, NATIONAL IMMIGRANT JUSTICE CENTER, Chicago, Illinois, for National Immigrant Justice Center, Amicus Supporting Appellant. Gabor Rona, Hina Shamsi, HUMAN

RIGHTS FIRST, New York, New York; Jennifer Daskal, HUMAN RIGHTS WATCH, Washington, D.C.; Donald Francis Donovan, Catherine M. Amirfar, Tali Farimah Farhadian, DEBEVOISE & PLIMPTON, L.L.P., New York, New York, for Human Rights First and Human Rights Watch, Amici Supporting Appellant. Gerald L. Neuman, Cambridge, Massachusetts; Harold Hongju Koh, New Haven, Connecticut; Sarah H. Cleveland, Cambridge, Massachusetts; Margaret L. Sanner, REED SMITH, L.L.P., Richmond, Virginia, for Professors of Constitutional Law and Federal Jurisdiction, Amicus Supporting Appellant. Timothy J. Finn, Julia E. McEvoy, Katherine E. Stern, JONES DAY, Washington, D.C., for National Association of Criminal Defense Lawyers, Amicus Supporting Appellant. Shankar Narayan, HATE FREE ZONE, Seattle, Washington, for Hate Free Zone, Amicus Supporting Appellant; Farhana Khera, MUSLIM ADVOCATES, Kensington, Maryland, for Muslim Advocates, Amicus Supporting Appellant. Morton Sklar, Executive Director, Joseph Husty, Legal Intern, WORLD ORGANIZATION FOR HUMAN RIGHTS USA, Washington, D.C., with the assistance of Law Student Contributors: Melissa Keyes (U. of CA at Hastings Law School), Charles Wait, Aaron Clark-Rizzio, Kennon Scott, Binish Hasan, Maria Tennyson, Olivia Maginley and Meredith Angelson (New York Univ. Law Sch.), Simon Moshenberg, Jesse Townsend, Stephanie Hays, Sameer Ahmed and Nicholas Pederson (Yale Law School), Matt Sadler (B.C. Law School), for World Organization for Human Rights USA, Amicus Supporting Appellant. David H. Remes, Enrique Armijo, John F. Coyle, COVINGTON & BURLING, L.L.P., Washington, D.C., for David M. Brahms, Brigadier General, Donald J. Guter, Rear Admiral, Merrill A. McPeak, Retired General, Amici Supporting Appellant.

---

**OPINION**

PER CURIAM:

Ali Saleh Kahlah al-Marri filed a petition for a writ of habeas corpus challenging his military detention as an enemy combatant. After the district court denied all relief, al-Marri noted this appeal. A divided panel of this court reversed the judgment of the district court

and ordered that al-Marri's military detention cease. *See Al-Marri v. Wright*, 487 F.3d 160 (4th Cir. 2007).

Subsequently, this court vacated that judgment and considered the case *en banc*. The parties present two principal issues for our consideration: (1) assuming the Government's allegations about al-Marri are true, whether Congress has empowered the President to detain al-Marri as an enemy combatant; and (2) assuming Congress has empowered the President to detain al-Marri as an enemy combatant provided the Government's allegations against him are true, whether al-Marri has been afforded sufficient process to challenge his designation as an enemy combatant.*

Having considered the briefs and arguments of the parties, the *en banc* court now holds: (1) by a 5 to 4 vote (Chief Judge Williams and Judges Wilkinson, Niemeyer, Traxler, and Duncan voting in the affirmative; Judges Michael, Motz, King, and Gregory voting in the negative), that, if the Government's allegations about al-Marri are true, Congress has empowered the President to detain him as an enemy combatant; and (2) by a 5 to 4 vote (Judges Michael, Motz, Traxler, King, and Gregory voting in the affirmative; Chief Judge Williams and Judges Wilkinson, Niemeyer, and Duncan voting in the negative), that, assuming Congress has empowered the President to detain al-Marri as an enemy combatant provided the Government's allegations against him are true, al-Marri has not been afforded sufficient process to challenge his designation as an enemy combatant.

Accordingly, the judgment of the district court is reversed and remanded for further proceedings consistent with the opinions that follow.

---

*We deny the Government's motion to dismiss this case for lack of jurisdiction. The Government relied on section 7 of the Military Commissions Act (MCA) of 2006, Pub. L. No. 109-366, 120 Stat. 2600, which amended the Detainee Treatment Act (DTA) of 2005, Pub. L. No. 109-148, § 1005(e)(1), 119 Stat. 2680, 2741-42. After we heard *en banc* argument in this case, the Supreme Court declared section 7 of the MCA unconstitutional. *See Boumediene v. Bush*, 553 U.S. ___, ___, slip op. at 64 (June 12, 2008). The Government now concedes that we have jurisdiction over al-Marri's habeas petition.

*REVERSED AND REMANDED*

DIANA GRIBBON MOTZ, Circuit Judge, concurring in the judgment:

For over two centuries of growth and struggle, peace and war, the Constitution has secured our freedom through the guarantee that, in the United States, no one will be deprived of liberty without due process of law. Yet more than five years ago, military authorities seized Ali Saleh Kahlah al-Marri, an alien lawfully residing here. He has been held by the military ever since — without criminal charge or process. He has been so held, despite the fact that he was initially taken from his home in Peoria, Illinois, by civilian authorities and imprisoned awaiting trial for purported domestic crimes. He has been so held, although the Government has never alleged that he is a member of any nation's military, has fought alongside any nation's armed forces, or has borne arms against the United States anywhere in the world. And he has been so held, without acknowledgment of the protection afforded by the Constitution, solely because the Executive believes that his indefinite military detention — or even the indefinite military detention of a similarly situated American citizen — is proper.

While criminal proceedings were underway against al-Marri, the President ordered the military to seize and detain him indefinitely as an enemy combatant. Since that order, issued in June of 2003, al-Marri has been imprisoned without charge in a military jail in South Carolina. Al-Marri petitions for a writ of habeas corpus to secure his release from military imprisonment. The Government defends this detention, asserting that al-Marri associated with al Qaeda and "prepar[ed] for acts of international terrorism." It maintains that the President has both statutory and inherent constitutional authority to subject to indefinite military detention al-Marri or anyone else who associates with al Qaeda and "prepare[s]" for such acts. If the Government accurately describes al-Marri's conduct, he has committed grave crimes, but a majority of the *en banc* court holds, as the panel did, that the judgment of the district court must be reversed.[1]

---

[1] As noted above, the *en banc* court — like the panel — has concluded that the judgment of the district court denying Ali Saleh Kahlah al-Marri

We would also grant al-Marri habeas relief. Even assuming the truth of the Government's allegations, they provide no basis for treating al-Marri as an enemy combatant or as anything other than a civilian. This does not mean that al-Marri, or similarly situated American citizens, would have to be freed. Like others accused of terrorist activity in this country, from the Oklahoma City bombers to the convicted September 11th conspirator, they could be tried on criminal charges and, if convicted, punished severely. But the Government would not be able to subject them to indefinite military detention.

With regret, we recognize that this view does not command a majority of the court. Our colleagues hold that the President can order the military to seize from his home and indefinitely detain anyone in this country — including an American citizen — even though he has never affiliated with an enemy nation, fought alongside any nation's armed forces, or borne arms against the United States anywhere in the world. We cannot agree that in a broad and general statute, Congress silently authorized a detention power that so vastly exceeds all traditional bounds. No existing law permits this extraordinary exercise of executive power.[2] Even in times of national peril, we must follow the law, lest this country cease to be a nation of laws. For "[l]iberty and security can be reconciled; and in our system they are reconciled within the framework of the law." *Boumediene v. Bush*, 553 U.S. ___, ___, slip op. at 70 (June 12, 2008).

---

habeas relief must be reversed. The opinion that follows incorporates some of the rationale originally contained in the now vacated panel opinion, *Al-Marri v. Wright*, 487 F.3d 160 (4th Cir. 2007). It also includes substantial additions and revisions applying intervening Supreme Court precedent and responding to the arguments on rehearing of the Government and of our colleagues. *See, e.g.*, *infra* at 7-8 & n.2, 12, 16 & n.6, 19-21 & nn.9-10, 30, 31-33, 34-52 & nn.18-25, 55, 57-58, 63-64.

[2]One of the dissenters repeatedly insists that we are really suggesting that the *Constitution* prohibits the detention of al-Marri. *See, e.g.*, *post* at 129, 144-45, 157, 159 n.5, 175, 183 (Wilkinson, J., concurring in part and dissenting in part). In fact, the panel explicitly refused to so hold, *see Al-Marri*, 487 F.3d at 193 n.17, and we refuse to do so here. Because Congress has not empowered the President to subject civilians within the United States to indefinite military detention, we need not, and do not, determine whether such a grant of authority would violate the Constitution.

Although our preferred disposition does not command a majority of the court, a majority does refuse to affirm the judgment of the district court. To give effect to the conclusion of that majority, we join in "ordering remand on terms closest to those" we would prefer. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 553 (2004) (Souter, J., concurring in part, dissenting in part, and concurring in the judgment); *see also Screws v. United States*, 325 U.S. 91, 134 (1945) (Rutledge, J., concurring in the result). In this case, that means that we join in a judgment reversing and remanding for evidentiary proceedings to determine whether al-Marri actually is an enemy combatant and so subject to military detention. Although we believe that Congress in the Authorization for Use of Military Force (AUMF), 115 Stat. 224, note following 50 U.S.C.A. § 1541 (West 2003), has not authorized al-Marri's military detention, the evidentiary proceedings envisioned by Judge Traxler will at least place the burden on the Government to make an initial showing that "the normal due process protections available to all within this country" are impractical or unduly burdensome in al-Marri's case and that the hearsay declaration that constitutes the Government's only evidence against al-Marri is "the most reliable available evidence" supporting the Government's allegations. *Post* at 94-95.

In reaching our conclusions, we note at the outset that we respect our dissenting colleagues' strongly held contrary views — and the rhetoric with which they advance those views. But rhetoric and passion — no matter how sincere — cannot substitute for faithful application of the Constitution and controlling legal principles. In this respect, the dissents fail. Finding scant legal support for their positions, our hardworking dissenting colleagues resort to inventing new definitions of enemy combatant. Not only have none of their differing definitions been adopted by Congress or advocated by the Government, these definitions are contrary to law-of-war principles long followed by the Supreme Court. The absence of authority supporting any of these divergent positions unsurprisingly results in our colleagues' inability to agree on the scope of the Executive's power to detain or the correct process for reviewing such detentions. Thus, while we do not doubt the dissenters' good faith and good will, we must reject their approaches.

As the Supreme Court recently reminded us, "[s]ecurity subsists . . . in fidelity to freedom's first principles. Chief among these are

freedom from arbitrary and unlawful restraint and the personal liberty that is secured by adherence to the separation of powers." *Boumediene*, 553 U.S. at ___, slip op. at 68-69. To allow the President, in the absence of congressional authorization, to exercise military force against civilians in this country is to abandon these principles. Without them, neither freedom nor security can survive.

## I.

Al-Marri, a citizen of Qatar, lawfully entered the United States with his wife and children on September 10, 2001, to pursue a master's degree at Bradley University in Peoria, Illinois, where he had obtained a bachelor's degree in 1991. The following day, terrorists hijacked four commercial airliners and used them to kill and inflict grievous injury on thousands of Americans. Three months later, on December 12, 2001, FBI agents arrested al-Marri at his home in Peoria as a material witness in the Government's investigation of the September 11th attacks. Al-Marri was imprisoned in civilian jails in Peoria and then New York City.

In February 2002, al-Marri was charged in the Southern District of New York with the possession of unauthorized or counterfeit credit card numbers with the intent to defraud. A year later, in January 2003, he was charged in a second, six-count indictment with two counts of making a false statement to the FBI, three counts of making a false statement on a bank application, and one count of using another person's identification for the purpose of influencing the action of a federally insured financial institution. Al-Marri pleaded not guilty to all of these charges. In May 2003, a federal district court in New York dismissed the charges against al-Marri for lack of venue.

The Government then returned al-Marri to Peoria, and he was re-indicted in the Central District of Illinois on the same seven counts, to which he again pleaded not guilty. The district court set a July 21, 2003, trial date. On Friday, June 20, 2003, the court scheduled a hearing on pre-trial motions, including a motion to suppress evidence against al-Marri assertedly obtained by torture. On the following Monday, June 23, before that hearing could be held, the Government moved *ex parte* to dismiss the indictment based on an order signed that morning by the President.

In the order, President George W. Bush stated that he "DETER-MINE[D] for the United States of America that" al-Marri: (1) is an enemy combatant; (2) is closely associated with al Qaeda; (3) "engaged in conduct that constituted hostile and war-like acts, including conduct in preparation for acts of international terrorism"; (4) "possesses intelligence . . . that . . . would aid U.S. efforts to prevent attacks by al Qaeda"; and (5) "represents a continuing, present, and grave danger to the national security of the United States." The President determined that al-Marri's detention by the military was "necessary to prevent him from aiding al Qaeda" and thus ordered the Attorney General to surrender al-Marri to the Secretary of Defense and further directed the Secretary of Defense to "detain him as an enemy combatant."

The federal district court in Illinois granted the Government's motion to dismiss the criminal indictment against al-Marri. In accordance with the President's order, al-Marri was then transferred to military custody and brought to the Naval Consolidated Brig in South Carolina.

Since that time (that is, for five years) the military has held al-Marri as an enemy combatant, without charge and without any indication when this confinement will end. For the first sixteen months of his military confinement, the Government did not permit al-Marri any communication with the outside world, including his attorneys, his wife, and his children. He alleges that he was denied basic necessities, interrogated through measures creating extreme sensory deprivation, and threatened with violence. A pending civil action challenges the "inhuman, degrading," and "abusive" conditions of his confinement. *See* Complaint at 1, *Al-Marri v. Rumsfeld*, No. 2:05-cv-02259-HFF-RSC (D.S.C. Aug. 8, 2005).

On July 8, 2003, counsel for al-Marri petitioned on his behalf (because it was undisputed that he was unavailable to petition) for a writ of habeas corpus in the Central District of Illinois. The district court dismissed the petition for lack of venue, *Al-Marri v. Bush*, 274 F. Supp. 2d 1003 (C.D. Ill. 2003); the Seventh Circuit affirmed, *Al-Marri v. Rumsfeld*, 360 F.3d 707 (7th Cir. 2004); and the Supreme Court denied certiorari, *Al-Marri v. Rumsfeld*, 543 U.S. 809 (2004). On July 8, 2004, al-Marri's counsel filed the present habeas petition

on al-Marri's behalf in the District of South Carolina. On September 9, 2004, the Government answered al-Marri's petition, citing the Declaration of Jeffrey N. Rapp, Director of the Joint Intelligence Task Force for Combating Terrorism, as support for the President's order to detain al-Marri as an enemy combatant.

The Rapp Declaration asserts that al-Marri: (1) is "closely associated with al Qaeda, an international terrorist organization with which the United States is at war"; (2) trained at an al Qaeda terrorist training camp in Afghanistan sometime between 1996 and 1998; (3) in the summer of 2001, was introduced to Osama Bin Laden by Khalid Shaykh Muhammed; (4) at that time, volunteered for a "martyr mission" on behalf of al Qaeda; (5) was ordered to enter the United States sometime before September 11, 2001, to serve as a "sleeper agent" to facilitate terrorist activities and explore disrupting this country's financial system through computer hacking; (6) in the summer of 2001, met with terrorist financier Mustafa Ahmed al-Hawsawi, who gave al-Marri money, including funds to buy a laptop; (7) gathered technical information about poisonous chemicals on his laptop; (8) undertook efforts to obtain false identification, credit cards, and banking information, including stolen credit card numbers; (9) communicated with known terrorists, including Khalid Shaykh Muhammed and al-Hawsawi, by phone and e-mail; and (10) saved information about jihad, the September 11th attacks, and Bin Laden on his laptop computer.

The Rapp Declaration does *not* assert that al-Marri: (1) is a citizen, or affiliate of the armed forces, of any nation at war with the United States; (2) was seized on, near, or having escaped from a battlefield on which the armed forces of the United States or its allies were engaged in combat; (3) was ever in Afghanistan during the armed conflict between the United States and the Taliban there; or (4) directly participated in any hostilities against United States or allied armed forces.

On October 14, 2004, the Government permitted al-Marri access to his counsel for the first time since his initial confinement as an enemy combatant sixteen months before. (According to al-Marri's counsel, as of the time of the *en banc* filings, the Government still has not permitted al-Marri to speak to his wife or any of his five children.) Al-

Marri then submitted a reply to the Government's evidence, contending that he is not an enemy combatant; he then moved for summary judgment. The district court denied the summary judgment motion and referred the case to a magistrate judge for consideration of the appropriate process to be afforded al-Marri in light of *Hamdi*, 542 U.S. 507. The magistrate judge ruled that the Rapp Declaration provided al-Marri with sufficient notice of the basis of his detention as an enemy combatant and directed al-Marri to file rebuttal evidence.

In response to the magistrate's ruling, al-Marri again denied the Government's allegations but filed no rebuttal evidence, contending that the Government had an initial burden to produce evidence that he was an enemy combatant and that the Rapp Declaration did not suffice. The magistrate judge recommended dismissal of al-Marri's habeas petition because al-Marri had failed to rebut the allegations in the Rapp Declaration. In August 2006, the district court adopted the magistrate judge's report and recommendation and dismissed al-Marri's habeas petition. A few days later, al-Marri noted this appeal.[3]

After oral argument, a panel of this court reversed the judgment of the district court and remanded the case for further proceedings. *See Al-Marri*, 487 F.3d 160. On the Government's motion for rehearing, the court voted to vacate the panel opinion and hear the case *en banc*. For the reasons set forth within, we would once again hold that al-Marri must be afforded habeas relief and so would reverse the judgment of the district court and remand the case for further proceedings consistent with that holding.

## II.

Al-Marri premises his habeas claim on the Fifth Amendment's guarantee that no person living in this country can be deprived of liberty without due process of law. He maintains that even if he has committed the acts the Government alleges, he is not a combatant but a civilian protected by our Constitution, and thus is not subject to mil-

---

[3]Numerous amici have submitted briefs to us, both on the jurisdictional and merits questions. Many of these briefs have been helpful, and we are especially grateful for the care exhibited in focusing on different issues, thus avoiding redundancy.

itary detention. Al-Marri acknowledges that the Government can deport him or charge him with a crime and, if he is convicted in a civilian court, imprison him. But he insists that neither the Constitution nor any law permits the Government, on the basis of the evidence it has proffered to date — even assuming all of that evidence is true — to treat him as an enemy combatant and subject him to indefinite military detention, without criminal charge or process.

The Government contends that the district court properly denied habeas relief to al-Marri, because the Constitution allows detention of enemy combatants by the military without criminal process, and, according to the Government, it has proffered evidence that al-Marri is an enemy combatant. The Government argues that the AUMF, as construed by precedent and considered in conjunction with the "legal background against which [it] was enacted," empowers the President on the basis of that proffered evidence to order al-Marri's indefinite military detention as an enemy combatant. Alternatively, the Government contends that even if the AUMF does not authorize the President to order al-Marri's military detention, the President has "inherent constitutional power" to do so.

A.

Each party grounds its case on well-established legal doctrine. Moreover, important principles guiding our analysis seem undisputed. Before addressing the conflicting contentions of the parties, we note these fundamental principles, which we take to be common ground.

The Constitution guarantees that no "person" shall "be deprived of life, liberty, or property, without due process of law." U.S. Const., amend. V; *see also id.* amend. XIV, § 1. The text of the Fifth Amendment affords this guarantee to "person[s]," not merely citizens, and so the constitutional right to freedom from deprivation of liberty without due process of law extends to all lawfully admitted aliens living within the United States. *See Wong Wing v. United States*, 163 U.S. 228, 238 (1896); *see also United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990).

To be sure, as al-Marri's counsel conceded at oral argument before the *en banc* court, our Constitution has no "force in foreign territory

unless in respect of our citizens." *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 318 (1936). But, as Chief Justice Rehnquist explained, a long line of Supreme Court cases establishes that aliens receive certain protections — including those rights guaranteed by the Due Process Clause — "when they have come within the territory of the United States and developed substantial connections with this country." *Verdugo-Urquidez*, 494 U.S. at 271; *see also Boumediene*, 553 U.S. at ___, slip op. at 12 (noting that "the Constitution's . . . substantive guarantees of the Fifth and Fourteenth Amendments . . . protect[ ] persons," including "foreign nationals"); *Sanchez-Llamas v. Oregon*, 126 S. Ct. 2669, 2681-82 (2006) (observing that "[a] foreign national . . . like anyone else in our country enjoys under our system the protections of the Due Process Clause"); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953) (noting that "once an alien lawfully enters and resides in this country he becomes invested with . . . rights . . . protected by . . . the Fifth Amendment[ ] and by the due process clause of the Fourteenth Amendment" (internal quotation marks omitted)); *Wong Wing*, 163 U.S. at 238 (holding that "all persons within the territory of the United States are entitled to the protection guaranteed by" the Due Process Clause of the Fifth Amendment); *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) (explaining that the Due Process Clause of the Fourteenth Amendment protects "all persons within the territorial jurisdiction" of the United States). Thus, the Due Process Clause protects not only citizens but also aliens, like al-Marri, lawfully admitted to this country who have established substantial connections here — in al-Marri's case by residing in Illinois for several months with his family and attending university there.[4]

"Freedom from imprisonment — from government custody, detention, or other forms of physical restraint — lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001); *see also Foucha v. Louisiana*, 504 U.S. 71, 80 (1992). This concept dates back to the Magna Carta, which guaranteed that "government would take neither life, liberty, nor property without a trial in accord with the law of the land." *Duncan v. Louisiana*, 391 U.S. 145, 169 (1968) (Black, J., concurring). The "law of the

---

[4]Hence, the case at hand involves — and we limit our analysis to — persons seized and detained within the United States who have constitutional rights under the Due Process Clause.

land" at its core provides that "no man's life, liberty or property be forfeited as a punishment until there has been a charge fairly made and fairly tried in a public tribunal." *In re Oliver*, 333 U.S. 257, 278 (1948). Thus, the Supreme Court has recognized that, because of the Due Process Clause, it "may freely be conceded" that as a "'general rule' . . . the government may not detain a person prior to a judgment of guilt in a criminal trial." *United States v. Salerno*, 481 U.S. 739, 749 (1987).

The Court, however, has permitted a limited number of specific exceptions to this general rule. Although some process is always required in order to detain an individual, in special situations detention based on process less than that attendant to a criminal conviction does not violate the Fifth Amendment. *See, e.g.*, *Kansas v. Hendricks*, 521 U.S. 346 (1997) (civil commitment of mentally ill sex offenders); *Salerno*, 481 U.S. 739 (pretrial detention of dangerous adults); *Schall v. Martin*, 467 U.S. 253 (1984) (pretrial detention of dangerous juveniles); *Addington v. Texas*, 441 U.S. 418 (1979) (civil commitment of mentally ill); *Humphrey v. Smith*, 336 U.S. 695 (1949) (courts martial of American soldiers). Among these recognized exceptions is the one on which the Government grounds its principal argument in this case: Congress may constitutionally authorize the President to order the military detention, without criminal process, of persons who "qualify as 'enemy combatants,'" that is, fit within that particular "legal category." *Hamdi*, 542 U.S. at 516, 522 n.1.[5]

---

[5]Case law also establishes that during times of war Congress may constitutionally authorize the President to detain "enemy aliens," also known as "alien enemies," defined as "subject[s] of a foreign state at war with the United States." *Johnson v. Eisentrager*, 339 U.S. 763, 769 n.2 (1950) (internal quotation marks omitted); *see Ludecke v. Watkins*, 335 U.S. 160 (1948). And the Government can detain potentially dangerous resident aliens for a limited time pending deportation. *See, e.g.*, *Carlson v. Landon*, 342 U.S. 524, 537-42 (1952); *cf. Zadvydas*, 533 U.S. 678 (construing a statute's authorization of post-removal-period detention not to permit indefinite detention of aliens in order to avoid serious doubt as to its constitutionality). But, as the Government recognizes, the Alien Enemy Act, the statute the Court considered in *Eisentrager* and *Ludecke*, does not apply to al-Marri's case. In fact, al-Marri is not an "enemy alien" but a citizen of Qatar, with which the United States has friendly diplomatic relations. The Government also does not seek to deport al-Marri. Therefore, neither of these exceptions is offered by the Government as a basis for holding al-Marri without criminal charge, and neither is applicable here.

The act of depriving a person of the liberty protected by our Constitution is a momentous one; thus, recognized exceptions to criminal process are narrow in scope and generally permit only limited periods of detention. *See, e.g.*, *Jackson v. Indiana*, 406 U.S. 715, 738 (1972). Moreover, regardless of possible "threat[s] to community safety" or "barriers to criminal prosecution," *post* at 146 (Wilkinson, J., concurring in part and dissenting in part), the Government can *never* invoke an exception, and so detain a person without criminal process, unless the individual fits within the narrow legal category of persons to whom the exception applies.[6] For example, the Supreme Court has held that the Constitution does not permit the Government to detain a predatory sex criminal through a civil commitment process simply by establishing that he is dangerous, i.e., a "threat to community safety." The civil commitment process may be substituted for criminal process only *if* the Government meets its statutory burden, that is, the Government demonstrates "proof of dangerousness" *and* "proof of some additional factor, such as a 'mental illness' or 'mental abnormality.'" *Hendricks*, 521 U.S. at 358.

In *Hamdi*, the plurality explained that precisely the same principles apply when the Government seeks to detain a person as an enemy

---

[6]Furthermore, the Supreme Court has never permitted an exception to criminal process merely on the basis of *judicial* fears as to "threat[s] to community safety" or "barriers to criminal prosecution." *See post* at 146 (Wilkinson, J., concurring in part and dissenting in part). Rather, the Court has permitted such exceptions only when a *legislative* body has explicitly authorized the exception. *See, e.g.*, *Salerno*, 481 U.S. 739 (Bail Reform Act of 1984); *Schall*, 467 U.S. 253 (New York Family Court Act); *Addington*, 441 U.S. 418 (Texas statute governing involuntary commitment on mental health grounds); *Hendricks*, 521 U.S. 346 (Kansas Sexually Violent Predator Act). Accordingly, it is hardly surprising that, despite the broad language of the AUMF, the Supreme Court in *Hamdi* found only that the statute provided congressional authorization for the military detention of an enemy combatant as that term is defined by traditional law-of-war principles. And, even more recently, in *Hamdan v. Rumsfeld*, 126 S. Ct. 2749, 2775 (2006), the Court expressly refused to read the broad language of the AUMF to "expand the President's authority to convene military commissions," instead finding that this authority was limited by traditional law-of-war principles "[a]bsent a more specific congressional authorization."

combatant. Under the habeas procedure prescribed in *Hamdi*, if the Government asserts an exception to the usual criminal process by detaining as an enemy combatant an individual with constitutional rights, it must proffer evidence to demonstrate that the individual "qualif[ies]" for this exceptional treatment. 542 U.S. at 516, 534. Only *after* the Government has "put[ ] forth credible evidence that" an individual "meets the enemy-combatant criteria" does "the onus" shift to the individual to demonstrate "that he falls outside the [enemy combatant] criteria." *Id.* at 534. For, in this country, the military cannot seize and indefinitely detain an individual — particularly when the sole process leading to his detention is a determination by the Executive that the detention is necessary[7] — unless the Government demonstrates that he "qualif[ies]" for this extraordinary treatment because he fits within the "legal category of enemy combatant." *Id.* at 516, 522 n.1.

Moreover, when the Government contends, as it does here, that an individual with constitutional rights is an enemy combatant and that such an individual's exclusive opportunity to escape indefinite military detention rests on overcoming presumptively accurate hearsay, courts must take particular care that the Government's allegations demonstrate that the detained individual is not a civilian, but instead, as the Supreme Court has explained, "meets the enemy-combatant criteria." *Id.* at 534. For only such care accords with the "deeply rooted and ancient opposition in this country to the extension of military control over civilians." *Reid v. Covert*, 354 U.S. 1, 33 (1957) (plurality).

These principles thus form the legal framework for consideration of the issues before us. Both parties recognize that it does not violate

---

[7]*Hamdi* recognizes that the sole process that the Government need provide in order to initially detain an enemy combatant is a presidential determination that the detention is necessary. 542 U.S. at 518. Of course, *Hamdi* also reaffirms that the writ of habeas corpus provides a remedy to challenge collaterally the legality of the ongoing detention. *Id.* at 525-26. Although the habeas remedy follows from the Suspension Clause, the *Hamdi* plurality borrowed the due process balancing approach from *Mathews v. Eldridge*, 424 U.S. 319 (1976), to design the specific requirements of this habeas remedy. *Hamdi*, 542 U.S. at 525-35.

the Due Process Clause for the President to order the military to seize and detain individuals who "qualify" as enemy combatants for the duration of a war. They disagree, however, as to whether the evidence the Government has proffered, even assuming its accuracy, establishes that al-Marri fits within the "legal category of enemy combatant." *Hamdi*, 542 U.S. at 522 n.1. The Government principally contends that its evidence establishes this, and therefore the AUMF grants the President *statutory* authority to detain al-Marri as an enemy combatant. Alternatively, the Government asserts that the President has inherent *constitutional* authority to order al-Marri's indefinite military detention. Al-Marri maintains that the proffered evidence does not establish that he fits within the "legal category of enemy combatant," *id.*, and so the AUMF does not authorize the President to order the military to seize and detain him, and that the President has no inherent constitutional authority to order this detention. We now turn to these contentions.

B.

The Government's primary argument is that the AUMF, as construed by precedent and considered against "the legal background against which [it] was enacted," i.e., constitutional and law-of-war principles, empowers the President to order the military to seize and detain al-Marri as an enemy combatant. The AUMF provides:

> [T]he President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

§ 2(a), 115 Stat. 224.[8] In considering the Government's AUMF argu-

---

[8]Although the Government asserts in a footnote that the Military Commissions Act (MCA) of 2006, Pub. L. No. 109-366, 120 Stat. 2600, "buttresses" the President's "inherent authority" to detain al-Marri, it does not assert that the MCA provides statutory authority to detain enemy comba-

ment, we first note the limits the Government places on its interpretation of this statute and then consider the Government's central contention.

1.

Tellingly, the Deputy Solicitor General conceded at oral argument before the *en banc* court that the AUMF only authorizes detention of enemy combatants. Thus, the Government does *not* argue that the broad language of the AUMF authorizes the President to subject to indefinite military detention anyone he believes to have aided any "nation[ ], organization[ ], or person[ ]" related to the September 11th attacks. *See* § 2(a), 115 Stat. 224. Such an interpretation would lead to absurd results that Congress could not have intended.

Under that reading of the AUMF, the President would be able to subject to indefinite military detention anyone, including an American citizen, whom the President believed was associated with any organization that the President believed in some way "planned, authorized, committed, or aided" the September 11th attacks, so long as the President believed this to be "necessary and appropriate" to prevent future acts of terrorism.

Under such an interpretation of the AUMF, if some money from a nonprofit charity that feeds Afghan orphans made its way to al Qaeda, the President could subject to indefinite military detention any donor to that charity. Similarly, this interpretation of the AUMF would allow the President to detain indefinitely any employee or

---

tants. Plainly, the MCA could not provide the Government with authority to subject al-Marri to indefinite military detention, since Congress did not enact the MCA until October 16, 2006, more than three years *after* the President ordered al-Marri's indefinite military detention. Moreover, the MCA addresses only whether a detained individual is an *unlawful* enemy combatant subject to military trial, pursuant to specific statutory procedures, not whether, in the first instance, an individual with constitutional rights seized in this country qualifies as an enemy combatant subject to indefinite military detention. *Accord post* at 183-184 n.9 (Wilkinson, J., concurring in part and dissenting in part).

shareholder of an American corporation that built equipment used by the September 11th terrorists; or allow the President to order the military seizure and detention of an American-citizen physician who treated a member of al Qaeda.

Moreover, at oral argument, the Deputy Solicitor General also explicitly and properly acknowledged that exercise of power under the AUMF must be consistent with the Constitution. But to read the AUMF to provide the President with the unlimited power outlined above would present serious constitutional questions. For the Supreme Court has long recognized that the Due Process Clause "cannot be . . . construed as to leave Congress free to make any process 'due process of law,' by its mere will." *See Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 276-77 (1855).

2.

The Government's arguments do not require us to deal with the absurd results, nor reach the constitutional concerns, raised by an interpretation of the AUMF that would authorize the President to detain indefinitely — without criminal charge or process — anyone he believes to have aided any "nation[ ], organization[ ], or person[ ]" related to the September 11th terrorists. *See* § 2(a), 115 Stat. 224. For the Government wisely limits its argument.[9] It relies only on the

---

[9]Chief Judge Williams and Judge Wilkinson each take a different approach; we address each of these approaches within. We note here, however, a basic inconsistency in both dissenters' reasoning. Both first heavily rely on the broad language of the AUMF as authorizing al-Marri's detention, but then explicitly recognize the difficulties with interpreting the statute to give effect to this broad language. Judge Williams dismisses the definition of enemy combatant under "the traditional 'law of war'" because, she contends, the AUMF "controls . . . for purposes of domestic law," but she then acknowledges that giving full force to that statute "might produce absurd results." *Post* at 117 & n.4. Judge Wilkinson goes even further. He initially points to the breadth of the AUMF language and chides us for refusing to give it full effect, *post* at 133-143, but ultimately he himself also refuses to give this language full effect. Rather, Judge Wilkinson properly recognizes the "constitutional limits on what Congress can authorize the executive to do," and given those limits,

scope of the AUMF as construed by precedent and considered in light of "the legal background against which [it] was enacted." Specifically, the Government contends that "[t]he Supreme Court's and this Court's prior construction of the AUMF govern this case and compel the conclusion that the President is authorized to detain al-Marri as an enemy combatant."

i.

The precedent interpreting the AUMF on which the Government relies for this argument consists of two cases: the Supreme Court's opinion in *Hamdi*, 542 U.S. 507, and our opinion in *Padilla v. Hanft*, 423 F.3d 386 (4th Cir. 2005).[10] The "legal background" for the AUMF, which the Government cites, consists of two cases from earlier conflicts, *Ex Parte Quirin*, 317 U.S. 1 (1942) (World War II), and *Ex Parte Milligan*, 71 U.S. (4 Wall.) 2 (1866) (U.S. Civil War), as well as constitutional and law-of-war principles.

With respect to the latter, we note that American courts have often been reluctant to follow international law in resolving domestic disputes. In the present context, however, they, like the Government here, have relied on the law of war — treaty obligations including the Hague and Geneva Conventions and customary principles developed alongside them. The law of war provides clear rules for determining an individual's status during an international armed conflict, distinguishing between "combatants" (members of a nation's military, militia, or other armed forces, and those who fight alongside them) and

---

he contends that to "qualify constitutionally" for treatment as an enemy combatant under the AUMF, an individual must fit within his three *newly created* criteria. *Post* at 156, 159-60. With these new criteria firmly in place, Judge Wilkinson maintains that our suggestion that the *actual* language of the AUMF would produce unconstitutional or absurd results, for example rendering donors to a nonprofit charity enemy combatants, is "beyond hyperbole." *Post* at 177.

[10]Of course, *Padilla* does not bind this court, but we consider it because the Government has heavily relied upon it, and it is in no way inconsistent with our conclusion that al-Marri is not an enemy combatant.

"civilians" (all other persons).[11] *See, e.g.*, Geneva Convention Relative to the Treatment of Prisoners of War (Third Geneva Convention) arts. 2, 4, 5, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135; Geneva Convention Relative to the Protection of Civilian Persons in Time of War (Fourth Geneva Convention) art. 4, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287. American courts have repeatedly looked to these careful distinctions made in the law of war in identifying which individuals fit within the "legal category" of "enemy combatant" under our Constitution. *See, e.g.*, *Hamdi*, 542 U.S. at 518; *Quirin*, 317 U.S. at 30-31 & n.7; *Milligan*, 71 U.S. at 121-22; *Padilla*, 423 F.3d at 391.

In the case at hand, the Government asserts that the construction given the AUMF in *Hamdi* and *Padilla* — based on these law-of-war principles — "compel[s] the conclusion that the President is authorized [by the AUMF] to detain al-Marri as an enemy combatant." In other words, the Government contends that al-Marri fits within the "legal category" of persons that the Supreme Court in *Hamdi*, and a panel of this court in *Padilla*, held the AUMF authorized the President to detain as enemy combatants. Thus, we examine those cases to determine whether the interpretation of the AUMF they adopt does indeed empower the President to treat al-Marri as an enemy combatant.

---

[11]Thus, "civilian" is a term of art in the law of war, not signifying an innocent person, but rather someone in a certain legal category who is *not* subject to *military* seizure or detention. So, too, a "combatant" is by no means always a wrongdoer, but rather a member of a different "legal category" who *is* subject to *military* seizure and detention. *Hamdi*, 542 U.S. at 522 n.1. For example, our brave soldiers fighting in Germany during World War II were "combatants" under the law of war, and viewed from Germany's perspective they were "enemy combatants." While civilians are subject to trial and punishment in civilian courts for all crimes committed during wartime in the country in which they are captured and held, combatant status protects an individual from trial and punishment by the capturing nation, unless the combatant has violated the law of war. *See id.* at 518; *Quirin*, 317 U.S. at 28-31. Nations in international conflicts can summarily remove the adversary's "combatants," i.e., the "enemy combatants," from the battlefield and detain them for the duration of such conflicts, but no such provision is made for "civilians." *Hamdi*, 542 U.S. at 518; *Quirin*, 317 U.S. at 28-31.

In *Hamdi*, the Supreme Court looked to precedent and the law of war to determine whether the AUMF authorized the President to detain as an enemy combatant an American citizen captured while engaging in battle against American and allied armed forces in Afghanistan as part of the Taliban. *See* 542 U.S. at 518-22. In support of that detention, the Government offered evidence that Yaser Esam Hamdi "affiliated with a Taliban military unit and received weapons training," "took up arms with the Taliban," "engaged in armed conflict against the United States" in Afghanistan, and, when captured on the battlefield, "surrender[ed] his Kalishnikov assault rifle." *Id.* at 510, 513, 516 (internal quotation marks omitted). Hamdi's detention was upheld because, in fighting against the United States on the battlefield in Afghanistan with the Taliban, the *de facto* government of Afghanistan at the time,[12] Hamdi bore arms with the army of an enemy nation and so, under the law of war, was an enemy combatant. *Id.* at 518-20.

The *Hamdi* Court expressly recognized that the AUMF did not explicitly provide for detention. *Id.* at 519; *see also id.* at 547 (Souter, J., concurring in part, dissenting in part, and concurring in the judgment). It concluded, however, "in light of" the law-of-war principles applicable to Hamdi's battlefield capture, that this was "of no moment" in the case before it. *Id.* at 519 (plurality). As the plurality explained, "[b]ecause detention to prevent a combatant's *return to the battlefield* is a fundamental incident of waging war, in permitting the use of 'necessary and appropriate force,' Congress has clearly and unmistakably authorized detention in the *narrow circumstances considered here*." *Id.* (emphasis added). Thus, the *Hamdi* Court reached the following limited holding: "the AUMF is explicit congressional authorization for the detention of individuals in the *narrow category*

---

[12]*See* White House Fact Sheet: Status of Detainees at Guantanamo (Feb. 7, 2002), http://www.pegc.us/archive/White_House/20020207_WH_POW_fact_sheet.txt; *see also* Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of International Armed Conflicts (Protocol I), June 8, 1977, arts. 43-44, 1125 U.N.T.S. 3 (defining combatants in conflicts between nations as members, other than chaplains and medical personnel, of "all organized armed forces, groups and units which are under a command responsible to that [nation] for the conduct of its subordinates").

we describe," that is, individuals who were "part of or supporting forces hostile to the United States or coalition partners in Afghanistan and who engaged in an armed conflict against the United States there." *Id.* at 516-17 (internal quotation marks omitted and emphasis added); *accord id.* at 587 (Thomas, J., dissenting). The plurality explained that its opinion "only finds legislative authority to detain under the AUMF once it is sufficiently clear that the individual *is*, in fact, an enemy combatant." *Id.* at 523 (emphasis added). The plurality also cautioned that "[i]f the practical circumstances of a given conflict" differed from those of the traditional conflicts that informed the law of war, the understanding that the AUMF authorizes detention "may unravel." *Id.* at 521.

In *Padilla*, a panel of this court similarly held that the AUMF authorized the President to detain as an enemy combatant an American citizen who "was armed and present in a combat zone" in Afghanistan as part of Taliban forces during the conflict there with the United States. 423 F.3d at 390-91 (internal quotation marks omitted). The Government had not been able to capture Jose Padilla until he came to the border of the United States, but, because the Government presented evidence that Padilla "took up arms against United States forces in [Afghanistan] in the same way and to the same extent as did Hamdi," we concluded that he "unquestionably qualifies as an 'enemy combatant' as that term was defined for the purposes of the controlling opinion in *Hamdi*." *Id.* at 391.[13] We too invoked the law of war, upholding Padilla's detention because we understood "the plurality's *reasoning* in *Hamdi* to be that the AUMF authorizes the President to

---

[13]Although our opinion discussed Padilla's association with al Qaeda, we *held* that Padilla was an enemy combatant because of his association with Taliban forces, i.e., Afghanistan government forces, on the battlefield in Afghanistan during the time of the conflict between the United States and Afghanistan. *Padilla*, 423 F.3d at 391. Al-Marri urges us to ignore *Padilla*, particularly in light of its subsequent history. *See Padilla v. Hanft*, 432 F.3d 582, 583 (4th Cir. 2005) (noting that the Government's transfer of Padilla to civilian custody for criminal trial after arguing before this court that he was an enemy combatant created "an appearance that the government may be attempting to avoid consideration of our decision by the Supreme Court"). That history is troubling, but we see no need to avoid *Padilla* since its narrow holding does not in any way conflict with our conclusion here.

detain all those who qualify as 'enemy combatants' within the meaning of the law of war." *Id.* at 392. We also noted that Padilla's detention, like Hamdi's, was permissible "'to prevent a *combatant's return to the battlefield . . .* a fundamental incident of waging war.'" *Id.* at 391 (emphasis added) (quoting *Hamdi*, 542 U.S. at 519).

Supreme Court precedent offered substantial support for the narrow rulings in *Hamdi* and *Padilla*. In *Quirin*, which the *Hamdi* plurality characterized as the "most apposite precedent," 542 U.S. at 523, the Supreme Court upheld the treatment, as enemy combatants, of men directed, outfitted, and paid by the German military to bring explosives into the United States to destroy American war industries during World War II. The *Quirin* Court concluded that even a petitioner claiming American citizenship had been properly classified as an enemy combatant because "[c]itizens who associate themselves with the military arm of the enemy government, and with its aid, guidance and direction enter this country bent on hostile acts, are enemy belligerents [combatants] within the meaning of . . . the law of war." 317 U.S. at 37-38. The Court cited the Hague Convention "which defines the persons to whom belligerent [i.e., combatant] rights and duties attach," *id.* at 30-31 n.7, in support of its conclusion that the *Quirin* petitioners qualified as enemy combatants. Given the "declaration of war between the United States and the German Reich," *id.* at 21, and that all the *Quirin* petitioners, including one who claimed American citizenship, were directed and paid by the "military arm" of the German Reich, the Court held that the law of war classified them as enemy belligerents (or combatants) and so the Constitution permitted subjecting them to military jurisdiction. *Id.* at 48.

*Hamdi* and *Padilla* ground their holdings on this central teaching from *Quirin*, i.e., enemy combatant status rests on an individual's affiliation during wartime with the "military arm of the enemy government." *Quirin*, 317 U.S. at 37-38; *Hamdi*, 542 U.S. at 519; *Padilla*, 423 F.3d at 391. In *Quirin*, that enemy government was the German Reich; in *Hamdi* and *Padilla*, it was the Taliban government of Afghanistan.

*Hamdi* and *Padilla* also rely on this principle from *Quirin* to distinguish (but not disavow) *Milligan*. In *Milligan*, the Court rejected the Government's impassioned contention that a presidential order and

the "laws and usages of war," 71 U.S. at 121-22, justified exercising military jurisdiction over Lamdin Milligan, an Indiana resident, during the Civil War. The Government alleged that Milligan had communicated with the enemy, had conspired to "seize munitions of war," and had "join[ed] and aid[ed] . . . a secret" enemy organization "for the purpose of overthrowing the Government and duly constituted authorities of the United States." *Id.* at 6. The Court recognized that Milligan had committed "an enormous crime" during "a period of war" and at a place "within . . . the theatre of military operations, and which had been and was constantly threatened to be invaded by the enemy." *Id.* at 7, 130. But it found no support in the "laws and usages of war" for subjecting Milligan to military jurisdiction as a combatant, for although he was a "dangerous enem[y]" of the nation, he was a civilian and had to be treated as such. *Id.* at 121-22, 130.

*Quirin*, *Hamdi*, and *Padilla* all emphasize that *Milligan*'s teaching — that our Constitution does not permit the Government to subject *civilians* within the United States to military jurisdiction — remains good law. The *Quirin* Court explained that while the petitioners before it were affiliated with the armed forces of an enemy nation and so were enemy belligerents, Milligan was a "non-belligerent" and so "not subject to the law of war." 317 U.S. at 45. The *Hamdi* plurality similarly took care to note that *Milligan* "turned in large part on the fact that Milligan was not a prisoner of war" (i.e., combatant) and suggested that "[h]ad Milligan been captured while he was assisting Confederate soldiers by carrying a rifle against Union troops on a Confederate battlefield, the holding of the Court might well have been different." 542 U.S. at 522. And in *Padilla*, we reaffirmed that "*Milligan* does not extend to enemy combatants" and so "is inapposite here because Padilla, unlike Milligan, associated with, and has taken up arms against the forces of the United States on behalf of, an enemy of the United States." 423 F.3d at 396-97. Thus, although *Hamdi*, *Quirin*, and *Padilla* distinguish *Milligan*, they recognize that its core holding remains the law of the land. That is, civilians within this country (even "dangerous enemies" like Milligan who perpetrate "enormous crime[s]" on behalf of "secret" enemy organizations bent on "overthrowing the Government" of this country) may not be sub-

jected to military control and deprived of constitutional rights. *Milligan*, 71 U.S. at 6, 130.[14]

In sum, the holdings of *Hamdi* and *Padilla* share two characteristics: (1) they look to law-of-war principles to determine who fits within the "legal category" of enemy combatant; and (2) following the law of war, they rest enemy combatant status on affiliation with the military arm of an enemy nation.

---

[14]Because of this important principle, the Supreme Court has hailed *Milligan* as "one of the great landmarks in th[e] Court's history." *Reid*, 354 U.S. at 30. Although in its appellate brief the Government largely avoids *Milligan*, it implicitly acknowledges this point and so attempts to distinguish *Milligan* from the case at hand on the ground that Milligan was a citizen and al-Marri an alien. In some circumstances, the Constitution does afford aliens less protection than citizens. *See, e.g.*, *Hamdi*, 542 U.S. at 558-59 (Scalia, J., dissenting) (suggesting that during war the constitutional rights of an "enemy alien," whom the Supreme Court has defined as a "subject of a foreign state at war with the United States," *Eisentrager*, 339 U.S. at 769 n.2 (internal quotation marks omitted), differ from those of a treasonous citizen); *Verdugo-Urquidez*, 494 U.S. at 274-75 (holding that the Fourth Amendment does not apply to searches by United States agents of property owned by aliens *in* foreign countries). But the distinction between citizens and aliens provides no basis for depriving an alien like al-Marri, lawfully resident within the United States and not the subject of an enemy nation, of those rights guaranteed by the Due Process Clause. Rather, the Supreme Court has repeatedly held that aliens situated like al-Marri have an unquestioned right to the due process of law. *See Sanchez-Llamas*, 126 S. Ct. at 2681-82; *Zadvydas*, 533 U.S. at 693; *Wong Wing*, 163 U.S. at 238; *see also Verdugo-Urquidez*, 494 U.S. at 271; 494 U.S. at 278 (Kennedy, J., concurring) (observing that "[a]ll would agree . . . that the dictates of the Due Process Clause of the Fifth Amendment protect" an alien lawfully within the United States). The Government does not dispute or distinguish these cases in its appellate brief; it simply ignores them. At oral argument before the *en banc* court, however, the Government finally acknowledged that an alien legally resident in the United States, like al-Marri, has the same Fifth Amendment due process rights as an American citizen. For this reason, the Government had to concede that if al-Marri can be detained as an enemy combatant, then the Government can also detain any American citizen on the same showing and through the same process.

ii.

In view of the holdings in *Hamdi* and *Padilla*, we find it remarkable that the Government contends that they "compel the conclusion" that the President may detain al-Marri as an enemy combatant. For unlike Hamdi and Padilla, al-Marri is not alleged to have been part of a Taliban unit, not alleged to have stood alongside the Taliban or the armed forces of any other enemy nation, not alleged to have been on the battlefield during the war in Afghanistan, not alleged to have even been in Afghanistan during the armed conflict there, and not alleged to have engaged in combat with United States forces anywhere in the world. *See* Rapp Declaration (alleging none of these facts, but instead that "[a]l-Marri engaged in conduct in preparation for acts of international terrorism intended to cause injury or adverse effects on the United States"). Indeed, unlike Hamdi and Padilla, al-Marri had been imprisoned in the United States by civil authorities on criminal charges for more than a year before being seized by the military and indefinitely confined in a Navy brig as an enemy combatant.

In place of the "classic wartime detention" that the Government argued justified Hamdi's detention as an enemy combatant, *see* Br. of Respondents at 20-21, 27, *Hamdi*, 542 U.S. 507 (No. 03-6696), or the "classic battlefield" detention it maintained justified Padilla's, *see* Opening Br. for the Appellant at 16, 20, 29, 51, *Padilla*, 432 F.3d 386 (No. 05-6396), here the Government argues that al-Marri's seizure and indefinite detention by the military in this country are justified "because he engaged in, and continues to pose a very real threat of carrying out, . . . acts of international terrorism." And instead of seeking judicial deference to decisions of "military officers who are engaged in the serious work of waging battle," *Hamdi*, 542 U.S. at 531-32, the Government asks us to defer to the "multi-agency evaluation process" of government bureaucrats in Washington made eighteen months after al-Marri was taken into custody. Neither the holding in *Hamdi* nor that in *Padilla* supports the Government's contentions here.

In arguing to the contrary, the Government confuses certain secondary arguments it advanced in *Hamdi* and *Padilla* with the actual holdings in those cases. As discussed above, both *Hamdi* and *Padilla* upheld the President's authority pursuant to the AUMF to detain as

enemy combatants individuals (1) who affiliated with and fought on behalf of Taliban government forces, (2) against the armed forces of the United States and its allies, (3) on the battlefield in Afghanistan. In both cases, however, the Government also contended that the AUMF provided the President with even broader authority to subject to military detention, as enemy combatants, persons otherwise involved "in the global armed conflict against the al Qaeda terrorist network." Br. of Respondents at 20-21, *Hamdi*, 542 U.S. 507 (No. 03-6996); *see* Opening Br. for the Appellant at 17-18, *Padilla*, 423 F.3d 386 (No. 05-6396).

But neither the Supreme Court in *Hamdi*, nor this court in *Padilla*, accepted the Government's invitation to fashion such a broad construction of the AUMF. Instead, the *Hamdi* plurality emphasized the narrowness of its holding, 542 U.S. at 509, 516-19, and the "limited category" of individuals controlled by that holding, *id.* at 518. In *Padilla*, we similarly saw no need to embrace a broader construction of the AUMF than that adopted by the Supreme Court in *Hamdi*. Indeed, the Government itself *principally* argued that Padilla was an enemy combatant because he, like Hamdi, "engaged in armed conflict" alongside the Taliban "against our forces in Afghanistan." *See* Opening Br. for the Appellant at 22-23, 27, *Padilla*, 423 F.3d 386 (No. 05-6396).[15]

---

[15]In doing so, the Government acknowledged, Opening Br. for the Appellant at 29-30, *Padilla*, 423 F.3d 386 (No. 05-6396), our distinguished colleague Judge Wilkinson's statement that "[t]o compare [Hamdi's] battlefield capture to the domestic arrest in *Padilla v. Rumsfeld* is to compare apples and oranges," *Hamdi v. Rumsfeld*, 337 F.3d 335, 344 (4th Cir. 2003) (Wilkinson, J., concurring in the denial of rehearing *en banc*), but explained that Judge Wilkinson's observation came *before* the Government had proffered any evidence that Padilla had carried arms alongside the Taliban against United States armed forces during the conflict in Afghanistan. In other words, at the time Judge Wilkinson differentiated Hamdi from Padilla, the Government's allegations against Padilla mirrored its allegations against al-Marri here — that he had associated with al Qaeda and engaged in conduct in preparation for acts of terrorism. We agree with Judge Wilkinson's characterization: to compare Hamdi's battlefield capture to the domestic arrest of al-Marri is indeed "to compare apples and oranges." *Id.*

Thus, the Government is mistaken in its representation that *Hamdi* and *Padilla* "recognized" "[t]he President's authority to detain 'enemy combatants' during the current conflict with al Qaeda." *Hamdi* and *Padilla* evidence no sympathy for the view that the AUMF permits indefinite military detention beyond the "limited category" of people covered by the "narrow circumstances" of those cases. *Hamdi*, 542 U.S. at 516-19. Therefore the Government's argument — that *Hamdi* and *Padilla* "compels the conclusion" that the AUMF authorizes the President "to detain al-Marri as an enemy combatant" — fails. *Accord post* at 73 (Traxler, J., concurring in the judgment).

3.

The Government offers no other legal precedent, rationale, or authority justifying its position that the AUMF empowers the President to detain al-Marri as an enemy combatant; indeed, at oral argument before the *en banc* court, the Government repeatedly emphasized that it argued only that al-Marri may be detained under the AUMF because he is an enemy combatant under established law-of-war principles explicated in *Quirin* and other precedent. Our dissenting colleagues go further, however. They contend that the definition of enemy combatant has somehow expanded to permit a person to be so classified because of his criminal conduct on behalf of a terrorist organization. We have searched extensively for authority that would support the dissents' position; we have found none.

i.

First, the Supreme Court's most recent terrorism cases — *Hamdan* and *Boumediene* — provide no support for the dissenters' position. In *Hamdan*, the Court held that because the conflict between the United States and al Qaeda in Afghanistan is not "between nations," it is a "'conflict not of an international character'" — and so is governed by Common Article 3 of the Geneva Conventions. *See* 126 S. Ct. at 2795; *see also id.* at 2802 (Kennedy, J., concurring).

Common Article 3 and other Geneva Convention provisions applying to non-international conflicts (in contrast to those applying to international conflicts) simply do *not* recognize the "legal category" of enemy combatant. *See* Third Geneva Convention, art. 3, 6 U.S.T.

at 3318. As the International Committee of the Red Cross — the official codifier of the Geneva Conventions — explains, "an 'enemy combatant' is a person who, either lawfully or unlawfully, engages in hostilities for the opposing side in an *international* armed conflict"; in contrast, "[i]n non-international armed conflict combatant status *does not exist*." Int'l Comm. of the Red Cross, Official Statement: The Relevance of IHL in the Context of Terrorism, at 1, 3 (Feb. 21, 2005), http://www.icrc.org/Web/Eng/siteeng0.nsf/htmlall/terrorism-ihl-210705 (emphasis added).[16]

Perhaps for this reason, our dissenting colleagues and the Government ignore *Hamdan*'s holding that the conflict with al Qaeda in Afghanistan is a non-international conflict and ignore the fact that, in such conflicts, the legal category of enemy combatant does not exist. Indeed, the Government's sole acknowledgment of *Hamdan* is a short footnote in its appellate brief, in which it asserts that "the Court took it as a given that Hamdan was subject to detention as an enemy combatant during ongoing hostilities." The weakness of this response is apparent. Not only does it avoid the holding in *Hamdan* that the conflict between the United States and al Qaeda is a non-international

_____

[16]Notwithstanding this principle, we recognize that some commentators have suggested that "for such time as they take a *direct* part in hostilities," participants in non-international armed conflicts may, as a matter of customary international law, be placed in the formal legal category of enemy combatant. *See, e.g.*, Curtis A. Bradley & Jack L. Goldsmith, *Congressional Authorization and the War on Terrorism*, 118 Harv. L. Rev. 2047, 2115 & n.304 (2005) [hereinafter Bradley & Goldsmith] (internal quotation marks omitted). No precedent from the Supreme Court or this court endorses this view, and the Government itself has *not* advanced such an argument. This may be because even were a court to follow this approach in *some* cases, it would not assist the Government here. For the Government has proffered no evidence that al-Marri has taken a "*direct* part in hostilities." Moreover, the United States has elsewhere adopted a formal treaty understanding of the meaning of the term "direct part in hostilities," which plainly excludes al-Marri. *See* Message from the President of the United States Transmitting Two Optional Protocols to the Convention on the Rights of the Child, S. Treaty Doc. No. 106-37, at VII (2000) (distinguishing between "immediate and actual action on the battlefield" and "indirect participation," including gathering and transmitting military information, weapons, and supplies).

conflict, but also it improperly suggests that the Supreme Court approved Hamdan's detention when the legality of that detention was not before the Court.

In fact, two years after *Hamdan* issued, the Court once again declined to resolve this very issue — the legality of the detention of those captured and detained in the conflict with al Qaeda *outside* the United States. *See Boumediene*, 553 U.S. at ___, slip op. at 2 (expressly noting that the Court does "not address whether the President has authority to detain these petitioners" and that "questions regarding the legality of the detention are to be resolved in the first instance by the District Court"). Furthermore, in *Boumediene*, the Court demonstrated no more sympathy for the Government's position than it had in any of the other recent terrorism cases. Rather, the Court expressly held that persons designated by the Executive "as enemy combatants" and held by United States forces at Guantanamo Bay must be afforded "the fundamental procedural protections of habeas corpus" guaranteed by our Constitution, even though they were foreign nationals who had been seized in foreign lands. *Id.* at ___, slip op. at 8, 70. The Court explained that "[t]he laws and Constitution are designed to survive, and remain in force, in extraordinary times." *Id.* at ___, slip op. at 70.

Moreover, even were the Supreme Court ultimately to approve the detention of Boumediene, Hamdan, and those like them, that would not bolster the view that the Government can militarily detain al-Marri as an enemy combatant.[17] Because the legal status of enemy

---

[17]The Supreme Court did not hold in *Boumediene* or *Hamdan* that there is a non-international armed conflict between the United States and al Qaeda *within the United States*. Non-international conflicts "occur[ ] in the territory of *one* of the High Contracting Parties," *Hamdan*, 126 S. Ct. at 2795 (emphasis added) (quoting Third Geneva Convention, 6 U.S.T. at 3318) — and *Hamdan* only found there to be a conflict between the United States and al Qaeda *in Afghanistan*. Of course, al-Marri is not a participant in any conflict involving the United States in Afghanistan. Although the Government alleges that al-Marri attended an al Qaeda training camp in Afghanistan years before September 11th, it has proffered no evidence that al-Marri was involved in the conflict between the United States and al Qaeda *in Afghanistan* — nor could it, for al-Marri has not been in Afghanistan at any point during that conflict.

combatant does not exist in non-international conflicts, the law of war leaves the detention of persons in such conflicts to the applicable law of the detaining country. In al-Marri's case, the applicable law is our Constitution. Under our Constitution, even if the Supreme Court should hold that the Government may detain indefinitely Boumediene, Hamdan, and others like them, who were captured *outside* the United States and lack substantial and voluntary connections to this country, that holding would provide no support for approving al-Marri's military detention. For not only was al-Marri seized and detained *within* the United States, he also has substantial connections to the United States and so plainly is protected by the Due Process Clause. *See Wong Wing*, 163 U.S. at 238; *see also Verdugo-Urquidez*, 494 U.S. at 271.

ii.

Other Supreme Court precedent similarly offers no support for the position that persons lawfully resident in this country entitled to the protections of our Constitution — even ordinary American citizens — can lose their civilian status and become enemy combatants if they have allegedly engaged in criminal conduct on behalf of, or associated with, an organization seeking to harm the United States. Of course, a person who commits a crime should be punished, but when a civilian protected by the Due Process Clause commits a crime, he is subject to charge, trial, and punishment in a civilian court, *not* to seizure and confinement by military authorities.

We recognize the understandable instincts of those who wish to treat domestic terrorists as "combatants" in a "global war on terror." Allegations of criminal activity in association with a terrorist organization, however, do not permit the Government to transform a civilian into an enemy combatant subject to indefinite military detention, just as allegations of murder in association with others while in military service do not permit the Government to transform a civilian into a soldier subject to trial by court martial. *See United States ex rel. Toth v. Quarles*, 350 U.S. 11, 23 (1955) (holding that ex-servicemen, "like other civilians, are entitled to have the benefit of safeguards afforded those tried in the regular courts authorized by Article III of the Constitution").

To be sure, enemy combatants may commit crimes just as civilians may. When an enemy combatant violates the law of war, that conduct will render the person an "unlawful" enemy combatant, subject not only to detention but also to military trial and punishment. *Quirin*, 317 U.S. at 31. But merely engaging in unlawful behavior does not make one an enemy combatant. *Quirin* illustrates these distinctions well. The *Quirin* petitioners were first enemy combatants — associating themselves with the military arm of the German government with which the United States was at war. They became *unlawful* enemy combatants when they violated the law of war by "without uniform com[ing] secretly through the lines for the purpose of waging war." *Id.* By doing so, in addition to being subject to military detention for the duration of the conflict as enemy combatants, they also became "subject to trial and punishment by military tribunals for acts which render their belligerency illegal." *Id.* Had the *Quirin* petitioners never "secretly and without uniform" passed our "military lines," *id.*, they still would have been enemy combatants, subject to military detention, but would not have been *unlawful* enemy combatants subject to military trial and punishment.

Neither *Quirin* nor any other precedent even suggests, as our dissenting colleagues seem to believe, that individuals with constitutional rights, unaffiliated with the military arm of any enemy government, can be subjected to military jurisdiction and deprived of those rights solely on the basis of their conduct on behalf of a terrorist organization.[18] In fact, *Milligan* rejected the Government's attempt to

---

[18]The distinction between organizations and nations is not without rationale. The law of war does not classify persons affiliated with terrorist organizations as enemy combatants for fear that doing so would immunize them from prosecution and punishment by civilian authorities in the capturing country. *See, e.g.*, Message from the President of the United States Transmitting the Protocol II Additional to the 1949 Geneva Conventions, and Relating to the Protection of Victims of Noninternational Armed Conflicts, S. Treaty Doc. No. 100-2, at IV (1987) (explaining President Reagan's recommendation against ratifying a treaty provision that "would grant combatant status to irregular forces" and so "give recognition and protection to terrorist groups").

Moreover, a rule permitting indefinite military detention of members of a "terrorist" organization as enemy combatants, in addition to being

do just this. There, the Court acknowledged that Milligan's conduct — "joining and aiding" a "secret political organization, armed to oppose the laws, and seek[ing] by stealthy means to introduce the enemies of the country into peaceful communities, there to . . . overthrow the power of the United States" — made him and his co-conspirators "dangerous enemies to their country." 71 U.S. at 6, 130. But the Government did not allege that Milligan took orders from any enemy government or took up arms against this country on the battle-field. And so the Court held that the Government could not subject Milligan to trial by military tribunal or treat him as an enemy comba-tant subject to military detention as a prisoner of war. Milligan was an "enem[y] of the country" and associated with an organization seek-ing to "overthrow[ ] the Government" of this country, but he was still a civilian and had to be treated as one. *Id.*

Although *Milligan* involved a time in which our democracy was much younger, it dealt with a war fully as threatening to our country as any present conflict. *See id.* at 88 (noting the Government's argu-ment that Milligan's military detention must be permitted because "the facts are unprecedented" as is "the war out of which they grew"). Today, the Government contends that the fate of our nation requires the military detention of al-Marri and others lawfully resident in this country because of their membership in a terrorist organization. A

---

contrary to controlling precedent, *Milligan*, 71 U.S. at 130, could well endanger citizens of this country or our allies. For example, a nation could employ this rule to treat American members of an environmental group, which it regards as a terrorist organization, as enemy combatants and so subject those Americans to indefinite military detention. Under definitions as nebulous as the ones proposed by our dissenting col-leagues, these fears are hardly "completely unfounded." *See post* at 177 (Wilkinson, J., concurring in part and dissenting in part). Foreign leaders who have already designated members of these environmental organiza-tions "terrorists" might well, applying the dissents' definitions, conclude that those individuals are enemy combatants and thus detain them indefi-nitely without criminal process. *See* Hiroko Tabuchi, *Japanese Are Hunt-ing Humpbacks*, Record (N.N.J.), Nov. 18, 2007, at A10 (reporting that some Japanese leaders regard activists for Greenpeace, an organization with 2.8 million members, as terrorists); Amanda Hodge, *Japan Warship "Sent to Help Whalers"*, Australian, Jan. 2, 2006, at 3 (same).

century ago, the Government similarly contended that the military detention of Milligan and other members of the Sons of Liberty lawfully resident in this country was necessary to "save the nation" from the terrorist plots of the "one hundred thousand men enrolled in" that organization. *Id.* at 102, 104. Thus *Milligan*, "one of [the Court's] great landmarks," *Reid*, 354 U.S. at 30, firmly and clearly rejected the argument the Government asserts here. The weakness of the dissents' brief attempts to distinguish *Milligan* attests to the strength of the precedent. (The concurrence does not even attempt a distinction.)

First, one of our dissenting colleagues maintains that "reliance on *Milligan*" is "misplaced" because its principles "apply only *after* it has been determined" that an individual "is a civilian, not a combatant." *Post* at 182-83 (Wilkinson, J., concurring in part and dissenting in part); *see also post* at 140. This contention ignores the *Milligan* Court's express rejection of the Government's argument that Milligan, even if not subject to military trial, could be held by the military as a prisoner of war during the duration of hostilities. *See Milligan*, 71 U.S. at 131. As the *Hamdi* plurality noted, that Milligan was not a combatant and therefore not a prisoner of war was "central to" the *Milligan* holding. 542 U.S. at 522 (noting if "Milligan [had] been captured while . . . assisting Confederate soldiers by carrying a rifle against Union troops on a Confederate battlefield, the holding of the Court might well have been different"). Thus, reliance on *Milligan* is hardly "misplaced": there, the Supreme Court unequivocally rebuffed an argument precisely parallel to the one the Government makes here — that an unarmed civilian captured in his home in the United States, rather than while "carrying a rifle . . . on a . . . battlefield," could be "detained under military authority for the duration of the conflict." *See id.*

Second, and equally unconvincing, the dissenters apparently believe that the enactment of the AUMF makes Milligan's case distinguishable from al-Marri's. *See post* at 117 (Williams, C.J., concurring in part and dissenting in part) (acknowledging that *Milligan* governs the rights of civilians but nevertheless finding that the AUMF permits the President to declare al-Marri an enemy combatant); *post* at 140 (Wilkinson, J., concurring in part and dissenting in part) (asserting that because Congress did not authorize use of military force against "the Sons of Liberty, Milligan's organization," but did, in the AUMF,

authorize the use of force against "al Qaeda, al-Marri's organization," *Milligan*'s "constitutional force" does not apply). This argument clearly fails, too, for, as we discuss in detail in the following section, it misreads the AUMF. As the Government expressly conceded at oral argument, the AUMF authorizes the detention of *only* enemy combatants. The AUMF does *not* purport to alter the definition of enemy combatant and so provides no basis for distinguishing al-Marri from Milligan or determining that al-Marri or anyone else "plainly qualifies" as an enemy combatant. *Post* at 140 (Wilkinson, J., concurring in part and dissenting in part).

In sum, the dissents have not — and cannot — distinguish *Milligan*. The Government's allegations against Milligan mirror the Government's allegations against al-Marri. If the Government's allegations here are true, like Milligan, al-Marri is deplorable, criminal, and dangerous, but, like Milligan, he is a civilian nonetheless and must be treated as one — for Congress certainly has not directed otherwise. Thus, we believe that the indefinite detention of al-Marri must cease.[19]

---

[19]We note that the Government's treatment of al-Marri, i.e., subjecting him to military detention, which the Government insists "is not 'punishment,'" is at odds with the Government's repeated recognition that criminal terrorist conduct by aliens *in this country* merits punishment by a civilian court, not indefinite military detention as an enemy combatant. *See, e.g.*, *United States v. Abdi*, 463 F.3d 547, 550 (6th Cir. 2006) (civilian prosecution of suspected al Qaeda terrorist who allegedly "indicated a desire to 'shoot up' a Columbus shopping mall with an AK-47"); *United States v. Moussaoui*, 382 F.3d 453 (4th Cir. 2004) (civilian prosecution of al Qaeda conspirator involved in the September 11th attacks); *United States v. Reid*, 369 F.3d 619, 619-20 (1st Cir. 2004) (civilian prosecution of terrorist allied with Bin Laden who attempted to destroy airplane with explosives); *United States v. Goba*, 240 F. Supp. 2d 242, 244 (W.D.N.Y. 2003) (civilian prosecution of associates of al Qaeda, including those who met with Bin Laden and trained in terrorist camps in Afghanistan). And after long contending he was an enemy combatant, the Government ultimately prosecuted even Jose Padilla in civilian court for his crimes. This practice is hardly new. Even the civilian co-conspirators of the *Quirin* petitioners were tried for their crimes in civilian courts. *See Cramer v. United States*, 325 U.S. 1 (1945); *United States v. Haupt*, 136 F.2d 661 (7th Cir. 1943).

iii.

Moreover, the AUMF does not assist our dissenting colleagues. The AUMF clearly states that it is "intended to constitute specific statutory authorization within the meaning of section 5(b) of the War Powers Resolution." § 2(b), 115 Stat. 224. And under the War Powers Resolution, such statutory authorization permits the President to "exercise[ ]" his powers "as Commander-in-Chief to introduce United States Armed Forces into hostilities" and to remain engaged in such hostilities for longer than sixty days. 50 U.S.C.A. §§ 1541(c), 1544(b) (West 2003). Thus, to say that Congress did not have a dramatic

---

The Government's treatment of others renders its decision to halt al-Marri's criminal prosecution — on the eve of a pre-trial hearing on a suppression motion — puzzling at best. Al-Marri contends that the Government has subjected him to indefinite military detention, rather than see his criminal prosecution to the end, in order to interrogate him without the strictures of criminal process. We trust that this is not so, for such a stratagem would contravene *Hamdi*'s injunction that "indefinite detention for the purpose of interrogation is not authorized." 542 U.S. at 521. We note, however, that not only has the Government offered no other explanation for abandoning al-Marri's prosecution, it has even propounded an affidavit in support of al-Marri's continued military detention, stating that he "possesses information of high intelligence value." *See* Rapp Declaration. Moreover, former Attorney General John Ashcroft has explained that the Government decided to declare al-Marri an enemy combatant only after he became a "hard case" by "reject[ing] numerous offers to improve his lot by . . . providing information." John Ashcroft, *Never Again: Securing America and Restoring Justice* 168-69 (2006). The Government's recent admission in other litigation that it has subjected al-Marri to repeated interrogation during his imprisonment in the Naval Brig would seem to substantiate al-Marri's contention. *See* Decl. of Robert H. Berry, Jr., Defense Intelligence Agency, ¶¶ 8, 9, Ex. 2 in Def.'s Resp. to Pl.'s Mot. for Preservation Order and Inquiry into Spoliation of Evidence, *Al-Marri v. Gates*, No. 2:05-cv-02259-HFF-RSC (D.S.C. Apr. 30, 2008) (stating that, although "a number of recordings of the Al-Marri interrogation sessions . . . were destroyed during the time period between December 1, 2004, and March 31, 2005," "subsequent investigation revealed . . . original or duplicate recordings of nine interrogation sessions").

expansion of the Executive's military detention power in mind when it passed the AUMF is *not* "to say that Congress had very little in mind at all." *Post* at 136 (Wilkinson, J., concurring in part and dissenting in part). Rather, it is to say that in the AUMF, as in other general authorizations for the use of force passed pursuant to the War Powers Resolution, Congress intended to provide the statutory authorization that it insists is required before the President may engage the United States Armed Forces in extended hostilities abroad.

At least some of our dissenting colleagues, however, apparently believe that enactment of the AUMF not only "activated the President's war powers," *Hamdan*, 126 S. Ct. at 2775, but also substantially expanded and redefined the legal category of enemy combatant. They are wrong. Plainly, the AUMF is not "a specific and targeted congressional directive" aimed at which individuals "may be detained[ ] for purposes of domestic law." *Post* at 116 (Williams, C.J., concurring in part and dissenting in part). Rather, precisely because the AUMF contains only a broad grant of war powers and lacks any specific language authorizing detention, the *Hamdi* plurality explained that its opinion "only finds legislative authority to detain under the AUMF once it is sufficiently clear that the individual *is*, in fact, an enemy combatant." 542 U.S. at 523 (emphasis added). Although the military detention of enemy combatants like Hamdi is certainly "a fundamental incident of waging war," *id.* at 519, the military detention of civilians like al-Marri just as certainly is not.

Even assuming the Constitution permitted Congress to grant the President such an awesome and unprecedented power, if Congress intended to grant this authority, it could and would have said so explicitly. The AUMF lacks the particularly clear statement from Congress that would, at a minimum, be necessary to authorize the indefinite military detention of *civilians* as enemy combatants. *See, e.g.*, *Greene v. McElroy*, 360 U.S. 474, 508 (1959) (rejecting Government argument that executive orders and statutes permitted deprivation of liberty rights absent "explicit authorization"); *Duncan v. Kahanamoku*, 327 U.S. 304, 324 (1946) (rejecting Government argument that statute authorized trial of civilians by military tribunals because Congress could not have intended "to exceed the boundaries between military and civilian power, in which our people have always believed"); *Ex Parte Endo*, 323 U.S. 283, 300 (1944) (rejecting Gov-

ernment argument that a "wartime" executive order and statute permitted detention of citizen of Japanese heritage when neither "use[d] the language of detention"); *Brown v. United States*, 12 U.S. (8 Cranch) 110, 128-29 (1814) (rejecting Government argument that declaration of war authorized confiscation of enemy property because it did not clearly "declare[ ]" the legislature's "will"). We are exceedingly reluctant to infer a grant of authority that is so far afield from anything recognized by precedent or law-of-war principles, especially given the serious constitutional concerns it would raise.

Additionally, nothing in the legislative history of the AUMF supports the view that Congress intended the AUMF to provide the President with the unprecedented power claimed here.[20] In fact, the legislative history suggests just the opposite — that in the AUMF Congress intended neither to expand the definition of enemy combatant to include civilians nor to authorize the military seizure and detention of civilians within the United States. Senator Daschle has recounted that "[l]iterally minutes before the Senate cast its vote" on the AUMF, "the administration sought to add the words 'in the United States and' after 'appropriate force' in the agreed-upon text" to give "the President broad authority to exercise expansive powers not just overseas — where we all understood he wanted authority to act — but right here in the United States, potentially against American citizens." Tom Daschle, Editorial, *Power We Didn't Grant*, Wash. Post, Dec. 23, 2005, at A21. The Senate refused to "accede to this extraordinary request for additional authority." *Id.*; *see also Wartime Executive*

---

[20]Judge Wilkinson challenges our reliance on legislative history. *Post* at 138-39. But none of our conclusions rests solely, or even principally, on analysis of the legislative history of the AUMF and the Patriot Act. We fully recognize that several of the statements to which we cite were made after the enactment of those statutes. But these statements — both those made contemporaneously and those made after the fact — do nevertheless provide further evidence regarding the limited scope of the AUMF. *See Boumediene*, 553 U.S. at ___, slip op. at 8 (approving as "correct" reliance on "legislative history when construing" a related statute, the MCA). Moreover, we cannot help but observe that although Judge Wilkinson criticizes us for relying on comments from the "distinguished members of the legislative branch," *post* at 139, he himself relies extensively on comments of those much further removed from the legislative process — distinguished legal academics.

*Power and the National Security Agency's Surveillance Authority: Hearings Before the S. Comm. on the Judiciary*, 109th Cong. 126 (2006) (statement of Sen. Specter, Chairman, S. Comm. on the Judiciary) ("[The proposal to add 'in the United States'] was rejected since it would give the President broad authority not just overseas, but also in the United States."). The congressional debates on the AUMF similarly indicate that key members of Congress believed that the AUMF *only* authorized the use of miliary force abroad, not within the United States. *See, e.g.*, 147 Cong. Rec. 17,047 (2001) (statement of Sen. Biden) ("In extending this broad authority to cover those 'planning, authorizing, committing, or aiding the attacks' it should go without saying, however, that the resolution is directed only at using force *abroad* to combat acts of international terrorism." (emphasis added)); 147 Cong. Rec. 17,111 (2001) (statement of Rep. Lantos) ("The resolution before us empowers the President to bring to bear the full force of American power *abroad* in our struggle against the scourge of international terrorism." (emphasis added)).

Furthermore, the day after Congress enacted the AUMF, it began consideration of another statute, which it enacted a few weeks later, that did explicitly authorize the President to arrest and detain "terrorist aliens" living within the United States believed to have come here to perpetrate acts of terrorism. *See* Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 [hereinafter Patriot Act].[21] However, the Patriot Act only authorizes

---

[21]The legislative history of the Patriot Act (originally titled the Anti-Terrorism Act of 2001) indicates that the Administration initially requested the power to indefinitely detain "terrorist aliens" within the United States. But in legislative hearings, members of both parties fiercely objected to this authorization, and several viewed authorization of indefinite detention as unconstitutional. *See, e.g.*, *Homeland Defense: Hearing Before the S. Comm. on the Judiciary*, 107th Cong. 18, 26, 28 (2001); *Administration's Draft Anti-Terrorism Act of 2001: Hearings Before the H. Comm. on the Judiciary*, 107th Cong. 21, 40, 54 (2001). In the course of these hearings, no one — no legislator and no member of the Administration — suggested that the AUMF already granted the President the power to order indefinite military detention of some terrorists within the United States. Congressional opposition to indefinite

detention for a limited time pending deportation or trial, accompanied by *civilian* law enforcement processes and careful congressional oversight; it expressly prohibits "indefinite detention" of "terrorist aliens." The explicit authorization for limited detention and criminal process in civilian courts in the Patriot Act provides still another reason why we cannot assume that in the AUMF Congress silently empowered the President to order the indefinite military detention of civilian "terrorist aliens" as enemy combatants without any criminal process.

We note that this does *not* mean that we accept al-Marri's contention that the Patriot Act affirmatively prohibits the detention of all suspected terrorist aliens within this country as enemy combatants. Plainly, the Patriot Act does not eliminate the statutory authority provided the President in the AUMF to detain individuals who fit within the "legal category" of enemy combatant; thus, if an alien "qualif-[ies]" as an enemy combatant, then the AUMF authorizes his detention. *Hamdi*, 542 U.S. at 516. But if there were any conflict between the Patriot Act and the AUMF as to the legality of the detention of terrorist alien *civilians* within the United States, we would have to give precedence to the Patriot Act — for while the Patriot Act's explicit and specific focus is on detention of terrorist aliens within the United States, the AUMF lacks any language permitting such detention. *See id.* at 519. And the Supreme Court has instructed that "a more specific statute will be given precedence over a more general one, regardless of their temporal sequence." *Busic v. United States*,

---

detention ultimately forced the Administration to accept elimination of indefinite detention from the Patriot Act. *See* Patriot Act § 412(a); *see also* 147 Cong. Rec. 19,507 (2001) (Senator Hatch relating that "Senator Kennedy, Senator Kyl, and I worked out a compromise that limits the [detention] provision"); 147 Cong. Rec. 20,448 (2001) (Representative Delahunt stating that negotiations had led to a "better bill" than that reflected in the initial proposal, which included authorization of indefinite detention). That the Administration and Congress felt the need during the hearings and markup to address indefinite detention of terrorists in such detail and at such length certainly suggests that no one believed that the AUMF, passed just days before the Patriot Act, already granted the President such authority.

446 U.S. 398, 406 (1980); *see also Edmond v. United States*, 520 U.S. 651, 657 (1997).[22]

iv.

Finally, we do not find our dissenting colleagues' respective new definitions of enemy combatant at all compelling. The dissents do not contend that, under *traditional* law-of-war principles, enemy combatant status would extend to al-Marri. *See, e.g.*, *post* at 116 (Williams, C.J., concurring in part and dissenting in part) ("The plurality opinion may very well be correct that, under the traditional 'law of war,' persons not affiliated with the military of a *nation-state* may not be con-

---

[22]Judge Williams acknowledges that the Patriot Act prohibits indefinite detention of unarmed alleged terrorist aliens captured in the United States, and she recognizes that the Patriot Act, as the "more-specific provision[ ]," governs if it "deal[s] with the same subject matter" as the AUMF. *Post* at 119. Yet she refuses to recognize that her expansive interpretation of the AUMF permits indefinite detention of precisely the same persons (unarmed alleged terrorist aliens captured in the United States) whose indefinite detention is prohibited by the Patriot Act. The sole rationale Judge Williams offers for refusing to hold the Patriot Act controls given this conflict is that, in her view, the two statutes "refer" to presidential powers set forth in different sections of the Constitution and, therefore, should not be read to conflict. *Post* at 119 (suggesting that the Patriot Act "refer[s] to the President's power" under the Take Care Clause, while the AUMF "relates to the Commander-in-Chief power"). Even if this view is correct, the Supreme Court has never suggested that this is a relevant consideration in determining whether two statutes conflict. Indeed, Judge Williams has not cited, and we have not found, any authority to support such an analysis. The Supreme Court has long directed that courts follow the "well settled rule" that a specific statute controls over a general one as a means to ascertain legislative intent. *Townsend v. Little*, 109 U.S. 504, 512 (1883) (noting that when "general and specific provisions" are "in apparent contradiction, whether in the same or different statutes," the specific will "qualify[ ] and supply[ ] exceptions to the general"); *Kepner v. United States*, 195 U.S. 100, 125 (1904); *see also Bulova Watch Co. v. United States*, 365 U.S. 753, 758 (1961) (collecting cases). Where — indeed whether — legislation "refer[s]" to a specific executive power permitting the President to enforce the congressional authorization matters not at all in making this determination.

sidered enemy combatants."); *post* at 162, 173 (Wilkinson, J., concurring in part and dissenting in part) ("Traditionally, the definition of 'enemy' has been state-based . . . .").[23] Instead, to justify al-Marri's indefinite military detention, the dissents resort to inventing novel definitions of enemy combatant, drawing on their own beliefs as to when detention is appropriate. That these judicially-created definitions differ so markedly from one another follows from the fact that each is simply the product of judicial conjecture; any limits on whom the Executive may detain as an enemy combatant are thus left to an individual judge. This is particularly troubling because, as our distinguished colleague has observed, "'it is difficult to conceive of an area of governmental activity in which the courts have less competence' than military affairs." *Post* at 142 (Wilkinson, J., concurring in part and dissenting in part) (quoting *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973)).

Moreover, Supreme Court precedent seems to foreclose the dissenters' rejection of traditional law-of-war principles. On every occasion in which the Court has considered — even tangentially — the important issues at stake in this case, it has invoked and relied on traditional law-of-war principles for guidance. *See, e.g.*, *Quirin*, 317 U.S. at 27-38 ("From the very beginning of its history this Court has recognized and applied the law of war . . . ."). Indeed, one of the dissenters somewhat grudgingly recognizes this. *See post* at 175 (Wilkinson, J., concurring in part and dissenting in part) (acknowledging that "[t]he Supreme Court insists we consult" traditional law-of-war principles in determining enemy combatant status).

In *Hamdi*, the Court had the opportunity to interpret the AUMF to incorporate new definitions like those proposed by the dissenters, but it refused to do so. Rather, the Court continued to hue closely to traditional and "longstanding law-of-war principles." 542 U.S. at 521. Of course, the *Hamdi* plurality noted that "[t]he permissible bounds" of "[t]he legal category of enemy combatant" would "be defined by the lower courts as subsequent cases are presented to them." *Id.* at 522

---

[23]The concurrence takes a different view, apparently contending that traditional law-of-war principles permit the military detention of al-Marri and persons like him. *See post* at 77 (Traxler, J., concurring in the judgment). For the reasons set forth above, we disagree.

n.1. But nothing in any of the *Hamdi* opinions suggests that lower courts, absent express congressional authorization, are free to venture beyond traditional law-of-war principles to fashion these "permissible bounds." Reading *Hamdi* to permit such an action is a huge leap. For four times in as many pages the *Hamdi* plurality cautioned that it was only willing to find that the AUMF authorized detention, as an enemy combatant, of a person who fit within "the narrow category" presented — a person affiliated with an enemy nation, captured on a battlefield, and engaged in armed conflict against the United States. *Id.* at 516-19. Contrary to our dissenting colleague's contentions, these traditional law-of-war principles are hardly "quaint" or "outmoded." *Post* at 128, 175, 185 (Wilkinson, J., concurring in part and dissenting in part). Rather, as the Supreme Court recently counseled, "[e]stablished legal doctrine . . . must be consulted for its teaching. Remote in time it may be; irrelevant to the present it is not." *Boumediene*, 553 U.S. at ___, slip op. at 68.

Furthermore, on the very same day that the Court issued *Hamdi*, four Justices expressly declared that in their view the AUMF "does *not* authorize . . . the protracted, incommunicado detention of American citizens *arrested in the United States*." *Rumsfeld v. Padilla*, 542 U.S. 426, 464 n.8 (2004) (Stevens, J., dissenting, joined by Souter, Ginsburg, & Breyer, JJ.) (emphasis added). Although Justice Scalia declined to reach the issue in *Padilla*, when dissenting in *Hamdi*, he similarly rejected the argument that the AUMF authorized the detention of United States citizens absent invocation of the Suspension Clause, stating that the AUMF did not "authorize[ ] detention of a citizen with the clarity necessary to satisfy the interpretive canon that statutes should be construed so as to avoid grave constitutional concerns." 542 U.S. at 554, 574. Given that the Government has now expressly conceded that aliens lawfully residing in the United States, like al-Marri, have the same due process rights as citizens, it would seem that a majority of the Court not only would reject the new definitions that the dissents propose, but in fact has already done so.

Although we respect our colleagues' hard work, we also find the specific rationales they offer in support of their respective new definitions totally unpersuasive.

a.

Judge Williams finds that in the AUMF, Congress has authorized the indefinite military detention, as an "enemy combatant," of any individual "who meets two criteria: (1) he attempts or engages in belligerent acts against the United States, either domestically or in a foreign combat zone; (2) on behalf of an enemy force." *Post* at 116. Her definition requires neither an affiliation with an enemy nation nor capture on a battlefield, nor anything else but attempted injurious acts "against the United States" on behalf of some hostile, organized group. As we have explained above, this new definition finds no support in the AUMF, *Hamdi*, or *Quirin*. We note that Judge Williams appears to place substantial weight on *Quirin*'s reference to "enemy belligerents, including those acting under the direction of the *armed forces* of the enemy," 317 U.S. at 37 (emphasis added), to conclude that an enemy combatant need only be affiliated with an "enemy force," rather than a nation-state. *Post* at 116. She ignores the fact that the Court in *Quirin* defined "armed forces" in accord with traditional law-of-war principles as forces of "belligerent *nations*." 317 U.S. at 30 (emphasis added).

Judge Williams attempts to limit the indefinite nature of the detention allowed under her broad definition of enemy combatant by associating al-Marri with ongoing hostilities in Afghanistan. *See post* at 117-18. But this invocation of a specific conflict in a specific country does nothing to circumscribe her construction of the AUMF, which imposes no limits on detention as long as somewhere in the world, someone is attempting belligerent acts against the United States on behalf of an "enemy force." Indeed, in response to questions from the *en banc* court, the Deputy Solicitor General admitted that in the Government's view, the Executive could hold an individual like al-Marri in military custody without charges, not just until the end of the conflict in Afghanistan, but "during the course of" all "ongoing hostilities," which he conceded could be "for a long time." *Cf. Boumediene*, 553 U.S. at ___, slip op. at 41 (noting that the duration of the current conflict "is already among the longest wars in American history").

In sum, by abandoning precedent and traditional law-of-war principles, Judge Williams renders the term "enemy combatant" utterly malleable. Such a definition presents serious constitutional concerns.

For an amorphous definition like that proposed by Judge Williams, lacking any of the limits provided by precedent and traditional law-of-war principles, simply will not ensure that "detention without trial 'is the carefully limited exception,'" rather than the rule. *Hamdi*, 542 U.S. at 529 (quoting *Salerno*, 481 U.S. at 755); *see also supra* n.19. We cannot agree that in the AUMF Congress replaced the narrow, established definition of enemy combatant with such a vague and unbounded one.

b.

Judge Wilkinson takes a very different, but no more persuasive, approach. Unlike every other member of this court, he maintains that the AUMF must be interpreted *solely* in terms of its broad language. *See post* at 133-43. Under this approach, the AUMF yields no definition of enemy combatant and thus, as Judge Wilkinson acknowledges, imposes no "limiting principle on enemy combatant detentions." *Post* at 176. Recognizing the necessity for such limits, Judge Wilkinson then creates *constitutional* criteria for establishing enemy combatant status. He proposes that to be classified as an enemy combatant subject to indefinite military detention:

> [a] person must (1) be a member of (2) an organization or nation against whom Congress has declared war or authorized the use of military force, and (3) knowingly plans or engages in conduct that harms or aims to harm persons or property for the purpose of furthering the military goals of the enemy nation or organization.

*Post* at 179. He explains, praises, and then applies these criteria to al-Marri, unsurprisingly concluding that al-Marri meets them and therefore is an enemy combatant. *Post* at 175-85. Without in any way denigrating Judge Wilkinson's extensive efforts, we do not believe that the approach he advocates is open to us. In addition to the problems set forth above, several other factors make such an approach untenable.

First, Judge Wilkinson's statutory analysis cannot be reconciled with that of the Supreme Court in *Hamdi*. There, the Court expressly relied on traditional law-of-war principles to interpret the AUMF. 542

U.S. at 517-21. Indeed, just this term, when discussing *Hamdi*, the Supreme Court characterized the holding of that case as resting on traditional law-of-war principles, explaining that the "detention of individuals who fought against the United States in Afghanistan . . . is so fundamental and accepted an incident to war" that it constitutes "an exercise of the necessary and appropriate force Congress has authorized the President to use." *Boumediene*, 553 U.S. at ___, slip op. at 2 (internal quotation marks omitted). Thus, although Judge Wilkinson defends his statutory analysis by asserting that we must "giv[e the] text [of the AUMF] some semblance of the meaning that Congress intended for it," *post* at 157, he utterly fails to acknowledge that the Supreme Court has twice held that the AUMF evinces Congress's intent to incorporate established law-of-war principles.

Second, by refusing to construe the AUMF through the lens of traditional law-of-war principles, as *Hamdi* did (and we do), Judge Wilkinson ignores a construction that avoids constitutional difficulties and instead chooses one that abounds in them. *See post* at 156 (recognizing the "serious constitutional issues that result" from giving full effect to the broad language of the AUMF); *see also post* at 131-32, 158-59, 176-77. This approach clearly violates the settled constitutional avoidance doctrine, which requires that, whenever possible, a statute be construed to avoid rather than "raise serious constitutional problems." *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) (collecting cases). The Supreme Court has repeatedly stressed the importance of this doctrine. *See, e.g.*, *Spector Motor Serv. v. McLaughlin*, 323 U.S. 101, 105 (1944) (explaining that this doctrine is "more deeply rooted than any other in the process of constitutional adjudication"). Thus, when, as here, a court can choose between a construction of a statute that avoids constitutional problems and one that "would raise" them, the former "prevail[s]." *Clark v. Martinez*, 543 U.S. 371, 380-82 (2005). Because "one of the [doctrine's] chief justifications is that it allows courts to *avoid* the decision of constitutional questions," a court must avoid an interpretation that raises serious constitutional questions *regardless* of whether the court's concerns are borne out on full consideration. *Id.* at 381 (emphasis in original). Of particular relevance here, a court must avoid an interpretation that raises serious constitutional questions "whether or not those constitutional problems pertain to the particular litigant before the Court." *Id.*

Nor do the difficulties with Judge Wilkinson's approach end with his statutory analysis. After rejecting reliance on law-of-war principles in interpreting the AUMF, Judge Wilkinson makes the startling contention that his constitutional criteria for defining enemy combatant "conform to the evolving principles of the law of war." *Post* at 175. We find it very strange indeed that he refuses to accord law-of-war principles any statutory relevance but then ascribes them a constitutional significance that would limit both the executive and legislative branches. Moreover, Judge Wilkinson offers *no* legal authority for the assertion that the law of war has in fact "evolved" to provide a basis for his proposed criteria, other than his own "emphatic[ ] conten[tion]" that it has. *Post* at 175.[24] As Judge Wilkinson acknowledges, changes in the law of war typically appear in treaties or international agreements, *see post* at 161, yet no treaty or agreement suggests any change in or evolution from the traditional law-of-war definition of enemy combatant.

Perhaps recognizing the difficulties outlined above, the Government has not in any of its extensive legal briefs or during its lengthy

---

[24] In response to this assertion, Judge Wilkinson surprisingly contends that the AUMF provides "legal authority" for his view that the law of war has "evolved" to support his criteria. *Post* at 174. In none of the Supreme Court's recent terrorism cases has it recognized the AUMF as evidencing any "evol[ution]" in law-of-war principles. To the contrary, the Court has consistently interpreted the AUMF as circumscribed by traditional law-of-war principles. Indeed, earlier in his opinion, Judge Wilkinson himself repeatedly and correctly recognizes that judges have consistently interpreted the AUMF in this manner. *See, e.g.*, *post* at 160. Judge Wilkinson's contention that the AUMF evidences an evolution in law-of-war principles not only ignores governing precedent, it also creates an entirely circular argument. First, Judge Wilkinson finds it necessary to determine the "constitutional limits" on the authority granted by the AUMF. *Post* at 156. Then he posits that the "law of war . . . informs" these constitutional limits on the AUMF. *Post* at 160. And finally he identifies the AUMF itself as the sole legal authority supporting his conception of the evolving law of war, which assertedly "informs" the constitutional limits on the AUMF. *Post* at 174-75. Of course, when a statute itself somehow informs the principles governing the constitutional review of the power it authorizes, the constitutionality of that authorization inevitably follows.

oral arguments espoused Judge Wilkinson's criteria *either* as a basis for interpreting the AUMF *or* as an independent set of constitutional limits on executive and congressional authority. Rather, when pressed at oral argument as to the source of the criteria for determination of enemy combatant status in this case, the Deputy Solicitor General assured us that the Government relied only on the traditional law-of-war principles articulated in *Hamdi* and *Quirin*.

In the last analysis, Judge Wilkinson's approach seems to be driven by his undoubtedly sincere belief that his new criteria best identify those individuals who *should* qualify as enemy combatants in our conflict with al Qaeda. Perhaps so. However, surely the determination of who should be classified as an enemy combatant is a task best left in the first instance to the political branches. *See Boumediene*, 553 U.S. at ___, slip op. at 68 (recognizing that when judges consider "the procedural and substantive standards used to impose detention to prevent acts of terrorism, proper deference must be accorded to the political branches"). Neither the President nor Congress has indicated any intent or desire to adopt Judge Wilkinson's new definition of enemy combatant. Rather, both political branches have been content to be guided by the traditional law-of-war principles against which the AUMF was enacted.

Given the total absence of authority for Judge Wilkinson's approach, we cannot adopt it, particularly in view of the Government's considered failure to champion this approach. Before concluding our discussion of Judge Wilkinson's position, we want to acknowledge his stirring statements as to why criminal process is ill-suited to deal with the unique problems presented by the prosecution of terrorists. *Post* at 147-51. *But see* Richard B. Zabel & James J. Benjamin, Jr., *In Pursuit of Justice: Prosecuting Terrorism Cases in the Federal Courts* 5 (2008) (analyzing data from over one hundred international terrorism cases prosecuted in U.S. federal courts and concluding that the criminal justice "system is generally well-equipped to handle most terrorism cases"). Whatever the merits of Judge Wilkinson's statements, we want to be clear that our rejection of his approach does not stem from some sort of "preference" for the criminal justice system. *Post* at 143. We reject Judge Wilkinson's position because we conclude, for all of the reasons set forth above,

that al-Marri is a civilian, and our Constitution demands, not prefers, that civilians be afforded the rights inherent in that system.[25]

---

[25]Judge Wilkinson also contends that the military detention of al-Marri and persons like him strikes the proper "balance" between criminal prosecution and military detention, that "the best way to maximize liberty for all" is to remove such persons from the criminal justice system so as not to "dilute the core protections of" that system, and that extending criminal process to these people "risks pushing the executive . . . in a more extreme direction." *Post* at 152-53. If true, this might provide some sort of philosophical (albeit not legal) justification for al-Marri's military detention. But recent admissions by the Administration itself, in fact, indicate that military detention in the recent conflicts has not achieved the proper "balance," but rather has permitted the Executive to pursue a very "extreme direction." In this vein, we note the admission by CIA director Michael Hayden that the CIA waterboarded al Qaeda suspects in order to extract intelligence, *see* Dan Eggen, *White House Defends CIA's Use of Waterboarding in Interrogations*, Wash. Post, Feb. 7, 2008, at A3; Hayden's acknowledgment that the CIA destroyed hundreds of hours of videotapes documenting interrogation of two al Qaeda operatives, sparking separate investigations by the Justice Department and the House Intelligence Committee, *see* Mark Mazzetti, *CIA Destroyed 2 Tapes Showing Interrogations*, N.Y. Times, Dec. 7, 2007, at A1; Mark Mazzetti & David Johnston, *U.S. Announces Criminal Inquiry Into CIA Tapes*, N.Y. Times, Jan. 3, 2008, at A1; Mark Mazzetti & Scott Shane, *Tapes' Destruction Hovers Over Detainee Cases*, N.Y. Times, Mar. 28, 2008, at A1; President Bush's disclosure that at least fourteen al Qaeda suspects were held for years, secretly and without charges, in covert CIA "black sites" outside the United States, *see* Jane Mayer, *The Black Sites*, New Yorker, Aug. 13, 2007, at 46; Sheryl Gay Stolberg, *President Moves 14 Held in Secret to Guantanamo*, N.Y. Times, Sept. 7, 2006, at A1; the public admission by Secretary of State Condoleezza Rice that the United States mishandled the case of Canadian Maher Arar, who was detained by United States officials in 2002 and deported to Syria, where Arar was allegedly held for ten months in a 3-by-6-foot cell and repeatedly beaten by Syrian interrogators, often with frayed electrical cables, *see Rice Admits U.S. Erred in Deportation*, N.Y. Times, Oct. 25, 2007, at A10; Ian Austen, *Canada Will Pay $9.75 Million to Man Sent to Syria and Tortured*, N.Y. Times, Jan. 27, 2007, at A5; and, finally, the recently declassified March 14, 2003, memorandum of the Office of Legal Counsel, advising Pentagon officials that neither federal laws prohibiting assault, maiming, and other crimes nor the U.N. Convention Against

v.

   In sum, neither the Government nor our dissenting colleagues have
offered, and although we have exhaustively searched, we have not
found, any authority that permits us to hold that the AUMF empowers
the President to detain al-Marri as an enemy combatant. If the Gov-
ernment's allegations are true, and we assume they are for present
purposes, al-Marri, like Milligan, is a dangerous enemy of this nation
who has committed serious crimes and associated with a secret terror-
ist organization that has engaged in hostilities against us. But, like
Milligan, al-Marri is still a civilian: he does not fit within the "permis-
sible bounds of" "[t]he legal category of enemy combatant." *Hamdi*,
542 U.S. at 522 n.1. Therefore, we believe the AUMF provides the
President no statutory authority to order the military to seize and
indefinitely detain al-Marri.

---

Torture nor customary international law prohibiting torture would apply
to military interrogation of al Qaeda detainees overseas, because the
President's authority as Commander-in-Chief overrode such restrictions,
*see* Dan Eggen & Josh White, *Memo: Laws Didn't Apply to Interroga-
tors*, Wash. Post, Apr. 2, 2008, at A1.

## C.

Thus, we turn to the Government's final contention. The Government summarily argues that even if the AUMF does not authorize al-Marri's seizure and indefinite detention as an enemy combatant, the President has "inherent constitutional authority" to order the military to seize and detain al-Marri. According to the Government, the President's "war-making powers" afford him "inherent" authority to subject persons legally residing in this country and protected by our Constitution to military arrest and detention, without the benefit of any criminal process, if the President believes these individuals have "engaged in conduct in preparation for acts of international terrorism." *See* Rapp Declaration. Given that the Government has now acknowledged that aliens lawfully residing in the United States have the same due process rights as United States citizens, this is a breathtaking claim — and one that no member of the court embraces.

To assess claims of presidential power, the Supreme Court has long recognized, as Justice Kennedy stated most recently, that courts look to the "framework" set forth by Justice Jackson in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635-38 (1952) (Jackson, J., concurring). *See Hamdan*, 126 S. Ct. at 2800 (Kennedy, J., concurring). Justice Jackson explained that "Presidential powers are not fixed but fluctuate, depending upon their disjunction or conjunction with those of Congress." *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring). "When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum," *id.*, but "[w]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb," *id.* at 637. Hence, to evaluate the President's constitutional claim, we must first look to the "expressed or implied will of Congress" as to detention of aliens captured within the United States alleged to be engaged in terrorist activity.

### 1.

In contrast to the AUMF, which is silent on the detention of asserted alien terrorists captured and held within the United States, in the Patriot Act, enacted shortly after the AUMF, Congress carefully stated how it wished the Government to handle aliens believed to be

terrorists who were seized and held within the United States. The Patriot Act provides the Executive with broad powers to deal with "terrorist aliens," but it *explicitly prohibits* their indefinite detention.

Section 412 of the Patriot Act, entitled "Mandatory Detention of Suspected Terrorists," permits the short-term "[d]etention of [t]errorist [a]liens." Patriot Act § 412(a). The statute authorizes the Attorney General to detain any alien whom he "has reasonable grounds to believe": (1) "seeks to enter the United States" to "violate any law of the United States relating to espionage or sabotage" or to use "force, violence, or other unlawful means" in opposition to the government of the United States; (2) "has engaged in a terrorist activity"; or (3) is "likely to engage after entry in any terrorist activity," has "incited terrorist activity," is a "representative" or "member" of a "terrorist organization," is a "representative" of a "group that endorses or espouses terrorist activity," or "has received military-type training" from a terrorist organization. *Id.*; 8 U.S.C.A. § 1182(a)(3)(A)-(B) (West 2007); *see also* 8 U.S.C.A. § 1227(a)(4)(A)(i), (a)(4)(A)(iii), (a)(4)(B) (West 2007). In addition, the Patriot Act authorizes the Attorney General to detain any other alien who "is engaged in any other activity that endangers the national security of the United States." Patriot Act § 412(a). In particular, the Patriot Act permits the Attorney General to "take into custody" any "terrorist aliens" based only on the Attorney General's "belie[fs]" as to the aliens' threat, with *no* process or evidentiary hearing, and judicial review available only through petition for habeas corpus. *Id.*

Recognizing the breadth of this grant of power, however, Congress also imposed strict limits in the Patriot Act on the duration of the detention of such "terrorist aliens" within the United States. Thus, the Patriot Act expressly prohibits unlimited "indefinite detention"; instead it requires the Attorney General either to begin "removal proceedings" or to "charge the alien with a criminal offense" "not later than 7 days after the commencement of such detention." *Id.* If a terrorist alien's removal "is unlikely for the reasonably foreseeable future," he "may be detained for additional periods of up to six months" if his release "will threaten the national security of the United States." *Id.* But no provision of the Patriot Act allows for unlimited indefinite detention. Moreover, the Attorney General must provide the legislature with reports on the use of this detention

authority every six months, which must include the number of aliens detained, the grounds for their detention, and the length of the detention. *Id.* § 412(c).

Therefore, the Patriot Act establishes a specific method for the Government to detain aliens affiliated with terrorist organizations who the Government believes have come to the United States to endanger our national security, conduct espionage and sabotage, use force and violence to overthrow the government, engage in terrorist activity, or are likely to engage in any terrorist activity. Congress could not have better described the Government's allegations against al-Marri — *and* Congress decreed that individuals so described are *not* to be detained indefinitely, but only for a limited time, and only by civilian authorities, prior to deportation or criminal prosecution.

In sum, Congress has carefully prescribed the process by which it wishes to permit detention of "terrorist aliens" within the United States, and it has expressly prohibited the indefinite detention the President seeks here. The Government's argument that the President may indefinitely detain al-Marri is thus contrary to Congress's expressed will. "When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring). As the Supreme Court has recently explained, "[w]hether or not the President has independent power . . . he may not disregard limitations that Congress has, in proper exercise of its own war powers, placed on his powers." *Hamdan*, 126 S. Ct. at 2774 n.23 (citing *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring)). In such cases, "Presidential claim[s]" to power "must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system." *Youngstown*, 343 U.S. at 638 (Jackson, J., concurring).

### 2.

In light of the Patriot Act, therefore, we must "scrutinize[ ] with caution" the Executive's contention that the Constitution grants the President the power to capture and subject to indefinite military detention certain civilians lawfully residing within the United States.

*Id.* The Government nowhere suggests that the President's inherent constitutional power to detain does not extend to American citizens. Yet it grounds its argument that the President has constitutional power to detain al-Marri on his alien status. Even though at oral argument before the *en banc* court the Government acknowledged that an alien legally resident in the United States has the same due process rights as an American citizen, the Government apparently maintains that alien status permits the President to exercise special "peak" authority over legally resident aliens like al-Marri. The Government can so contend only by both ignoring the undisputed and relying on the inapposite.

It is undisputed that al-Marri had been legally admitted to the United States, was attending an American university from which he had earlier received an undergraduate degree, and was legally residing here (with his family) for several months before the Government arrested him at his home in Peoria. The Government's refusal to acknowledge these undisputed facts dooms its contention that al-Marri's status as an alien somehow provides the President with special "peak" authority to deprive al-Marri of constitutional rights. For, as we have noted within, and as the Government itself has conceded on rehearing, the Supreme Court has repeatedly and expressly held that aliens like al-Marri, i.e., those lawfully admitted into the United States who have "developed substantial connections with this country," are entitled to the Constitution's due process protections. *Verdugo-Urquidez*, 494 U.S. at 271; *see also Sanchez-Llamas*, 126 S. Ct. at 2681-82; *Kwong Hai Chew*, 344 U.S. at 596; *Wong Wing*, 163 U.S. at 238. No case suggests that the President, by fiat, can eliminate the due process rights of such an alien.

Without even a mention of these undisputed facts and controlling legal principles, the Government relies on two sorts of inapposite cases as assertedly establishing special presidential authority over aliens like al-Marri. The first of these, *Eisentrager*, 339 U.S. at 769 n.2, and *Ludecke*, 335 U.S. at 161-62, involves "enemy aliens." In those cases, the Supreme Court specifically defined "enemy aliens," but the Court did *not* define them as aliens who commit crimes against our country and so are enemies, as the Government seems to suggest. Rather, the Supreme Court defined "enemy aliens" as "subject[s] of a foreign state at war with the United States." *Eisentrager*,

339 U.S. at 769 n.2. Al-Marri plainly is *not* the "subject of a foreign state at war with the United States" and so is *not* an "enemy alien," but rather is a citizen of Qatar, a country with which the United States has friendly relations. Thus *Eisentrager* and *Ludecke* provide no basis for asserting authority over al-Marri. In fact, elsewhere in its brief, the Government concedes, as it must, that *Eisentrager* and *Ludecke* do not "have direct application" to al-Marri.

The other inapposite cases on which the Government relies involve *congressional* authority over aliens stemming from Congress's power over naturalization and immigration — not some special "inherent" constitutional authority enjoyed by the President over aliens. *See Mathews v. Diaz*, 426 U.S. 67, 79-80 (1976); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-91 (1952). These cases do not speak to the powers of the President acting alone — let alone contrary to an Act of Congress — and certainly do not suggest that the President has the power to subject to indefinite military detention an alien lawfully residing in this country.

In sum, al-Marri is not a subject of a country with which the United States is at war, he did not illegally enter the United States, and he is not alleged to have committed any other immigration violation. Rather, after lawfully entering the United States, al-Marri "developed substantial connections with this country," *Verdugo-Urquidez*, 494 U.S. at 271, and so his status as an alien neither eliminates his due process rights nor provides the President with extraordinary powers to subject al-Marri to seizure and indefinite detention by the military. The President's constitutional powers do not allow him to order the military to seize and detain indefinitely al-Marri without criminal process any more than they permit the President to order the military to seize and detain, without criminal process, other terrorists within the United States, like the Unabomber or the perpetrators of the Oklahoma City bombing.

3.

In light of al-Marri's due process rights under our Constitution and Congress's express prohibition in the Patriot Act on the indefinite detention of those civilians arrested as "terrorist aliens" within this

country, we can only conclude that, in the case at hand, the President claims power that far exceeds that granted him by the Constitution.

We do not question the President's wartime authority over enemy combatants, but absent suspension of the writ of habeas corpus, the Constitution simply does not provide the President the power to exercise military authority over civilians within the United States. *See Toth*, 350 U.S. at 14 ("[A]ssertion of military authority over civilians cannot rest on the President's power as commander-in-chief."). The President cannot eliminate constitutional protections with the stroke of a pen by proclaiming a civilian, even a criminal civilian, an enemy combatant subject to indefinite military detention. Put simply, the Constitution does not empower the President to order the military to seize civilians residing within the United States and detain them indefinitely without criminal process, and this is so even if he calls them "enemy combatants."

A "well-established purpose of the Founders" was "to keep the military strictly within its proper sphere, subordinate to civil authority." *Reid*, 354 U.S. at 30. In the Declaration of Independence, our forefathers lodged the complaint that the King of Great Britain had "affected to render the Military independent of and superior to the Civil power" and objected that the King had "depriv[ed] us in many cases, of the benefits of Trial by Jury." *The Declaration of Independence* paras. 14, 20 (U.S. 1776). Thus, a resolute conviction that civilian authority should govern the military animated the framing of the Constitution. As Alexander Hamilton, no foe of executive power, observed, the President's Commander-in-Chief powers "amount to nothing more than the supreme command and direction of the military and naval forces." The Federalist No. 69, at 386 (Alexander Hamilton) (Clinton Rossiter ed., 1961). "That military powers of the Commander in Chief were not to supersede representative government of *internal affairs* seems obvious from the Constitution and from elementary American history." *Youngstown*, 343 U.S. at 644 (Jackson, J., concurring) (emphasis added). For this reason, in *Youngstown*, the Supreme Court rejected the President's claim to "inherent power" to use the military even to seize property within the United States, despite the Government's argument that the refusal would "endanger the well-being and safety of the Nation." *Id.* at 584 (majority opinion).

Of course, this does not mean that the President lacks power to protect our national interests and defend our people, only that in doing so he must abide by the Constitution. We understand and do not in any way minimize the grave threat international terrorism poses to our country and our national security. But as *Milligan* teaches, "the government, within the Constitution, has all the powers granted to it, which are necessary to preserve its existence." 71 U.S. at 121. Those words resound as clearly in the twenty-first century as they did in the nineteenth.

Thus, the President plainly has plenary authority to deploy our military against terrorist enemies overseas. *See Curtiss-Wright*, 299 U.S. at 319-20; *see also Eisentrager*, 339 U.S. at 789. Similarly, the Government remains free to defend our country against terrorist enemies within, using all the considerable powers "the well-stocked statutory arsenal" of domestic law affords. *Hamdi*, 542 U.S. at 547 (Souter, J., concurring in part, dissenting in part, and concurring in the judgment) (citing numerous federal statutes criminalizing terrorist acts). Civilian law enforcement officers may always use deadly force whenever reasonable. *See Scott v. Harris*, 127 S. Ct. 1769, 1776-78 (2007). Furthermore, in the wake of September 11th, Congress has specifically authorized the President to deploy the armed forces at home to protect the country in the event of actual "terrorist attack[s] or incident[s]" within the United States meeting certain conditions. *See* 10 U.S.C.A. § 333(a)(A) (West 2007) (amending the Insurrection Act to provide the President with this authority, notwithstanding the Posse Comitatus Act, 18 U.S.C. § 1385).

But in this nation, military control cannot subsume the constitutional rights of civilians. Rather, the Supreme Court has repeatedly catalogued our country's "deeply rooted and ancient opposition . . . to the extension of military control over civilians." *Reid*, 354 U.S. at 33; *see also Laird v. Tatum*, 408 U.S. 1, 15 (1972) (Burger, C.J.) (recognizing "a traditional and strong resistance of Americans to any military intrusion into civilian affairs" that "has deep roots in our history and found early expression . . . in the constitutional provisions for civilian control of the military"). The Court has specifically cautioned against "break[ing] faith with this Nation's tradition" — "firmly embodied in the Constitution" — "of keeping military power subservient to civilian authority." *Reid*, 354 U.S. at 40. When the Court

wrote these words in 1957, it explained that "[t]he country ha[d] remained true to that faith for almost one hundred seventy years." *Id.* Another half century has passed, but the necessity of "remain[ing] true to that faith" remains as important today as it was at our founding. *See id.*

The President has cautioned us that "[t]he war on terror we fight today is a generational struggle that will continue long after you and I have turned our duties over to others." Pres. George W. Bush, State of the Union Address (Jan. 23, 2007). Unlike detention for the duration of a traditional armed conflict between nations, detention for the length of a "war on terror" has no bounds. Justice O'Connor observed in *Hamdi* that "[i]f the practical circumstances of a given conflict are entirely unlike those of the conflicts that informed the development of the law of war," the understanding that combatants can be detained "for the duration of the relevant conflict" "may unravel." 542 U.S. at 521. If the indefinite military detention of an actual combatant in this new type of conflict might cause the thread of our understandings to "unravel," the indefinite military detention of a civilian like al-Marri would shred those understandings apart.

In an address to Congress at the outset of the Civil War, President Lincoln defended his emergency suspension of the writ of habeas corpus to protect Union troops moving to defend the Capital. Lincoln famously asked: "[A]re all the laws, but one, to go unexecuted, and the government itself to go to pieces, lest that one be violated?" Abraham Lincoln, Message to Congress in Special Session (July 4, 1861), *in Abraham Lincoln: Speeches and Writings 1859-1865* at 246, 254 (Don E. Fehrenbacher ed., 1989). The authority the President seeks here turns Lincoln's formulation on its head. For the President does not acknowledge that the extraordinary power he seeks would result in the suspension of even one law, and he does not contend that this power should be limited to dire emergencies that threaten the nation. Rather, he maintains that the authority to order the military to seize and detain certain civilians is an inherent power of the Presidency, which he and his successors may exercise as they please.

To sanction such presidential authority to order the military to seize and indefinitely detain civilians, even if the President calls them "enemy combatants," would have disastrous consequences for the

Constitution — and the country. For a court to uphold a claim to such extraordinary power would do more than render lifeless the Suspension Clause, the Due Process Clause, and the rights to criminal process in the Fourth, Fifth, Sixth, and Eighth Amendments; it would effectively undermine all of the freedoms guaranteed by the Constitution. It is that power — were a court to recognize it — that could lead all our laws "to go unexecuted, and the government itself to go to pieces." We refuse to recognize a claim to power that would so alter the constitutional foundations of our Republic.

## III.

Because we find that neither the AUMF nor the President's inherent authority permits the military to detain al-Marri indefinitely as an enemy combatant, we would not reach the question of whether the Government has afforded al-Marri sufficient process to challenge his designation as an enemy combatant. We would simply reverse the judgment of the district court and remand the case with instructions to issue a writ of habeas corpus directing the Secretary of Defense to release al-Marri from military custody within a reasonable period of time to be set by the district court. Pursuant to this directive, the Government could transfer al-Marri to civilian authorities to face criminal charges, initiate deportation proceedings against him, hold him as a material witness in connection with grand jury proceedings, or detain him for a limited time pursuant to the Patriot Act, but military detention of al-Marri would have to cease.

This disposition, however, does not command a majority of the *en banc* court. Accordingly, to give practical effect to the conclusions of the majority of the court who reject the Government's position, we join in ordering remand on the terms closest to those we would impose. *See Hamdi*, 542 U.S. at 553 (Souter, J., concurring in part, dissenting in part, and concurring in the judgment). We believe that it is unnecessary to litigate whether al-Marri is an enemy combatant, but joining in remand for the evidentiary proceedings outlined by Judge Traxler will at least place the burden on the Government to make an initial showing that normal due process protections are unduly burdensome and that the Rapp declaration is "the most reliable available evidence," supporting the Government's allegations before it may order al-Marri's military detention. *See post* at 94-95. There-

fore, we concur in the per curiam opinion reversing and remanding for evidentiary proceedings to determine whether al-Marri actually is an enemy combatant subject to military detention.

Judges Michael, King, and Gregory have authorized me to indicate that they join in this opinion.

TRAXLER, Circuit Judge, concurring in the judgment:

Ali Saleh Kahlah al-Marri ("al-Marri"), a citizen of Qatar and alleged operative of the al Qaeda terrorist network, was designated an enemy combatant by the President of the United States and is currently being detained at the Naval Consolidated Brig in Charleston, South Carolina. According to evidence submitted by the government in support of al-Marri's military detention, al-Marri received training and funding from al Qaeda prior to the September 11 attacks perpetrated by that organization and entered this country as a "sleeper agent" charged with carrying out additional terrorist activities on its behalf. Al-Marri now appeals the district court's decision dismissing his habeas petition, filed under 28 U.S.C.A. § 2241, challenging the President's authority to designate him an enemy combatant and militarily detain him as such. In the alternative, al-Marri challenges the process he has been afforded by the district court to contest the factual basis for his designation.

I agree with my colleagues who hold that the Authorization for Use of Military Force ("AUMF"), Pub. L. No. 107-40, 115 Stat. 224 (2001), enacted by Congress in the wake of the 9/11 attacks, grants the President the power to detain enemy combatants in the war against al Qaeda, including belligerents who enter our country for the purpose of committing hostile and war-like acts such as those carried out by the al Qaeda operatives on 9/11. And, I agree that the allegations made by the government against al-Marri, if true, would place him within this category and permit the President to militarily detain him.

However, I depart from my dissenting colleagues on the issue of whether al-Marri has been afforded a fair opportunity to challenge the factual basis for his designation as an enemy combatant. Because the process afforded al-Marri by the district court to challenge the factual

basis for his designation as an enemy combatant did not meet the minimal requirements of due process guaranteed by the Fifth Amendment, I would reverse the district court's dismissal of al-Marri's habeas petition and remand for further evidentiary proceedings on the issue of whether al-Marri is, in fact, an enemy combatant subject to military detention.

## I.   Background

As is now tragically well-known, on September 11, 2001, operatives of the al Qaeda terrorist network hijacked commercial airliners on the East Coast and launched an attack upon the United States, successfully striking the World Trade Center and the Pentagon, and crashing a third airliner, believed to have been bound for an additional target in Washington, D.C., in Pennsylvania. Approximately 3,000 civilians were killed as a result of these war-like attacks.

One week after these devastating attacks, Congress passed the AUMF, providing that

> the President is authorized to *use all necessary and appropriate force against those nations, organizations, or persons* he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

*Id.* (emphasis added). The preamble to the AUMF references the President's "authority under the Constitution to take action to deter and prevent acts of international terrorism against the United States," points to the continued "unusual and extraordinary threat to the national security and foreign policy of the United States" posed by the forces responsible for the 9/11 attacks, and declares that it is "both necessary and appropriate that the United States exercise its rights to self-defense and to protect United States citizens *both at home and abroad*." *Id.* (emphasis added).

Having determined that the 9/11 attacks were inflicted by operatives of al Qaeda who were sent to our country to attack us from

within, and that al Qaeda was heavily supported and harbored by the Taliban government of Afghanistan, the President responded militarily against both entities by ordering our armed forces to Afghanistan.

On September 10, 2001, the day before al Qaeda's devastating attack upon our homeland, al-Marri entered the United States from abroad with his wife and children, ostensibly for the purpose of pursuing a degree at Bradley University in Peoria, Illinois. Two months later, FBI agents arrested al-Marri as a material witness in the investigation of the 9/11 attacks. In the course of their investigation, the authorities discovered that al-Marri was rarely attending his university classes and was failing his courses. Additional investigation resulted in al-Marri being charged with several federal criminal offenses.[1] Al-Marri pled not guilty and trial was set to begin in the district court of Illinois on July 21, 2003.

On June 23, 2003, however, President George W. Bush declared that al-Marri "is, and at the time he entered the United States in September 2001 was, an enemy combatant." J.A. 54. According to the presidential declaration, "al-Marri is closely associated with al Qaeda, an international terrorist organization with which the United States is at war" and "engaged in conduct that constituted hostile and war-like acts, including conduct in preparation for acts of international terrorism that had the aim to cause injury to or adverse effects on the United States." J.A. 54. The President additionally declared that "al-Marri possesses intelligence, including intelligence about personnel and activities of al Qaeda that, if communicated to the [United

---

[1]The offenses consisted of one count of possession of 15 or more unauthorized or counterfeit credit card numbers, with intent to defraud, in violation of 18 U.S.C.A. § 1029(a)(3) (West 2000); two counts of making a false statement to the FBI, in violation of 18 U.S.C.A. § 1001(a)(2) (West 2000 & Supp. 2007); three counts of making a false statement in a bank application, in violation of 18 U.S.C.A. § 1014 (West Supp. 2007); and one count of using a means of identification of another person for the purpose of influencing the action of a federally insured financial institution, in violation of 18 U.S.C.A. § 1028(a)(7) (West Supp. 2007). Al-Marri was initially charged with these offenses in two indictments in the Southern District of New York, but the indictments were dismissed on venue grounds. Al-Marri was then returned to Peoria and re-indicted on the same seven counts in the district court of Illinois.

States], would aid [United States'] efforts to prevent attacks by al Qaeda on the United States or its armed forces, other governmental personnel, or citizens," and that he "represents a continuing, present, and grave danger to the national security of the United States." J.A. 54. Accordingly, the President declared that the "detention [of al-Marri] is necessary to prevent him from aiding al Qaeda in its efforts to attack the United States or its armed forces, other governmental personnel, or citizens" and that "it is in the interest of the United States that the Secretary of Defense detain [him] as an enemy combatant." J.A. 54.

In the wake of this declaration, the government successfully moved to dismiss the criminal indictment pending in the district court of Illinois, asserting national security interests required that al-Marri be transferred from civilian to military custody.[2] Al-Marri was transferred to the custody of the Secretary of Defense and transported to the Naval Consolidated Brig in Charleston, where he has remained in military custody as an enemy combatant.

On July 8, 2003, approximately two weeks after al-Marri was transferred from civilian to military custody, al-Marri's legal counsel filed a petition for a writ of habeas corpus in the district court of Illinois challenging the President's designation and al-Marri's continued detention by the military. The petition was eventually dismissed for lack of jurisdiction, *see Al-Marri v. Rumsfeld*, 360 F.3d 707 (7th Cir. 2004), but re-filed in the United States District Court for the District of South Carolina.

In his petition, al-Marri claimed that his military detention was unlawful, that the government was required to charge him with a crime or release him, and that the government abridged his due process rights. Al-Marri asserted that as a civilian lawfully residing in the United States, he was unlawfully "detained by the military without basis, without charge, without access to counsel, and without being

---

[2]Although the district court denied al-Marri's motion for a stay to prevent his transfer prior to filing a habeas petition, the government agreed to inform counsel of al-Marri's location and to provide the court and counsel with advance notice of any plan to move al-Marri outside the United States.

afforded any process by which he can challenge his detention or his designation as an enemy combatant." J.A. 21.[3] Al-Marri also demanded that a hearing be scheduled at which the government should be "compelled to present evidence establishing that [al-Marri] is, in fact, an enemy combatant, and at which [al-Marri] is afforded an opportunity to challenge such designation with the assistance of counsel." J.A. 25.

The government thereafter filed its response to al-Marri's petition, supported by a hearsay declaration of Jeffrey N. Rapp, identified as the Director of the Joint Intelligence Task Force for Combating Terrorism (the "Rapp Declaration"). In this affidavit, Rapp professed to be "familiar with the interviews of [al-Marri] conducted by agents of the Federal Bureau of Investigation and by personnel of the Department of Defense (DOD) once the DOD took custody of Al-Marri . . . after he was declared an enemy combatant by the President." J.A. 213. The Rapp Declaration summarized the national intelligence and other federal investigative information upon which the President rested his determination that al-Marri was not simply a man bent on committing criminal activities for personal reasons or gain, but an al-Qaeda operative or soldier dispatched to this country to perpetrate or facilitate additional war-like attacks in the wake of the 9/11 attacks. According to the Rapp Declaration, "Al-Marri is an al Qaeda 'sleeper' agent sent to the United States for the purpose of engaging in and facilitating terrorist activities subsequent to September 11, 2001," and "possesses information of high intelligence value, including information about personnel and activities of al Qaeda." J.A. 216. Prior to his

---

[3]Al-Marri's petition initially set forth two additional claims, asserting that he was denied the right to counsel and unlawfully interrogated. When his petition was filed, al-Marri claimed that he was being held incommunicado at the Naval Brig, without access to his counsel, and that he had been provided no opportunity to contest his designation as an enemy combatant. He was subsequently granted access to counsel in October 2004. The district court ruled that al-Marri's claims for deprivation of his right to counsel and unlawful interrogation were not cognizable in the habeas action. Al-Marri is currently pursuing these claims in a separate action, *Al-Marri v. Rumsfeld*, C.A. No. 2:05-cv-02259-HFF-RSC (filed Aug. 8, 2005), which is still pending before the district court. *See Al-Marri v. Wright*, 443 F. Supp. 2d 774, 777 n.2 (D.S.C. 2006).

arrival in this country, he was "trained at Bin Laden's Afghanistan terrorist training camps" and, "[a]mong other things, . . . received training in the use of poisons at an al-Qaeda camp." J.A. 217. He "met personally with Usama Bin Laden . . . and volunteered for a martyr mission or to do anything else that al Qaeda requested." J.A. 216. The Rapp Declaration asserted that al-Marri was assisted in his al Qaeda assignment to the United States by known al Qaeda members, including "[9/11] mastermind Khalid Shaykh Muhammed" and "al Qaeda financier and [9/11] moneyman Mustafa Ahmed Al-Hawsawi." J.A. 216. He traveled to the United States with money provided for him by al Qaeda for the purpose of carrying out his assigned mission.

In response, al-Marri asserted that, even if the allegations were true, the President lacked authority to detain him as an enemy combatant. However, al-Marri also denied the factual allegations supporting his classification and asserted that he was "entitled to a fair opportunity to rebut the factual assertions on which his classification as an 'enemy combatant' [was] based and to an evidentiary hearing conducted consistent with the fundamental requirements of due process, including, most importantly, the right to confront and cross-examine the witnesses against him." J.A. 69. According to al-Marri, "[a]nything less would make his right to due process illusory." J.A. 69.

As discussed in more detail below, the district court rejected al-Marri's assertion that the President lacked the authority to detain him as an enemy combatant, *see Al-Marri v. Hanft*, 378 F. Supp. 2d 673 (D.S.C. 2005), and, in a later decision, dismissed al-Marri's habeas petition based upon its determination that he had failed to rebut the allegations upon which his designation rested, *see Al-Marri v. Wright*, 443 F. Supp. 2d 774 (D.S.C. 2006). On appeal, al-Marri challenges the district court's determination that the President can detain him as an enemy combatant and, in the alternative, asserts that he was not afforded a meaningful opportunity to contest his status. I address each issue in turn.

## II. The Authority to Detain

I begin with the district court's denial of al-Marri's motion for summary judgment based upon its determination that, assuming the

allegation of the Rapp Declaration to be true, the President possessed legal authority under the AUMF to detain al-Marri as an enemy combatant in the war against al Qaeda even though al-Marri had successfully crossed our borders and was residing within this country at the time of his seizure. *See Al-Marri*, 378 F. Supp. 2d at 680. Al-Marri asserts that the President lacks legal authority to designate and detain him as an enemy combatant because he was taken into custody in the United States and, as a result, enjoyed "civilian" status and its accompanying rights to full criminal process for his alleged wrongdoing. The government counters that both the AUMF and the President's inherent constitutional authority allowed for the detention.

A.

As pointed out by my colleagues, the Constitution generally affords all persons detained by the government the right to be charged and tried in a criminal proceeding for suspected wrongdoing, and it prohibits the government from subjecting individuals arrested inside the United States to military detention *unless* they fall within certain narrow exceptions. *See United States v. Salerno*, 481 U.S. 739, 755 (1987) ("In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."). The detention of enemy combatants during military hostilities, however, is such an exception. If properly designated an enemy combatant pursuant to legal authority of the President, such persons may be detained without charge or criminal proceedings "for the duration of the relevant hostilities." *Hamdi v. Rumsfeld*, 542 U.S. 507, 519-521 (2004).

The Supreme Court first considered the breadth of the AUMF's grant of such authority in *Hamdi*, a case which originated from this circuit. Hamdi was captured by our allies in Afghanistan and turned over to our military personnel there. When it was discovered that he was a United States citizen by birth, Hamdi was transported to the United States for continued detention here. A plurality of the Court ruled that "individuals who fought against the United States in Afghanistan as part of the Taliban, an organization known to have supported the al Qaeda terrorist network responsible for [the 9/11] attacks, are individuals Congress sought to target in passing the AUMF." *Id.* at 518. Although the AUMF did not specifically authorize such military detention, the plurality "conclude[d] that detention

of individuals falling into the limited category we are considering, for the duration of the particular conflict in which they were captured, is so fundamental and accepted an incident to war as to be an exercise of the 'necessary and appropriate force' Congress has authorized the President to use." *Id.*; *see also id.* at 519 ("Because detention to prevent a combatant's return to the battlefield is a fundamental incident of waging war, in permitting the use of 'necessary and appropriate force,' Congress has clearly and unmistakably authorized detention in the narrow circumstances considered here.").

Because Hamdi was "part of or supporting forces hostile to the United States or coalition partners in Afghanistan and who engaged in an armed conflict against the United States there," *id.* at 516 (internal quotation marks omitted), the plurality concluded that, even though he was a United States citizen detained within this country, he clearly fell within the legal category of those "enemy combatants" who may be detained. However, in the course of rejecting Hamdi's claim that his citizenship prohibited his detention as an enemy combatant, the plurality also recognized the Court's precedent in *Ex parte Quirin*, 317 U.S. 1 (1942), which "held that '[c]itizens who associate themselves with the military arm of the enemy government, and with its aid, guidance and direction enter this country bent on hostile acts are enemy belligerents within the meaning of . . . the law of war.'" *Hamdi*, 542 U.S. at 519 (quoting *Quirin*, 317 U.S. at 37-38).

This court also considered the scope of the AUMF in *Padilla v. Hanft*, 423 F.3d 386 (4th Cir. 2005), albeit in a somewhat different context. There we held that the AUMF was broad enough to authorize the military detention of Jose Padilla, "a citizen of this country who is closely associated with al Qaeda, an entity with which the United States is at war; who took up arms on behalf of that enemy and against our country in a foreign combat zone of that war; *and* who thereafter traveled to the United States for the avowed purpose of further prosecuting that war on American soil, against American citizens and targets." *Id.* at 389. In so holding, we also relied upon the Supreme Court's decision in *Quirin*, which dealt with "the military trial of Haupt, a United States citizen who entered th[is] country with orders from the Nazis to blow up domestic war facilities but was captured before he could execute those orders." *Id.* at 392. Noting that, "[l]ike Haupt, Padilla associated with the military arm of the enemy,

and with its aid, guidance, and direction entered this country bent on committing hostile acts on American soil," we held that Padilla "falls within *Quirin*'s definition of enemy belligerent, as well as within the definition of the equivalent term [enemy combatant] accepted by the plurality in *Hamdi*." *Id.* We concluded:

> The Congress of the United States, in the Authorization for Use of Military Force Joint Resolution, provided the President all powers necessary and appropriate to protect American citizens from terrorist acts by those who attacked the United States on September 11, 2001. As would be expected, and as the Supreme Court has held, those powers include the power to detain identified and committed enemies such as Padilla, who associated with al Qaeda and the Taliban regime, who took up arms against this Nation in its war against these enemies, *and* who entered the United States for the avowed purpose of further prosecuting that war by attacking American citizens and targets on our own soil — a power without which, Congress understood, the President could well be unable to protect American citizens from the very kind of savage attack that occurred four years ago almost to the day.

*Id.* at 397. Accordingly, we reversed the district court's determination that the detention of Padilla by the President was without legal support, necessitating additional proceedings below.[4]

---

[4]Shortly after our ruling in *Padilla*, the government filed a motion for authorization to transfer Padilla from military custody to civilian custody and suggested that we withdraw our prior opinion. We denied the motion and suggestion, noting "that the transfer of Padilla and the withdrawal of our opinion at the government's request while the Supreme Court is reviewing this court's decision . . . would compound what is, in the absence of explanation, at least an appearance that the government may be attempting to avoid consideration of our decision by the Supreme Court, and also because we believe that this case presents an issue of such especial national importance as to warrant final consideration by that court, even if only by denial of further review." *Padilla v. Hanft*, 432 F.3d 582, 583 (4th Cir. 2005). We, therefore, expressed the view that any decision to terminate the litigation "should be made not by this court but, rather, by the Supreme Court." *Id.* at 584. The Supreme Court subsequently granted the government's motion to transfer. *See Hanft v. Padilla*, 546 U.S. 1084 (2006).

B.

Like my colleagues, I agree that neither *Hamdi* nor *Padilla* compels the conclusion that the AUMF authorized the President to detain al-Marri as an enemy combatant, although they do provide guidance. I disagree, however, that *Ex Parte Milligan*, 71 U.S. (4 Wall.) 2 (1866), compels the opposite conclusion. Having carefully considered these cases, as well as the Supreme Court's decision in *Quirin*, I am of the opinion that the AUMF also grants the President the authority to detain enemy combatants who associate themselves "with al Qaeda, an entity with which the United States is at war," and "travel[ ] to the United States for the avowed purpose of further prosecuting that war on American soil, against American citizens and targets," even though the government cannot establish that the combatant also "took up arms on behalf of that enemy and against our country in a *foreign* combat zone of that war." *Padilla*, 423 F.3d at 389 (emphasis added).

1.

As accurately pointed out by my colleagues, the alleged enemy combatants in *Hamdi* and *Padilla* were affiliated with the military arm of an enemy government, specifically the Taliban government of Afghanistan. By virtue of the alleged combatant's affiliation with the Taliban government, neither court was required to decide whether their affiliation with al Qaeda and, in the case of Padilla, the mission to carry out additional terrorist acts within this country, would also have supported their detention as enemy combatants.

In my opinion, however, there is no doubt that individuals who are dispatched here by al Qaeda, the organization known to have carried out the 9/11 attacks upon our country, as sleeper agents and terrorist operatives charged with the task of committing additional attacks upon our homeland "are [also] individuals Congress sought to target in passing the AUMF." *Hamdi*, 542 U.S. at 518. Citing the right of the United States "to protect United States citizens *both at home and abroad*," the AUMF authorized the President's use of "all necessary and appropriate force against" the nations *and organizations* that "planned, authorized, committed, or aided" the 9/11 attacks, "or harbored such organizations or persons, in order to prevent any future

acts of international terrorism against the United States." 115 Stat. 224. Clearly, Congress was not merely authorizing military retaliation against a reigning foreign government known to have *supported* the enemy force that attacked us in our homeland, but was also authorizing military action against al Qaeda operatives who, like the 9/11 hijackers, were sent by the al Qaeda organization to the United States to conduct additional terror operations here.

As persuasively pointed out by the government, it was the 9/11 attacks which triggered the passage of the AUMF. The al Qaeda operatives who successfully carried out those attacks entered this country under false pretenses for the purpose of carrying out al Qaeda orders and, while finalizing the preparations for these attacks, maintained a facade of peaceful residence until the very moment they boarded the commercial airliners that they used as weapons. The hijackers never engaged in combat operations against our forces on a foreign battlefield. Yet al-Marri would have us rule that when Congress authorized the President to deal militarily with those responsible for the 9/11 attacks upon our country, it did not intend to authorize the President to deal militarily with al Qaeda operatives identically situated to the 9/11 hijackers. There is nothing in the language of the AUMF that suggests that Congress intended to limit the military response or the presidential authorization to acts occurring in foreign territories, and it strains reason to believe that Congress, in enacting the AUMF in the wake of those attacks, did *not* intend for it to encompass al Qaeda operatives standing in the exact position as the attackers who brought about its enactment. Furthermore, Congress has not revised or revoked the AUMF since its enactment or since the Supreme Court decided *Hamdi*.

I am also unpersuaded by the claim that because al Qaeda itself is an international terrorist organization instead of a "nation state" or "enemy government," the AUMF cannot apply, consistent with the laws of war and our constitutional guarantees, to such persons. The premise of that claim seems to be that because al Qaeda is not technically in control of an enemy nation or its government, it cannot be considered as anything other than a criminal organization whose members are entitled to all the protections and procedures granted by our constitution. I disagree.

In my view, al Qaeda is much more and much worse than a criminal organization. And while it may be an unconventional enemy force in a historical context, it is an enemy force nonetheless. The fact that it allied itself with an enemy government of a foreign nation only underscores this point, rendering attempts to distinguish its soldiers or operatives as something meaningfully different from military soldiers in service to the Taliban government (or al Qaeda operatives such as Hamdi and Padilla, who fought beside them) equally strained. The President attacked the Taliban in Afghanistan as *retaliation* for al Qaeda's strike upon our nation *because* al Qaeda was centralized there and allied with the Taliban, and it also strains credulity to assert that while we are legitimately at war with the Taliban government, we cannot be at war with al Qaeda.

In sum, the war that al Qaeda wages here and abroad against American interests may be viewed as unconventional, but it is a war nonetheless and one initially declared by our enemy. *See Hamdi v. Rumsfeld*, 296 F.3d 278, 283 (4th Cir. 2002) (noting that "[t]he unconventional aspects of the present struggle do not make its stakes any less grave"); *Padilla*, 423 F.3d at 389 (noting that al Qaeda is "an entity with which the United States is at war"). The members of this enemy force come from different countries and they are positioned globally. They fight us with conventional weapons in Afghanistan and Iraq, but they have also infiltrated our borders and those of our allies, bent on committing, at a minimum, sabotage and other war-like acts targeting both military and civilian installations and citizens. While they do not hail from a single nation state, they are not really so dissimilar from the multi-national forces united against the United States and its allies in the conventional wars that we are more comfortable discussing. And when they cross our borders with the intent to attack our country from within on behalf of those forces, they are not appreciably different from the soldiers in *Quirin*, who infiltrated our borders to commit acts of sabotage against our military installations here — although as history and intelligence inform us, al Qaeda soldiers target not only our military installations, but also the citizens of this country. Nor does it matter that "they have not actually committed or attempted to commit any act of depredation or entered the theatre or zone of active military operations." *Quirin*, 317 U.S. at 38. When they enter this country "with hostile purpose," they are enemy belligerents subject to detention. *Id.*

In my view, limiting the President's authority to militarily detain soldiers or saboteurs as enemy combatants to those who are part of a formal military arm of a foreign nation or enemy government is not compelled by the laws of war, and the AUMF plainly authorizes the President to use all necessary and appropriate force against al Qaeda. I believe this necessarily includes the detention of al Qaeda operatives who associate with the enemy, be that the al Qaeda organization or the Taliban government, "and with its aid, guidance and direction enter this country bent on hostile acts." *Id.* at 37-38. Accordingly, I find it unnecessary to reach the question of whether the President possesses inherent authority to detain al-Marri.

2.

If the allegations of the Rapp Declaration are true, I am also of the view that al-Marri would fall within the category of persons who may be lawfully detained pursuant to the authority granted by the AUMF.

According to Rapp, al-Marri was *not* simply a civilian who lawfully entered the United States and was residing peacefully here while pursuing a higher educational goal. Nor, for that matter, was he a civilian who became sympathetic to al-Qaeda's mission and sought to support it in indirect ways. And he was certainly not a common criminal bent on committing criminal acts for personal reasons or gain. On the contrary, the allegations are that al-Marri directly allied himself with al Qaeda abroad, volunteered for assignments (including a martyr mission), received training and funding from al Qaeda abroad, was dispatched by al Qaeda to the United States as an al Qaeda operative with orders to serve as a sleeper agent, and was tasked with facilitating and ultimately committing terrorist attacks against the United States within this country. Unlike the al Qaeda operatives who preceded him, al-Marri was unsuccessful in his mission. But with this exception — owing to the efforts of our federal authorities here — he would not be appreciably different from either the German soldier dispatched here to attack military installations in *Quirin* or the al Qaeda operatives dispatched here to attack this country on 9/11. As noted by the magistrate judge, "[a]ssuming . . . that all of the facts asserted by [the government] are true, [al-Marri] attended an al Qaeda terror training camp and later, on September 10, 2001, entered this

country to continue the battle that the September 11th hijackers began on American soil." J.A. 123.

For these reasons, I agree that, assuming the allegations of the Rapp Declaration to be true, al-Marri would fall within the definition of an enemy combatant and that his military detention would be authorized pursuant to the AUMF.

### III.   Due Process

While I agree with my colleagues who would hold that the President has the legal authority under the AUMF to detain al-Marri as an enemy combatant for the duration of the hostilities, we part company on the issue of whether the process afforded al-Marri to challenge his detention was sufficient to meet the minimum requirements of due process of law. In my opinion, due process demands more procedural safeguards than those provided to al-Marri in the habeas proceedings below.

### A.

Consideration of "the question of what process is constitutionally due to a [person] who disputes his enemy-combatant status" begins with consideration of the Supreme Court's decision in *Hamdi*, which addressed not only the legal authority of the President to detain enemy combatants but also the process due to those so designated. *Hamdi*, 542 U.S. at 524.

Hamdi was captured on the battlefield in Afghanistan by our allies, transferred into our military custody, and then transported to the United States, where a habeas petition was filed on his behalf. In support of Hamdi's designation as an enemy combatant, the government filed the hearsay declaration of Michael Mobbs, Special Advisor to the Under Secretary of Defense for Policy, summarizing the factual basis for Hamdi's detention. The government argued that "'[r]espect for separation of powers and the limited institutional capabilities of courts in matters of military decision-making in connection with an ongoing conflict' ought to eliminate entirely any individual process, restricting the courts to investigating only whether legal authorization

exists for the broader detention scheme," or "[a]t most," review "under a very deferential 'some evidence' standard," which the government asserted the Mobbs Declaration met. *Id.* at 527. The district court disagreed, imposing procedural safeguards and discovery burdens "approach[ing] the process that accompanies a criminal trial." *Id.* at 528. The plurality of the Court, however, disagreed with both positions, noting that due process and normal habeas procedures demand more than the government sought to give, but also recognized that the exigencies and burdens of military warfare may necessitate a modification of the procedures and evidentiary showings normally demanded by our habeas jurisprudence.

As noted by the *Hamdi* plurality at the outset, "§ 2241 and its companion provisions provide at least a skeletal outline of the procedures to be afforded a petitioner in federal habeas review." *Id.* at 525. Once the petition is filed by or on behalf of the detainee setting forth "the facts concerning the applicant's . . . detention," 28 U.S.C.A. § 2242, the habeas court "direct[s] the respondent to show cause why the writ should not be granted," 28 U.S.C.A. § 2243, which places the burden upon "[t]he person to whom the writ or order is directed [to] make a return certifying the true cause of the detention," *id.* Section "2243 provides that 'the person detained may, under oath, deny any of the facts set forth in the return or allege any other material facts,' and § 2246 allows the taking of evidence in habeas proceedings by deposition, affidavit, or interrogatories." *Hamdi*, 542 U.S. at 525. However, while "Congress envisioned that habeas petitioners would have some opportunity to present and rebut facts[,] . . . courts in cases like this retain some ability to vary the ways in which they do so as mandated by due process." *Id.* at 526.

In determining what process would be appropriate in light of the facts at hand, the *Hamdi* plurality recognized the fundamental "tension that often exists between the autonomy that the [g]overnment asserts is necessary in order to pursue effectively a particular goal and the process that a citizen contends he is due before he is deprived of a constitutional right." *Id.* at 528. The individual's interest, of course, is "the most elemental of liberty interests — the interest in being free from physical detention." *Id.* at 529. The government's interests, however, are equally compelling — the interest "in detaining those who actually pose an immediate threat to the national security of the

United States during ongoing international conflict," *id.* at 530, and the interest in "ensuring that those who have in fact fought with the enemy during a war do not return to battle against the United States," *id.* at 531. Arriving at the procedures necessary to ensure that a person, even an enemy combatant, is not deprived of his liberty without due process of law, the plurality noted, requires a balancing of these "serious competing interests." *Id.* at 529. To balance those competing interests, the plurality turned to the test articulated by the Court in *Mathews v. Eldridge*, 424 U.S. 319 (1976), which

> dictates that the process due *in any given instance* is determined by weighing "the private interest that will be affected by the official action" against the [g]overnment's asserted interest, "including the function involved" and the burdens the [g]overnment would face in providing greater process. The *Mathews* calculus then contemplates a judicious balancing of these concerns, through an analysis of "the risk of an erroneous deprivation" of the private interest if the process were reduced and the "probable value, if any, of additional or substitute procedural safeguards."

*Hamdi*, 542 U.S. at 529 (internal citations omitted) (emphasis added) (quoting *Mathews*, 424 U.S. at 335).

Applying the *Mathews* test to the situation at hand, the plurality ultimately rejected both the "some evidence" standard proposed by the government *and* the criminal-like process suggested by the district court, ruling that:

> neither the process proposed by the [g]overnment nor the process apparently envisioned by the District Court below strikes the proper constitutional balance when a United States citizen is detained in the United States as an enemy combatant. That is, "the risk of an erroneous deprivation" of a detainee's liberty interest is unacceptably high under the [g]overnment's proposed rule, while some of the "additional or substitute procedural safeguards" suggested by the District Court are unwarranted in light of their limited "probative value" and the burdens they may impose on the military in such cases.

*Hamdi*, 542 U.S. at 532-33 (quoting *Mathews*, 424 U.S. at 335). However, while the plurality rejected the notion that a criminal-like process was mandated, it concluded that, at a minimum, a "citizen-detainee seeking to challenge his classification as an enemy combatant must receive notice of the factual basis for his classification, and a fair opportunity to rebut the [g]overnment's factual assertions before a neutral decisionmaker." *Hamdi*, 542 U.S. at 533. "[T]he full protections that accompany challenges to detentions in other settings *may* prove unworkable and inappropriate in the enemy-combatant setting," the plurality recognized, but "the threats to military operations posed by a basic system of independent review are not so weighty as to trump a citizen's core rights to challenge meaningfully the [g]overnment's case and to be heard by an impartial adjudicator." *Id.* at 535 (emphasis added).[5]

Because Hamdi was a battlefield detainee captured in a foreign nation, the core of the government's argument was that the need for lessened process was "heightened by the practical difficulties that would accompany a system of trial-like process." *Id.* at 531. Specifically, the government argued that "military officers who are engaged in the serious work of waging battle would be unnecessarily and dangerously distracted by litigation half a world away, and discovery into military operations would both intrude on the sensitive secrets of national defense and result in a futile search for evidence buried under the rubble of war." *Id.* at 531-32.

As dictated by *Mathews*, the plurality took account of these military burdens in weighing the interests at stake, and recognized that, when balancing the competing interests, these burdens *might* indeed demand a lessening of the normal process due:

---

[5]In a partially concurring opinion, Justice Souter and Justice Ginsberg joined with the plurality in ordering remand to "allow Hamdi to offer evidence that he is not an enemy combatant." *Hamdi*, 542 U.S. at 553 (Souter, concurring in part). Although they declined to adopt the plurality's precise resolution of the due process issue, the concurring justices indicated that they would not "disagree with the plurality's determinations (given the plurality's view of the [AUMF]) that someone in Hamdi's position is entitled at a minimum to notice of the [g]overnment's claimed factual basis for holding him, and to a fair chance to rebut it before a neutral decisionmaker." *Id.*

[T]he *exigencies* of the circumstances *may* demand that, aside from these core elements [of notice and an opportunity to be heard], enemy-combatant proceedings may be tailored to alleviate their uncommon potential to burden the Executive at a time of ongoing military conflict. *Hearsay, for example, may need to be accepted as the most reliable available evidence from the [g]overnment in such a proceeding.* Likewise, the Constitution would not be offended by a *presumption in favor of the [g]overnment's evidence*, so long as that presumption remained a rebuttable one and fair opportunity for rebuttal were provided. Thus, once the [g]overnment puts forth credible evidence that the habeas petitioner meets the enemy-combatant criteria, the onus could shift to the petitioner to rebut that evidence with more persuasive evidence that he falls outside the criteria. A burden-shifting scheme of this sort would meet the goal of ensuring that the errant tourist, embedded journalist, or local aid worker has a chance to prove military error while giving due regard to the Executive once it has put forth meaningful support for its conclusion that the detainee is in fact an enemy combatant. In the words of *Mathews*, process of this sort would sufficiently address the "risk of an erroneous deprivation" of a detainee's liberty interest while eliminating certain procedures that have questionable additional value in light of the burden on the [g]overnment.

*Hamdi*, 542 U.S. at 533-34 (emphasis added).[6]

In sum, *Hamdi*'s relaxed evidentiary standard of accepting hearsay evidence and presumption in favor of the government arose from the plurality's recognition that the process warranted in enemy-combatant proceedings *may* be lessened *if* the practical obstacles the Executive

---

[6]In August 2004, following the Supreme Court's June decision in *Hamdi*, we remanded the case to the Eastern District of Virginia for further proceedings consistent with the Supreme Court's decision. By October 2004, the parties had settled the matter. Hamdi was transported to Saudi Arabia, released from United States custody, and his petition dismissed with prejudice as settled, with no further consideration of the issue of what process was due Hamdi on remand.

would confront in providing the procedural protections normally due warrant such a modification.[7]

### B.

With these concepts in mind, I turn to the habeas proceeding conducted by the district court in al-Marri's case, and the question of whether the process accorded him after his motion for summary judgment was denied was constitutionally sufficient.

Although the district court rejected al-Marri's claim that as a matter of law he could not be detained as an enemy combatant, the district court properly recognized that al-Marri (like Hamdi) retained the constitutional right to challenge the allegations supporting his detention at a hearing satisfying the requirements of due process. Thus, the district court referred the case to a magistrate judge for a determination of what process al-Marri was entitled to in his efforts to challenge his designation.

---

[7]The Supreme Court's recent decision in *Boumediene v. Bush*, 553 U.S. ___, No. 06-1195 (June 12, 2008), I believe, confirms this approach to the question of whether and how the normal process due may be lessened in enemy-combatant proceedings. There, the Court reiterated the "uncontroversial" principles that "the privilege of habeas corpus entitles the prisoner to a meaningful opportunity to demonstrate that he is being held pursuant to 'the erroneous application or interpretation' of relevant law" and that "the habeas court must have the power to order the conditional release of an individual unlawfully detained." *Id.* at ___, slip op. at 50. But, the Court went on to recognize that these are only "the easily identified attributes of any constitutionally adequate habeas corpus proceeding. . . . [D]epending on the circumstances, more may be required." *Id.* As noted by the Court, "common-law habeas corpus was, above all, an adaptable remedy. Its precise application and scope changed *depending upon the circumstances.*" *Id.* (emphasis added); *see also id.* at ___, slip op. at 8-9 (Roberts, C.J., dissenting) ("Because the central purpose of habeas corpus is to test the legality of executive detention, the writ requires most fundamentally an Article III court able to hear the prisoner's claims and, when necessary, order release. Beyond that, the process a given prisoner is entitled to receive *depends on the circumstances* and the rights of the prisoner." (citation omitted) (emphasis added)).

During a status conference held before the magistrate judge, al-Marri sought full discovery from the government, arguing that such discovery was appropriate because many of the factors weighing against expansive discovery that were appropriate in *Hamdi* would not apply to him because Hamdi had been seized by military officers in a combat setting.[8] Unlike in *Hamdi*, al-Marri argued, the discovery he sought would be primarily, if not entirely, from civilian agencies and therefore would not interfere with the war powers or operations of the government. Al-Marri thus argued that the discovery he sought would be more akin to information obtained in a standard criminal investigation.

The magistrate judge, however, denied al-Marri's attempts to obtain evidence under § 2246, rejected al-Marri's attempts to distinguish *Hamdi*, and ruled that *Hamdi*'s relaxed evidentiary standard and presumption in favor of the government were equally and automatically appropriate for al-Marri's enemy-combatant proceeding. Thus, the magistrate judge concluded that the Rapp Declaration was sufficient by itself to provide al-Marri with notice of the factual basis for his designation as an enemy combatant and to meet the government's initial burden to set forth credible evidence that he met the enemy-combatant criteria. The magistrate judge accorded al-Marri sixty days to file factual evidence to rebut the Rapp Declaration by "more persuasive evidence."[9] If al-Marri was "unable to produce more persua-

---

[8]Specifically, al-Marri sought all statements made by al-Marri; all documents relied upon by Rapp or describing the sources of information referenced in the Rapp Declaration; all documents upon which the government intended to rely; all documents upon which the CIA, Department of Justice, Department of Defense, and the President relied in determining whether al-Marri was an enemy combatant; all documents describing the standard for the designation; and any exculpatory evidence. The request, therefore, included all documents pertaining to interrogations and interviews conducted by United States officials or others acting on their behalf. In addition, al-Marri sought to depose the sources referenced in or relied upon by Rapp in his declaration, including the high-level officials in the Executive Branch.

[9]The *Hamdi* framework requires the individual to meet the government's evidence with proof that is "more persuasive," and this is what the magistrate judge explicitly required of al-Marri. Thus, there is no basis for the argument that al-Marri needed only to come forward with "some evidence" to contradict the Rapp Declaration.

sive evidence than that produced by the government," *i.e.*, the Rapp Declaration, "the inquiry [would] end there." J.A. 183. But if al-Marri proved *by more persuasive evidence* that he was not an enemy combatant, he would not necessarily receive relief. If the government so desired, the magistrate judge would give the government another chance and proceed to a "full-blown adversary hearing" with the government having the burden to show "by clear and convincing evidence that the petitioner represents a continuing, present and grave danger to the national security of the United States and whose detention is necessary to prevent him from aiding al Qaeda in its efforts to attack the United States." J.A. 183.

Al-Marri thereafter filed a response generally denying the government's allegations. However, al-Marri asserted that the magistrate judge had erred in relieving the government of its constitutional and legal burden of coming forward with sufficient admissible evidence establishing that al-Marri was, in fact, an enemy combatant. Al-Marri thus "decline[d] *at th[at] time* the Court's invitation to assume the burden of proving his own innocence," which he deemed to be an "unconstitutional, unlawful and un-American" burden. J.A. 243 (internal quotation marks omitted).[10] The magistrate judge then issued a report and recommendation that the habeas petition be dismissed based upon al-Marri's failure to rebut the Rapp Declaration. Because al-Marri "present[ed] nothing but a general denial to the Executive's assertion of facts," J.A. 243, the magistrate judge concluded, al-Marri had "refused to participate in a meaningful way," J.A. 244, thus "squander[ing] his opportunity to be heard." J.A. 248.

Over al-Marri's objections, the district court adopted the report and recommendation and dismissed the petition. Although recognizing the lack of any "binding standard for reviewing the factual basis supporting the detention of an alleged enemy combatant" and the "little guidance" provided by the Supreme Court in *Hamdi*, the district court

---

[10]Al-Marri also complained that large portions of the Rapp Declaration deemed classified were not shared with him or his counsel, severely hampering his ability to refute the allegations against him. After the district court advised the parties that it would not consider information not presented to al-Marri, the government filed an updated, declassified version of the Rapp Declaration.

concluded that the framework discussed by the *Hamdi* plurality should be applied to al-Marri's situation. *Al-Marri*, 443 F. Supp. 2d at 778. The district court found unconvincing al-Marri's contention that "*Hamdi* does not apply here because the 'constitutional balance' it struck is limited to cases where the alleged enemy combatant is captured on a foreign battlefield." *Id.* In the district court's view, *Hamdi* was "not tethered to the facts surrounding [Hamdi's] apprehension and detention," and "the Supreme Court intended the due process structure it announced in *Hamdi* to apply to any challenge to detention mounted by an alleged enemy combatant." *Id.* at 779. "As *Hamdi* has been interpreted as supporting the authority of the President to designate Padilla and al-Marri as enemy combatants and to order their detention," the district court noted, "it makes little sense to cast aside the framework it announced for analyzing the factual evidence supporting that detention. The Court concludes, then, that the due process requirements outlined in *Hamdi* apply here." *Id.* at 780 (internal citations omitted). The district court therefore held that the hearsay declaration of Rapp was sufficient to satisfy the government's initial burden of providing al-Marri notice of the factual allegations supporting his designation and that al-Marri had no right to cross-examination or discovery in making his initial response.

Turning to the adequacy of al-Marri's response itself, the district court agreed that al-Marri had abandoned his opportunity to respond, "render[ing] the [g]overnment's assertions uncontested" and placing al-Marri "in an untenable position." *Id.* at 785. Al-Marri's "failure to offer *any* evidence on his behalf" necessarily resulted in his failure "to present 'more persuasive evidence' to rebut" the Rapp Declaration. *Id.* "[U]nder *Hamdi*'s outline of the procedures applicable in enemy combatant proceedings," the district court concluded that it "need go no further" and dismissed the petition. *Id.* According to the district court, al-Marri "received notice of the factual basis supporting his detention" and was "afforded a meaningful opportunity to rebut that evidence." *Id.* I respectfully disagree.

C.

The dispute in this appeal is relatively straight-forward, although its resolution is not. Al-Marri contends that he stands in a different posture from Hamdi and that due process demands more rigorous pro-

cedural safeguards than those provided by the district court here and
by the plurality in *Hamdi*. The government counters that the *Hamdi*
plurality's framework provided al-Marri all the process he was due,
asserting (1) that the *Hamdi* framework for providing process to a *cit-
izen* enemy combatant captured on a foreign battlefield is, *a fortiori*,
constitutionally sufficient for an *alien* enemy combatant seized in the
United States; and (2) that al-Marri failed to take advantage of the
process he was provided, making his claim for additional process
unpersuasive.

Having carefully considered the plurality's guidance in *Hamdi* and
the precedents upon which it relies, I am of the opinion that the dis-
trict court erred in categorically applying the framework discussed by
the *Hamdi* plurality to al-Marri's situation and accepting the Rapp
Declaration as sufficient to shift the burden of persuasion to al-Marri
without considering the specific circumstances before it. As was the
case in *Hamdi*, "the full protections that accompany challenges to
detentions in other settings [might] prove unworkable and inappropri-
ate in [al-Marri's] enemy-combatant [proceeding]." *Hamdi*, 542 U.S.
at 535. But that remains to be seen because, in my opinion, the district
court erred in the initial step of accepting the hearsay affidavit of
Rapp "as the most reliable available evidence from the
[g]overnment," *id.* at 534, without any inquiry into whether the provi-
sion of nonhearsay evidence would unduly burden the government,
and erred in failing to then weigh the competing interests of the liti-
gants in light of the factual allegations and burdens placed before it
for consideration.[11]

---

[11]I find no guidance from *Padilla* on this particular question. Like
Hamdi, Padilla "associated with forces hostile to the United States in
Afghanistan and took up arms against the United States forces in that
country in our war against al Qaeda." *Padilla*, 423 F.3d at 388. And like
al-Marri, Padilla was then "recruited, trained, funded, and equipped by
al Qaeda leaders to continue prosecution of the war in the United States"
through additional terrorist activities here, but was apprehended in this
country before he could complete his mission. *Id.* Although we held in
*Padilla* that the place of capture did not affect the President's power to
detain Padilla, neither this court nor the Supreme Court has held that the
place of capture does not affect the minimum constitutional process due.

1.

I begin with a general observation of the breadth of the ruling below. The district court concluded that the *Hamdi* decision was not limited to the facts surrounding Hamdi's apprehension and that the Supreme Court intended its framework to apply to every habeas petition filed by an alleged enemy combatant. On this broad point, I have no particular quarrel. However, from this premise, the district court also ruled that the Rapp Declaration, like the Mobbs Declaration in *Hamdi*, was sufficient to satisfy the government's initial step in the burden-shifting scheme, without requiring any showing by the government that the circumstances demanded that the proceedings should be "tailored to alleviate their uncommon potential to burden the Executive" or that the hearsay affidavit of Rapp was "the most reliable available evidence from the [g]overnment" because the presentation of more reliable evidence would unduly burden the government or otherwise interfere with the military or other national security efforts of the Executive. *Id.* at 534.

In my opinion, the *Hamdi* plurality neither said nor implied that normal procedures and evidentiary demands would be lessened in *every* enemy-combatant habeas case, regardless of the circumstances. And I cannot endorse such a view, which would allow the government to seize and militarily detain any person (including American citizens within this country) and support such military detention solely with a hearsay declaration of a government official who has no first-hand information about the detainee — *regardless* of whether more reliable evidence is readily available or whether the presentation of such evidence would impose *any* burden upon the government or interfere at all with its war or national security efforts.[12]

Although I do not rule out the possibility that hearsay evidence

---

[12]Once such evidence (which might also enjoy a favorable presumption) is presented, the burden will shift to the detainee to rebut the showing with evidence that is "more persuasive" than that of the government. *See Hamdi*, 542 U.S. at 534. A detainee's general denial of the hearsay allegations will be insufficient. Rather, he will be required to refute the fact-specific allegations made against him by presenting "more persuasive evidence that he falls outside the criteria." *Id.*

might ultimately prove to be the most reliable available evidence from the government in this case, *Hamdi* does not support such a categorical relaxation of the protections due persons who are detained within our borders. As noted earlier, the *Hamdi* plurality balanced the competing interest of the detainee in being free from governmental detention against the interest of the government in detaining those who pose a threat to national security and concluded that "the full protections that accompany challenges to detentions in other settings *may* prove unworkable and inappropriate in the enemy-combatant setting." *Id.* at 535 (emphasis added). The *Hamdi* plurality's acceptance of hearsay evidence from the government in such settings, however, clearly arose from the context of a battlefield detainee, the "exigencies of [such] circumstances," and the "uncommon potential to burden the Executive at a time of ongoing military conflict." *Id.* at 533. The relaxed evidentiary standard was accepted in the balance as appropriate in light of the facts of that case — a person initially detained abroad by our allies on a battlefield in Afghanistan. The plurality rejected an outright disapproval of such hearsay declarations, and described lesser procedures it believed might be sufficient to satisfy the due process rights of such detainees, noting that the normal evidentiary requirements *might* need to be relaxed to account for the governmental interest in military matters. *See id.* at 533-34 (explaining that hearsay "*may* need to be accepted as the most reliable available evidence from the [g]overnment" and "a presumption in favor of the [g]overnment's evidence" would not "offend[ ]" the Constitution in battlefield detainee proceedings). But while the plurality refused to categorically prohibit hearsay declarations, neither did it categorically approve the use of such hearsay declarations in all enemy-combatant proceedings.[13] Hearsay declarations *may* be accepted upon a weighing

---

[13]Thus, I do not believe *Hamdi* recognized that the government's burden in enemy-combatant proceedings could always be satisfied by a knowledgeable affiant who summarizes the evidence on which the detention was based. That is not what *Hamdi* said at all. Instead, the plurality merely noted that, in the context of the case before it, the Government had made it clear "that documentation regarding *battlefield detainees* already is kept in the ordinary court of military affairs" and that "[a]ny factfinding imposition created by requiring a knowledgeable affiant to summarize *these* records to an independent tribunal is a minimal one." *Hamdi*, 542 U.S. at 534 (emphasis added). For this reason, the *Hamdi* plurality was unpersuaded by the government's claim that "this basic

of the burdens in time of warfare of "providing greater process" against the detainee's liberty interests. *Id.* at 529. But to decide whether a hearsay declaration is acceptable, the court must first take into account "the risk of erroneous deprivation" of the detainee's liberty interest, "the probable value, if any, of any additional or substitute procedural safeguards," and the availability of additional or substitute evidence which might serve the interests of both litigants. *Id.* (internal quotation marks omitted).

In sum, I disagree that the plurality in *Hamdi* endorsed a categorical acceptance of such hearsay declarations for all alleged enemy combatants regardless of the place of seizure or the other circumstances at hand. In my view, the balancing test set forth in *Mathews*, and discussed in the context of enemy-combatant proceedings in *Hamdi*, presumes that the process due a detainee, including enemy combatants, will indeed vary with the facts surrounding the detention and the precise governmental burdens that would result from providing the normal procedures due under our constitution. *See Mathews*, 424 U.S. at 334 ("[D]ue process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances. Due process is flexible and calls for such procedural protections as the particular situation demands" (internal quotation marks and alteration omitted)); *Hamdi*, 542 U.S. at 526 (noting that courts in habeas cases "retain some ability to vary the ways in which" enemy combatants may present and rebut facts "as mandated by due process"). This balancing will require flexibility on the part of the habeas court in order to deal with the wide variety of situations involved in each individual case and is a necessary component of the *Hamdi* framework. Thus, on remand, the locus of al-Marri's seizure will not forbid his classification as an enemy combatant subject to military detention or foreclose the district court from lessening the normal procedures where appropriate in the balance of the competing interests, but it is not irrelevant to the task of weighing the interests at stake and balancing the risks involved to determine what due pro-

---

process [would] have [a] dire impact on the central functions of warmaking." *Id.* I cannot read this language divorced from the context in which it was written and would demand no more than the same benefits/burdens analysis given to Hamdi.

cess protections are due him in his quest to challenge his designation and continued detention by our military. *See Mathews*, 424 U.S. at 334 ("[R]esolution of the issue of whether [the] procedures provided . . . are constitutionally sufficient requires analysis of the governmental and private interests that are affected.").[14]

2.

In this case al-Marri's "private interest affected by the official action" is the same as that of Hamdi, *i.e.*, the liberty interest in being free from unlawful seizure and detention. *Hamdi*, 542 U.S. at 529 (internal quotation marks and ellipsis omitted). The risk of an erroneous deprivation of al-Marri's liberty interest, however, is not identical to the risk that was present in *Hamdi*. Al-Marri was not captured on the battlefields of Afghanistan or Iraq, nor even apprehended in a neighboring country where al Qaeda trains its soldiers. He was arrested by civilian federal authorities while residing in Illinois. I am acutely aware of the dangers of detention and imprisonment without compliance with criminal process safeguards, dangers that are even greater when the military detains persons inside the borders of the United States. In my view, the risk of erroneously detaining a civilian or citizen in this country as an enemy combatant is much greater inside the United States than in the very different context addressed

---

[14]Thus, the locus of capture is not an artificial or categorical distinction, nor is it the lynchpin of my view. I have made it clear that I do not rule out the possibility that the Rapp Declaration *might* be acceptable, although al-Marri is entitled to have the basis for such acceptance explained to an Article III court before he is deprived of his liberty interest in being free from physical detention. Actually, I propose that al-Marri receive exactly what the *Hamdi* plurality gave to Hamdi — a directive that the district court weigh his rights against the *actual* governmental burdens to determine whether a lessening of the normal procedures is warranted. For the reasons discussed by the *Hamdi* plurality, the locus of capture affects the question of whether we should accept less reliable evidence, such as a hearsay affidavit, than we normally would in habeas cases. But this is because capture in a war zone almost certainly will increase the burden placed upon the Executive by requiring production of direct or first-hand evidence supporting the designation. It is not simply because the detainee was abroad when seized.

by the Supreme Court in *Hamdi*, *i.e.*, a conventional battlefield within the borders of a foreign country in which we are fighting our enemies.

On the other hand, we must consider the government's interest "in detaining those who actually pose an immediate threat to the national security of the United States during ongoing international conflict," *Hamdi*, 542 U.S. at 530, and in "ensuring that those who have in fact fought with the enemy during a war do not return to battle against the United States," *id.* at 531, as well as "the burdens the [g]overnment would face in providing greater process," *id.* at 529.

Here, the government asserts that the Rapp Declaration, which summarizes the intelligence gathered on al-Marri's activities as an al-Qaeda operative, is sufficient to meet its initial burden of proving that al-Marri was properly designated an enemy combatant. However, unlike in *Hamdi*, the government has presented *only* the Rapp Declaration. It has made no attempt to show that this hearsay evidence "need[s] to be accepted as the most reliable available evidence from the [g]overnment," *id.* at 533-34, or that additional protections to ensure that the innocent are not detained by our military would be "unworkable and inappropriate in th[is] enemy-combatant setting," *id.* at 535. Nor has there been any consideration of the "probable value, if any, of additional or substitute procedural safeguards" or the availability of more reliable evidence that might be presented by substitute methods which account for the government's weighty interests. *Id.* at 529 (internal quotation marks omitted).

As previously noted, al-Marri argued below that he believed the discovery sought would be primarily from civilian agencies that could produce it without interfering with the war powers and war operations of this government.[15] At a minimum, I believe the government should

---

[15]For example, it seems that at least some portions of the Rapp Declaration merely summarize interviews of al-Marri conducted by FBI agents after his civilian arrest and by DOD personnel once he was transferred to military custody and imprisoned in the Charleston Naval Brig. There is every indication that these governmental agents have first-hand information about the basis for al-Marri's detention and, unlike the military personnel at issue in *Hamdi*, are present in the United States. The government has made no showing that it would be unduly burdensome to the war effort or, more particularly, to its efforts to carry out the directives of the AUMF, to have them appear, either in person or by their own first-hand affidavits, before the district court.

be required to demonstrate to the district court why this is not the case and why, in balancing the liberty interest of the detainee and the heightened risk of erroneous deprivation, the Rapp Declaration should be accepted as the most reliable available evidence the government can produce without undue burden or serious jeopardy to either its war efforts or its efforts to ensure the national security of this nation.

3.

In this context, the Constitution prohibits subjecting an individual inside the United States to military detention *unless* he fits within the legal category of an enemy combatant in the armed conflict against al Qaeda or its supporting nations. If the allegations contained within the Rapp Declaration are true, then al-Marri fits within the exception and can be properly designated an enemy combatant and militarily detained pursuant to the authority granted the President in the AUMF. He would be properly classified as an enemy combatant who infiltrated our country under false pretenses for the purpose of waging war via terrorist activities.

Because al-Marri was seized and detained in this country, however, he is entitled to habeas review by a civilian judicial court and to the due process protections granted by our Constitution, interpreted and applied in the context of the facts, interests, and burdens at hand. To determine what constitutional process al-Marri is due, the court must weigh the competing interests, and the burden-shifting scheme and relaxed evidentiary standards discussed in *Hamdi* serve as important guides in this endeavor. *Hamdi* does not, however, provide a cookie-cutter procedure appropriate for every alleged enemy-combatant, regardless of the circumstances of the alleged combatant's seizure or the *actual* burdens the government might face in defending the habeas petition in the normal way.

Al-Marri clearly stands in a much different position from Hamdi. He was not captured bearing arms on the battlefield of Afghanistan, but was arrested within the United States by the FBI as a result of the 9/11 investigation and subsequent intelligence operations conducted by our government. This does not preclude his designation as an enemy combatant, but we cannot ignore that the evidence supporting his designation is not likely buried under the rubble of a foreign bat-

tlefield — although it might be equally unavailable for national security reasons. Thus, unlike in *Hamdi*, the government's interest "in *reducing* the process available to alleged enemy combatants" may not be "heightened by the practical difficulties that would accompany a system of trial-like process." *Id.* at 531 (emphasis added). In sum, the government has not demonstrated that al-Marri's fair opportunity for rebuttal requires no more than that which would have been accorded to Hamdi on remand.

Al-Marri, like any person accused of being an enemy combatant, is entitled to a fair, meaningful opportunity to contest that designation by requiring the government to demonstrate through "the most reliable available evidence" that he is an enemy combatant, denying the allegations against him, and presenting evidence in support of his contest. *Id.* at 534. As in *Hamdi*, the evidence which will be accepted and the determination of the manner in which due process proceedings must occur will again be left largely to the district courts. *See id.* at 538-39 (noting that "[w]e anticipate that a District Court [will] proceed with the caution that we have indicated is necessary in this setting, engaging in a factfinding process that is both prudent and incremental. We have no reason to doubt that courts faced with these sensitive matters will pay proper heed both to the matters of national security that might arise in an individual case and to the constitutional limitations safeguarding essential liberties that remain vibrant even in times of security concerns"); *accord Boumediene*, 553 U.S. at ___, slip op. at 67-68 ("We make no attempt to anticipate all of the evidentiary and access-to-counsel issues that will arise during the course of the detainees' habeas corpus proceedings. We recognize, however, that the Government has a legitimate interest in protecting sources and methods of intelligence gathering; and we expect that the District Court will use its discretion to accommodate this interest to the greatest extent possible. . . . These and . . . other remaining questions are within the expertise and competence of the District Court to address in the first instance."). In this regard, the district court retains all its normal flexibility to vary the manner in which the presentation of evidence occurs in enemy-combatant proceedings. It is not precluded from accepting the hearsay declaration should it conclude that threats to national security or the war efforts dictate its use. *See Hamdi*, 542 U.S. at 533-34; *see also Boumediene*, 553 U.S. at ___, slip op. at 67 (Habeas corpus courts may not "disregard the dangers the detention

in these cases was intended to prevent. . . . Certain accommodations can be made to reduce the burden habeas corpus proceedings will place on the military without impermissibly diluting the protections of the writ."). But, it is not handcuffed by an inflexible procedure that would demand acceptance of a hearsay declaration from the government simply because the government has labeled al-Marri an enemy combatant.

The general rule, therefore, is that al-Marri would be entitled to the normal due process protections available to all within this country, including an opportunity to confront and question witnesses against him. But, if the government can demonstrate to the satisfaction of the district court that this is impractical, outweighed by national security interests, or otherwise unduly burdensome because of the nature of the capture and the potential burdens imposed on the government to produce non-hearsay evidence and accede to discovery requests, then alternatives should be considered and employed. Given the grave national security concerns in matters such as this, and that the Rapp Declaration references not only al-Marri's activities in this country but also those he engaged in abroad prior to his entry here, the Rapp Declaration might conceivably prove to be "the most reliable available evidence" within the meaning of *Hamdi*, at least as to some allegations. However, I am not satisfied to let matters stand as they are when the government has not even been required to demonstrate to the district court why it cannot or should not be required to produce, even for *ex parte* examination, any of the supporting evidence relied upon by Rapp to justify al-Marri's detention. Here, the government has made no showing that "[h]earsay . . . [needs] to be accepted as the most reliable available evidence from the [g]overnment" or that the "exigencies of the circumstances . . . demand . . . [that the] enemy-combatant proceeding[ ] . . . be [otherwise] tailored to alleviate their uncommon potential to burden the Executive at a time of ongoing military conflict." *Hamdi*, 542 U.S. at 533-34; *cf. Boumediene*, slip op. at 64-65 ("Practical considerations and exigent circumstances inform the definition and reach of the law's writs, including habeas corpus. The cases and our tradition reflect this precept.").[16]

---

[16]The *Boumediene* Court held that the procedural protections given to enemy combatants under the Military Commissions Act of 2006, Pub. L.

I think due process, at a minimum, demands that the government make this showing. It is only after *that* showing has been made, *i.e.*, "once the [g]overnment puts for *credible* evidence that the habeas petitioner meets the enemy-combatant criteria," that "the onus could shift to the petitioner to rebut that evidence with more persuasive evidence that he falls outside the criteria." *Id.* at 534 (emphasis added). "In the words of *Mathews*, process of this sort would sufficiently address the 'risk of an erroneous deprivation' of a detainee's liberty interest while eliminating certain procedures that have questionable additional value in light of the burden on the [g]overnment." *Id.*

D.

Concluding that the procedural framework employed below has not been shown to be constitutionally sufficient, however, does not completely end the inquiry. The district court held that the *Hamdi* framework, with its relaxed evidentiary standards and presumption in favor

---

No. 109-366, 120 Stat. 2600, fell "well short of the procedures and adversarial mechanisms that would eliminate the need for habeas corpus review," *id.*, 553 U.S. at ___, slip op. at 37, noting in particular that while "[t]he detainee is allowed to present 'reasonably available' evidence, . . . his ability to rebut the Government's evidence against him [which is accorded a presumption of validity] is limited by the circumstances of his confinement and his lack of counsel at th[at] stage," *id.*, 553 U.S. at ___, slip op. at 38 (citation omitted). And while the dissent disagreed that the CSRT hearings were an insufficient substitute for habeas, it too pointed out in defense that the CSRT provides "every petitioner . . . the right to present evidence that he has been wrongfully detained," "includ[ing] the right to call witnesses who are reasonably available, question witnesses called by the tribunal, introduce documentary evidence, and testify before the tribunal." *Id.*, 553 U.S. at ___, slip op. at 17 (Roberts, C.J., dissenting). Nowhere, in either *Hamdi* or *Boumediene*, do I find support for the view that a detainee may be wholly deprived of all discovery *and* all rights to cross-examination and confrontation — regardless of the availability of the witnesses and documentary evidence — without any inquiry into whether exigent circumstances or other concerns for national security necessitate such a drastic lessening of the process normally available who challenge their executive detention.

of the government, applies to every enemy-combatant case, permitting the government to meet its initial burden with a hearsay declaration regardless of the location of capture or the citizenship of the detainee. The district court also held that the Rapp Declaration was sufficient to meet the government's initial burden, entitling it to the favorable presumption and shifting to al-Marri the burden of refuting the allegations by "more persuasive" evidence. However, al-Marri's petition was not ultimately dismissed because the district court weighed competing factual evidence and determined that it supported a finding that al-Marri *was* an enemy combatant, *i.e.*, that the allegations of the Rapp Declaration were true. Rather, the district court dismissed the petition because al-Marri failed to come forward with affidavits and documents of his own as required by the court's order, thereby ostensibly failing to contradict the government's position "with more persuasive evidence."

Al-Marri, however, did not ignore the district court. He filed a pleading in which he denied the allegations in the Rapp declaration, he denied that he was an enemy combatant, and he denied he had entered the United States to commit hostile acts. In this, his first opportunity to contest his designation as an enemy combatant, he had been completely denied any discovery, not been allowed to see the evidence upon which the allegations were based, and not told even the identity of his accusers, all without adequate explanation or justification. Given that his burden was not just to contest, but to disprove, he was placed at a substantial disadvantage. And despite the efforts that have been made to slough off or ignore the burden of proof placed upon him, the fact warrants emphasis that al-Marri was required under these circumstances to prove that he was not an enemy combatant by more persuasive evidence. *See* J.A. 183 (holding that al-Marri would be given sixty days to file factual evidence to rebut the Rapp Declaration by "more persuasive evidence, but if "unable to produce more persuasive evidence than that produced by the government," *i.e.*, the Rapp Declaration, "the inquiry [would] end there"). He did contest the constitutionality of the process to which he had been subjected, and he declined for the time being "to assume the burden of proving his innocence." J.A. 231. Had he produced evidence, it is possible that the district court might have found his contrary evidence sufficiently "more persuasive" than the Rapp Declaration, but proving he was not the enemy would have gotten al-Marri exactly nothing as

a practical matter since the government had been guaranteed the option of further proceedings against him.

In the end, the district court rejected al-Marri's petition because it presumed that the process it utilized *was* a constitutional one, the point on which I disagree. I am aware of no case in which a person detained in this country has been stripped of the opportunity to contest the legality of his detention for refusing to participate in an unconstitutional process. Nor has any been pointed out to me. A criminal defendant cannot claim a procedural due process violation after he has refused to avail himself of protections that comport with his constitutional rights, but al-Marri is not presently a criminal defendant and he refused to participate in a process that, in my judgment, was *not* constitutional.

In any event, given the unique and uncertain circumstances in which al-Marri found himself as he progressed in his challenge, I think it would be unfair to punish al-Marri by dismissing his petition on this basis. Al-Marri had been charged criminally with serious crimes prior to his designation as an enemy combatant. After his transfer from civilian to military custody, he advanced a novel but plausible argument that, as a resident seized within this country, he should be considered a civilian who could not be detained as an enemy combatant and he should be *returned* to the criminal justice system. Were he ultimately successful on this issue, al-Marri would be accorded the presumption of innocence and the Fifth Amendment right not to "be compelled . . . to be a witness against himself." U.S. Const. Amend. V. Al-Marri simultaneously advanced a second, plausible argument that the *Hamdi* framework would not meet the minimum procedural due process requirements in his quite different situation, and that he was entitled to something more akin to the criminal process protections. As evidenced in *Hamdi*, *Padilla*, and this case, the government frequently changes the manner in which it deals with alleged enemy combatants during the pendency of habeas proceedings, including transferring detainees back and forth from civilian to military detention when it deems it prudent. Accordingly, al-Marri had every reason to fear that were he to give evidence on his behalf in an attempt to meet the "more persuasive" standard, the government might then choose to transfer him *back* to civilian custody and use his own evidence against him.

Given the serious nature of the claims before us and the uncertainties which existed at the time, and the fact that al-Marri was deprived of any opportunity to obtain any direct or first-hand evidence from those who had arrested him and later detained him, I cannot be overly critical of al-Marri's strategy of not responding to the Rapp Declaration with rebuttal evidence beyond his general denial, and I cannot sanction dismissal of al-Marri's habeas petition based upon a choice not to participate in the constitutionally and statutorily insufficient procedure.[17] Al-Marri may have squandered *an* opportunity to contest his designation, but he did not squander a "meaningful opportunity" to do so.

## IV.   Conclusion

To conclude, the issues we decide today are significant for the reasons stated throughout all of the opinions. But, in my judgment, there are additional concerns implicated by our decision that may have gone without sufficient notice. The case before us deals on the surface with a foreign national who has entered the United States. But the rights al-Marri asserts are those available under our Constitution to anyone within our borders, including, obviously, American citizens. Under the current state of our precedents, it is likely that the constitutional rights our court determines exist, or do not exist, for al-Marri will apply equally to our own citizens under like circumstances. This means simply that protections we declare to be unavailable under the Constitution to al-Marri might likewise be unavailable to American citizens, and those rights which protect him will protect us as well.

The *Hamdi* court gave the government the opportunity to use hearsay testimony when practical considerations required it, and the court suggested that this evidence might also be accompanied by a presumption of validity. *See id.* at 534. Because the detainee must prove a negative — that he is *not* an enemy combatant — to obtain release and he or someone on his behalf must do it with more persuasive evi-

---

[17]*See* 28 U.S.C.A. § 2246 ("On application for a writ of habeas corpus, evidence may be taken orally or by deposition, or, in the discretion of the judge, by affidavit. If affidavits are admitted any party shall have the *right* to propound written interrogatories to the affiants, or to file answering affidavits.") (emphasis added).

dence in circumstances where the military may be holding the detainee incommunicado, simple fairness seems to me to require that first-hand evidence from the government should be the norm and the use of hearsay the exception. Add to the mix that the individual could be an American citizen and that the government's evidence could be here in the United States, easily accessible and publicly disclosable, and the need for a check on the government's use of a hearsay affidavit to justify the long-term military detention of a person becomes obvious.

In these uncertain times, we must tread carefully when balancing our need for national security with our rights as individuals. This case is fraught with danger to individual rights and for that reason, I expressly limit the reach of my opinion and decide no more than is explicit and necessary to address the issues presented to us.

If the allegations against al-Marri are true, al-Marri is a foreign national and member of al Qaeda who entered the United States with a purpose to commit additional hostile and war-like acts within our homeland, and he may therefore be detained as an enemy combatant under the AUMF. Accordingly, I would affirm the district court's order denying al-Marri's motion for summary judgment on the issue of whether the President possesses the legal authority to detain al-Marri as an enemy combatant.

However, because al-Marri was present within our borders at the time our intelligence sources identified him as an enemy combatant, he is entitled to contest his designation under the burden-shifting scheme outlined in *Hamdi*. Under this scheme, the government may demonstrate that the balance of the competing interests weighs on the side of lessened due process protections, which al-Marri and his counsel may contest. But because the district court applied *Hamdi*'s lessened procedures to al-Marri without any additional inquiry or balancing of the respective interests, I would hold that the process al-Marri received was constitutionally insufficient, vacate the district court's order dismissing al-Marri's petition, and remand for further proceedings.

GREGORY, Circuit Judge, concurring in the judgment:

I join the per curiam opinion reversing and remanding the district court's decision because "al-Marri has not been afforded sufficient

process to challenge his designation as an enemy combatant." (Per Curiam Op. at 5). Further, I join in Judge Motz's concurrence. While I respect the opinions and tireless work of my colleagues, I write separately to provide historical context and to express my intransigent belief that the Constitution requires a person detained in the United States under the Authorization for the Use of Military Force ("AUMF") receive a *determinate* level of due process to justify the denial of his liberty. And it is the role of this Court to provide clear guidance as to the contours of that due process.

The horrific attack on 9/11 resulted in congressional passage of the AUMF, the most far-reaching bestowal of power upon the Executive since the Civil War. The AUMF authorizes the President to "use all necessary and appropriate force against . . . persons" with a connection — however attenuated that connection may be — to the 9/11 attacks in order to "prevent any future [terrorist] attacks . . . against the United States." Pub. L. No. 107-40, 115 Stat. 224 (2001). As I discuss below, the AUMF punishes *conduct*, not status. Therefore, the location and citizenship of a putative enemy should be of no consequence in determining the level of due process that an enemy combatant detained in America under the AUMF, like al-Marri, should receive.

The majority of my colleagues agree that a person of al-Marri's status is entitled to more due process than that which he received, but unfortunately, there is no concrete guidance as to what further process is due. Little doubt exists that this judgment will leave the district court with more questions than answers. In deciding what this process should entail, the district court can find wise counsel in Supreme Court and Fourth Circuit precedent, including our decision in *United States v. Moussaoui*, 382 F.3d 453 (4th Cir. 2004), and in the statutory framework Congress created for handling classified material in a judicial setting, the Classified Information Procedures Act ("CIPA"), 18 U.S.C. App. 3, §§ 1-16 (West 2000 & Supp. 2007).

I.

Every American, unless clearly abrogated by congressional act or deprived by due process of law, has a right to freedom—a right pro-

tected by the writ of habeas corpus.[1] Senator Arlen Specter, in introducing a bill to restore habeas corpus to all aliens detained within U.S. territory, reminded us that the venerated right to habeas corpus is "a right which has existed in Anglo Saxon jurisprudence since King John in 1215 at Runnymede." 152 Cong. Rec. S11196-01 (December 5, 2006). Indeed, the writ is so cherished that it has been referred to by Blackstone as "the most celebrated writ in the English law", 3 William Blackstone, Commentaries *129, a reverence echoed by the Supreme Court. *See Ex parte Bollman*, 4 Cranch 75, 95 (1807) (describing the writ of habeas corpus as the "[G]reat [W]rit.")

Alexander Hamilton lauded "the establishment of the writ of habeas corpus" along with "the prohibition of ex-post-facto laws, and of TITLES OF NOBILITY" as the Constitution's "greate[st] securities to liberty and republicanism." The Federalist No. 84 (Alexander Hamilton) (emphasis in original); *see also*, *Boumediene v. Bush*, 553 U.S. ___, ___, slip op. at 12, No. 06-1195 (June 12, 2008) ("That the Framers considered the writ a vital instrument for the protection of individual liberty is evident from the care taken to specify the limited grounds for its suspension[.]"). The broad language of the AUMF, literally construed, gives the President carte blanche to take any action necessary to protect America against any nation, organization, or person associated with the attacks on 9/11 who intends to do future harm to America. Nevertheless, nothing calls for the lifting of the Great Writ in the AUMF, in its legislative history, or even in congressional or presidential public statements. But, if we approved the "due process" al-Marri received, we would do precisely that.

When an American citizen[2] can be designated an enemy combatant, arrested by the military, and held incommunicado with no knowledge

---

[1]The Great Writ originally concerned whether the court had jurisdiction, *see e.g.*, *Ex parte Watkins*, 28 U.S. 193 (1830), but it has "evolved as a remedy available to effect discharge from any confinement contrary to the Constitution or fundamental law." *Preiser v. Rodriguez*, 411 U.S. 475, 485 (1973).

[2]As I explain below, while al-Marri is not an American citizen, that distinction is insignificant under the AUMF, and the rights al-Marri receives will no doubt be the standard by which we measure the due process rights of all enemy combatants detained in the United States.

of the justification for his detention (other than a declaration from a government official who has no first-hand knowledge of the situation), it is not only al-Marri's rights that are at stake, but rather the rights of every man, woman, and child who breathe the fragrant scent of liberty in this great land. I am cognizant that the Commander-in-Chief must be able to conduct a war without undue interference from a co-equal branch of government. Accordingly, I recognize the delicate constitutional balance that must be struck between military detention and the possibility of abridged due process proceedings during times of war. However, an independent judiciary is obliged to preserve the fundamental building blocks of our free society — in this case, the right to know why one has been deprived of his liberty and a fair opportunity to answer that charge. *See Boumediene*, 553 U.S. at ____, slip op. at 9 ("The Framers viewed freedom from unlawful restraint as a fundamental precept of liberty, and they understood the writ of habeas corpus as a vital instrument to secure that freedom.").

Our judgment today, while entitling al-Marri to an indeterminate measure of further due process, leaves much to be desired. Regrettably, the unvarnished result is that the AUMF authorizes the President to substitute the *full* protections of the Great Writ for any enemy combatant detained in the United States with an alternative due process framework tethered to mere suggestions.

The uncertain duration of this conflict — the seven-year anniversary of 9/11 is less than three months away - and the fact that America is not fighting a traditional nation-state means that the prospect of future al-Qaeda operatives entering the country for deleterious purposes is very real and ongoing with no foreseeable end. *See Boumediene*, 553 U.S. at ___, slip op. at 56, 41 (predicting that the war on terrorism may "last a generation or more" and noting that it is "already among the longest wars in American history"). It stretches the bounds of credulity to think that a Treaty of Versailles-esque ceremony will ever end all terrorist hostilities against the United States.

With this troubling thought in mind, I attempt to provide a legal framework to assist the district court in adjudicating this matter on remand.

## II.

The factual circumstances underlying this case "are entirely unlike those of the conflicts that informed the development of the law of war," *Hamdi v. Rumsfeld*, 542 U.S. 507, 521 (2004), thus it is incumbent upon us to outline the contours of the due process framework for the district court.[3] In doing so, we must respect the Framers' decision to place the power to conduct a war in the hands of the Executive, *see* U.S. Const. art. II, § 2, cl. 1, but we must also recall the Supreme Court's admonition that "a hermetic sealing off of the three branches of Government from one another would preclude the establishment of a Nation capable of governing itself effectively." *Buckley v. Valeo*, 424 U.S. 1, 121 (1976) (per curiam). This is particularly true when, as here, the situation demands adjudication. It is, without question, the sole province of the judicial branch to determine what process a person should receive. *See Boumediene*, 553 U.S. at ___, slip op. at 36 (holding that "the writ of habeas corpus is itself an indispensable mechanism for monitoring the separation of powers"). As we pointed out in *United States v. Moussaoui*, 382 F.3d 453, 469 (4th Cir. 2004):

> This is not a case involving arrogation of the powers or duties of another branch. The district court orders requiring production of the enemy combatant witnesses involved the resolution of questions properly-indeed, exclusively-reserved to the judiciary. Therefore, if there is a separation of powers problem at all, it arises only from the burden the actions of the district court place on the Executive's performance of its duties.

Accordingly, the separation of powers issue is of no moment here as the remand requires the district court to perform a purely judicial function: determine which evidence the Government must turn over to al-Marri. Moreover, as we have seen in *Moussaoui*, and more recently in *United States v. Abu Ali*, 528 F.3d 210 (4th Cir. 2008), the question of whether that evidence is publicly disclosable is of little

---

[3]The din of my good colleagues urging an incremental due process approach is problematic because "the relevant language in *Hamdi* did not garner a majority of the Court." *Boumediene*, 553 U.S. at ___, slip op. at 55.

relevance. Rather, the pertinent question is whether al-Marri will be able to review such evidence, and if so, in what form that evidence will be presented.

A.

While Judge Traxler states that "it is *likely* that the constitutional rights our court determines exist, or do not exist for al-Marri will apply equally to our own citizens under like circumstances" *ante* at 98 (Traxler, J., concurring in judgment) (emphasis added), it is beyond peradventure that the Constitution will furnish an American citizen, detained under these circumstances, no more rights than those we provide al-Marri. Indeed, any other result would be inconsistent with the very text of the AUMF and the Constitution. After *Hamdi*, we decided *Hanft v. Padilla*, 423 F.3d 386 (4th Cir. 2005), where we explained that the "distinction between an enemy combatant captured abroad and detained in the United States, such as Hamdi, and an enemy combatant who escaped capture abroad but was ultimately captured domestically and detained in the United States, such as Padilla" is insignificant when determining who is an enemy combatant. *Id.* at 393. Though we did not address the issue of what process, if any, the Constitution owed Padilla, his arrest in the United States entitled him to the same level of process that al-Marri should receive.

As the district court recognized, the *Hamdi* plurality set out some guideposts for determining the due process rights of an enemy combatant. Most importantly, the Supreme Court held that "a citizen-detainee seeking to challenge his classification as an enemy combatant must receive notice . . . and a *fair opportunity* to rebut the Government's factual assertions[.]". *Hamdi*, 542 U.S. at 533 (emphasis added). The circumstances underlying al-Marri's detention, when juxtaposed with the facts in *Moussaoui*, *Padilla*, and *Abu Ali*, and with the Executive's decision as to which of them should be designated enemy combatants, inform my view as to what is "fair" in this case.

The Executive's process for designating an al-Qaeda operative an enemy combatant has very real legal consequences. Padilla, Moussaoui, and Abu Ali, all al-Qaeda operatives bearing the trademarks of an enemy combatant, were charged, like al-Marri, in the civilian criminal system. Unlike al-Marri, however, the Executive allowed the

other defendants to proceed in civilian criminal trials for reasons that are unknown.

In *Padilla*, the Executive's decision to designate Padilla as an enemy combatant upon his arrest gave credence to that decision. Foregoing any discussion of due process, we held that "the availability of criminal process cannot be determinative of the power to detain," *Padilla*, 423 F.3d at 394, because detention prevented the enemy combatant from "return[ing] to the field of battle." *Id.* at 395. Moreover, if Padilla was not detained, "criminal prosecution would impede the Executive in its efforts to gather intelligence from the detainee and to restrict the detainee's communication with confederates so as to ensure that the detainee does not pose a continuing threat to national security even as he is confined." *Id.* Given these justifications, the Executive's subsequent decision to transfer Padilla from military to civilian custody on the eve of the Supreme Court's review of our decision came, in this Court's view, at a "substantial cost to the government's credibility before the courts," *Padilla v. Hanft*, 432 F.3d 582, 585-86 (4th Cir. 2005) because:

> we would regard the intentional mooting by the government of a case of this import out of concern for Supreme Court consideration not as legitimate justification but as admission of attempted avoidance of review. The government cannot be seen as conducting litigation with the enormous implications of this litigation-litigation imbued with significant public interest-in such a way as to select by which forum as between the Supreme Court of the United States and an inferior appellate court it wishes to be bound.

Though much of the Government's evidence against Padilla, Moussaoui, and Abu Ali remains classified, the sheer volume of that evidence is overwhelming.[4] Beyond the Rapp Declaration, the Gov-

---

[4]For example, the Government ultimately provided Moussaoui "with millions of pages of documents, including more than 166,000 FBI interview reports and over 1.7 million pages of documents from the FBI's ongoing criminal investigation of the September 11 attacks (the PENTTBOM investigation). In addition, the Government provided a number of other evidentiary materials, such as audio and video tapes and grand jury information." *United States v. Moussaoui*, 483 F.3d 220, 224 (4th Cir. 2007).

ernment turned nothing over to al-Marri. Therefore, at this stage, it is impossible to determine if evidentiary concerns played any role in the Executive's decision to designate al-Marri an enemy combatant.

Al-Marri was arrested and imprisoned for *eighteen months* in the civilian criminal system, and with less than one month before the commencement of his trial, the Executive authorized al-Marri's transfer to military custody. Just as we expressed our skepticism with the Government's attempt to transfer Padilla from the military to the civilian criminal system *three and a half years* after his initial detention, the Executive's decision to designate al-Marri an enemy combatant on the very eve of his civilian criminal trial raises a similar concern.

**Volume 3 of 4**

B.

While the *Hamdi* court held that "full protections that accompany challenges to detentions in other settings *may* prove *unworkable* and *inappropriate* in the enemy-combatant setting," *Hamdi*, 542 U.S. at 535 (emphasis added), this may not be the case for al-Marri. Determining the "workability" of providing al-Marri with first-hand evidence to support the Rapp Declaration is critical, especially in light of the harsh conditions to which enemy combatants are subject. As my colleagues point out, al-Marri was neither arrested on the battlefield in some far-flung location nor were his alleged criminal activities centered abroad. Moreover, from the information available to us, al-Marri's crimes relate to defrauding American financial institutions and lying to American law enforcement. Nothing in the record undermines al-Marri's contention that the majority of evidence relied upon by the Government is in the possession of U.S. governmental agencies. If this proves to be the case, obtaining such evidence should be "workable," and "fairness" requires an in-camera, ex-parte review of such evidence. *See Boumediene*, 553 U.S. at ___, slip op. at 64-65 ("Practical considerations and exigent circumstances inform the definition and reach of the law's writs, including habeas corpus.").

During this in-camera, ex-parte proceeding, the Government could present evidence supporting the allegations against al-Marri and would presumably make its case for keeping such evidence from him. The district court would then decide which evidence is "appropriate" for al-Marri to review, and subsequently, provide a rationale as to why any remaining evidence is "inappropriate." In fashioning the process by which the district court should make its evidentiary determination, we need not develop a framework from whole cloth. Supreme Court and Fourth Circuit precedent, when considered alongside CIPA, provides the Judiciary with a step-by-step guide for balancing the national security interests of the country with individual due process rights.

C.

In *Abu Ali*, we presciently set forth the following statement on the treatment of terrorists in our criminal system:

> Persons of good will may disagree over the precise extent to which the formal criminal justice process must be utilized when those suspected of participation in terrorist cells and networks are involved. There should be no disagreement, however, that the criminal justice system does retain an important place in the ongoing effort to deter and punish terrorist acts without the sacrifice of American constitutional norms and bedrock values. *As will be apparent herein, the criminal justice system is not without those attributes of adaptation that will permit it to function in the post-9/11 world. These adaptations, however, need not and must not come at the expense of the requirement that an accused receive a fundamentally fair trial.*[5]

*Abu Ali*, 528 F.3d at 221 (emphasis added). Our judicial system is well-equipped to handle classified material efficiently and to balance an accused's right to review evidence against national security interests. In *Mathews v. Eldridge*, 424 U.S. 319 (1976), the Supreme Court "dictate[ed] that the process due in any given instance is determined by weighing the private interest that will be affected by the official action against the Government's asserted interest, including the function involved and the burdens the Government would face in providing greater process." *Hamdi*, 524 U.S. at 529 (internal quotation marks and citation omitted). Because much of the evidence al-Marri requests may be readily available, assuming that evidence would not compromise the Executive's ability to wage war, the Government should provide it to the district court.

i.

The *Mathews* calculus, albeit helpful, leaves many questions unanswered, particularly those concerning how the district court should assess the classified information's relevance. "In the area of national security and the government's privilege to protect classified information from public disclosure, we [have] look[ed] to CIPA for appropriate procedures." *Abu Ali*, 528 F.3d at 245. Prior to CIPA's enactment,

---

[5]Like Moussaoui, Abu Ali was tried in the civilian judicial system. Because both Abu Ali and Moussaoui could have been detained under the AUMF, I find that the process provided to them is informative.

the Government was placed in the unenviable position of "abandon[-ing] prosecution rather than risk possible disclosure of classified information." *Id.* (internal quotation marks and citation omitted). By structuring a framework for evaluating the use and admissibility of classified evidence without public disclosure, CIPA alleviates this dilemma. It provides that any hearing conducted "shall be held in-camera" if the Attorney General provides the court with reasons for why "that public proceeding may lead to the disclosure of classified information."[6] 18 U.S.C.App. § 6(a).

Section 6 of CIPA sets out a clear procedure for the district court to utilize in handling classified evidence and determining its "use, relevance and admissibility." 18 U.S.C.App. § 6(a). If the district court finds the classified information relevant and material, CIPA requires that the district court give it to the accused unless an adequate substitute can be provided. *See Moussaoui*, 382 F.3d at 476. In determining the accessibility of such information, the district court should "take[ ] cognizance of both the state's interest in protecting national security and the defendant's interest in receiving a fair trial." *United States v. Fernanadez*, 913 F.2d 148, 154 (4th Cir. 1990).

When weighing the competing interests of the Government and the accused, common law privileges protecting the disclosure of evidence continue to apply. *See United States v. Smith*, 780 F.2d 1102, 1107 (4th Cir. 1985) (en banc). Thus, common law privileges protecting classified information from disclosure on account of military or state secrets remain applicable. However, in the context of CIPA, we held that privilege would "give way" if the classified information "is relevant and helpful to the defense of an accused or is essential to a *fair determination* of a cause." *Id.* at 1107 (internal quotation marks and citation omitted) (emphasis added).

ii.

CIPA provides the accused with access to classified documents, not witnesses. Nevertheless, in *Moussaoui*, we held that, while CIPA was not directly applicable, it "provides a useful framework for consider-

---

[6] Section 6 also allows the district court to seal the records from any in-camera proceedings. 18 U.S.C.App. § 6(d).

ing the questions raised by Moussaoui's request for access to the enemy combatant witnesses." *Moussaoui*, 382 F.3d at 472 n.20. Similarly, CIPA is not directly applicable to al-Marri's case because he is not entitled to the "equivalent of a full blown" criminal trial. *Hamdi*, 542 U.S. at 524. Yet, CIPA can certainly guide the district court's consideration of al-Marri's evidentiary requests especially given that al-Marri primarily requests documents.

Additionally, we held that Moussaoui should have qualified access to material enemy combatant witnesses and their prior statements. In order to establish the witnesses' relevance, he only had to make a "plausible showing" of materiality. *Moussaoui*, 382 F.3d at 472 (internal quotation marks and citation omitted). As al-Marri will likely be placed in the same evidentiary quandary as Moussaoui — i.e., no direct access to enemy combatant witnesses — he should likewise be held to the same lower threshold in establishing the materiality of witnesses. Further, we also held that substituting actual testimony from enemy combatants with an alternative procedure should "be an interactive process among the parties and the district court." *Id.* at 480. Recognizing that "the burdens that would arise from production of the enemy combatant witnesses are substantial," *id.* at 471, there are times when such evidence, even via an affidavit, will be necessary to substantiate the Government's evidence.

As a practical matter, this process could take place in an in-camera, ex-parte hearing where the Government responds to al-Marri's requests for information and explains why national security concerns preclude disclosing evidence. While some of al-Marri's requests, such as to depose high-level members of the Executive, may indeed prove onerous, *Moussaoui* is an excellent template for the district court. It demonstrates how, in consultation with the relevant parties, a court can craft remedies that satisfy an enemy combatant's unique evidentiary requests without unduly burdening the Government or compromising national security. Ultimately, in giving al-Marri a "fair opportunity" to dispute his designation as an enemy combatant, the district court should "seek a solution that neither disadvantages [al-Marri] nor penalizes the government (and the public) for protecting classified information that may be vital to national security." *Id.* at 477.

## III.

If our remand is to be meaningful, the district court must demand evidence supporting the veracity of the Rapp Declaration. Presumably, al-Marri's civilian grand jury reviewed material portions of al-Marri's file prior to his classification as an enemy combatant. Common sense leads to the conclusion that many of the documents al-Marri requests are located here in the United States. As we set out in *Moussaoui* and *Abu Ali*, should the Government object to turning over documents on the basis of national security concerns, the district court has a very specific federal statute, CIPA, to guide its determination of what documents can be turned over to al-Marri. In addition, the Supreme Court's decisions in *Mathews* and *Hamdi* provide the appropriate balance that the district court should strike upon reviewing such evidence.

In this time of angst and fear, we can find solace and wisdom in the words of Thomas Jefferson—words that have kept our nation's focus on noble principles in the worst of times. Speaking at his First Inaugural, Jefferson included the "protection of habeas corpus" among those "principles [which] form the bright constellation which has gone before us and guided our steps through an age of revolution and reformation . . . and should we wander from them in moments of error or of alarm, let us hasten to retrace our steps and to regain the road which alone leads to peace, liberty, and safety." Thomas Jefferson, First Inaugural Address, March 4, 1801. I urge the district court to "retrace our steps" as it considers this case on remand.

WILLIAMS, Chief Judge, concurring in part and dissenting in part:

While I respect the lengthy and thorough writings in this case, I believe that Ali Saleh Kahlah al-Marri's 28 U.S.C.A. § 2241 (West 2006 & Supp. 2007) petition presents a relatively straightforward factual situation.[1] According to the declaration filed in this case (and sworn under pain of perjury) by Jeffrey N. Rapp, the Director of the Joint Intelligence Task Force for Combating Terrorism (the "Rapp

---

[1]In light of *Boumediene v. Bush*, 553 U.S. ___, ___ S. Ct. ___ (June 12, 2008), I agree with the plurality opinion that we have jurisdiction over al-Marri's 28 U.S.C.A. § 2241 (West 2006 & Supp. 2007) petition.

Declaration"), Al-Marri is a member of al-Qaeda who underwent training in Afghanistan between 1996 and 1998 and was sent to the United States as a sleeper agent on September 10, 2001.[2] Accepting these allegations as true, I believe, pursuant to the Authorization for Use of Military Force Joint Resolution, Pub. L. No. 107-40, 115 Stat. 224 (September 18, 2001) ("AUMF"), the President has the power to detain al-Marri. Thus, on this issue I agree with the separate opinions of Judge Traxler, Judge Wilkinson, and Judge Niemeyer. Unlike Judge Traxler, however, given al-Marri's failure to "participate in a meaningful way," (J.A. at 244), before the magistrate judge and district court, I would hold that al-Marri cannot now challenge the factual basis for his detention before our court. Accordingly, like Judge Wilkinson and Judge Niemeyer, I would affirm the dismissal of al-Marri's § 2241 petition and therefore dissent from the judgment of the court.

## I.

## A.

Following the September 11 attacks, Congress, on September 18, 2001, enacted the AUMF, which authorized the President, acting as Commander-in-Chief, to "use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided" the terrorist attacks that occurred on September 11, 2001. 115 Stat. at 224. The purpose of such authorization, Congress made clear, was to "prevent any future acts of international terrorism against the United States by such nations, organizations, or persons." *Id.*

In *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), the Supreme Court held that the AUMF granted the President the power to detain "enemy combatants"—as the term was defined in that case—including a United States citizen captured overseas during the conflict in Afghanistan. *Id.* at 521. As the Court explained, detention of an enemy combatant fell within the range of "necessary and appropriate force" granted by the AUMF because "detention to prevent a combatant's

---

[2]Because the separate opinions have spelled out the details of the allegations in the Rapp Declaration, I do not repeat them here.

return to the battlefield is a fundamental incident of waging war."[3] *Id.* at 519; *see also In re Territo*, 156 F.2d 142, 145 (9th Cir. 1946) (noting military detention serves "to prevent the captured individual from serving the enemy.") Of equal import, however, is the Supreme Court's holding that civilians may not be subject to military detention. *Ex Parte Milligan*, 71 U.S. 2 (1866). Thus, in my view, if al-Marri is an "enemy combatant" who falls within the scope of the AUMF, he may be detained; if, however, he is not an enemy combatant, and therefore a mere civilian, the Constitution forbids such detention.

In *Hamdi*, the Supreme Court defined the term "enemy combatant" for purposes of that case as "an individual who . . . was part of or supporting forces hostile to the United States or coalition partners in Afghanistan and who engaged in an armed conflict against the United States there." *Hamdi*, 542 U.S. at 516 (plurality) (internal quotation marks omitted). The *Hamdi* Court left it to lower courts to further refine the definition in future cases, *see Hamdi*, 542 U.S. at 522 n.1 ("The permissible bounds of the [enemy combatant] category will be defined by the lower courts as subsequent cases are presented to them.").

In the context of World War II, the Court defined the term "unlawful combatant" to include:

> those who during time of war pass surreptitiously from enemy territory into our own, discarding their uniforms upon entry, for the commission of hostile acts involving destruction of life or property, have the status of unlawful combatants punishable as such by military commission.

*Ex Parte Quirin*, 317 U.S. 1, 35 (1942). The Court expounded later that "enemy belligerents" "includ[ed] those acting under the direction of the armed forces of the enemy, for the purpose of destroying property used or useful in prosecuting the war." *Id.* at 37.

---

[3]Indeed, the practice of detaining enemy combatants militarily predates our Constitution. *See Ex Parte Quirin*, 317 U.S. 1, 31 (1942) (noting that "[s]uch was the practice of our own military authorities before the adoption of the Constitution, and during the Mexican and Civil Wars.").

A distillation of these precedents, I believe, yields a definition of an enemy combatant subject to detention pursuant to Congressional authorizations as an individual who meets two criteria: (1) he attempts or engages in belligerent acts against the United States, either domestically or in a foreign combat zone; (2) on behalf of an enemy force.

Given the specific allegations against al-Marri, I have little difficulty concluding that he satisfies the first criterion. First, the allegations set forth in the Rapp Declaration, if true, clearly show that al-Marri was on United States soil to commit acts of belligerency against the United States. *See Quirin*, 317 U.S. at 31 (stating that unlawful combatants include those who commit "hostile acts involving destruction of life or property" on United States soil).

According to the Rapp Declaration, al-Marri also meets what I view as the second requirement of an enemy combatant: that the belligerent acts be carried out on behalf of an enemy force. Unlike the plurality, I cannot accept al-Marri's contention that because he allegedly has ties only to al Qaeda, a terrorist organization that does not control any nation, he does not meet this portion of the definition of enemy combatant.

The plurality opinion may very well be correct that, under the traditional "law of war," persons not affiliated with the military of a *nation-state* may not be considered enemy combatants. And I recognize the respect domestic courts have long afforded the "law of nations." *See Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804) ("[A]n act of Congress ought never to be construed to violate the law of nations if any other possible construction remains."). Here, however, Congress has, through the AUMF, addressed precisely this question by clearly authorizing the President to use force against "organizations," as well as against nation-states. *See Padilla v. Hanft*, 423 F.3d 386, 395-96 (4th Cir. 2005) (noting "the AUMF constitutes . . . a clear statement" in favor of detention). As a specific and targeted congressional directive, the AUMF controls the question of who may be detained, for purposes of domestic law— at least with respect to those individuals that fall within its scope.

The AUMF grants the President power to use force against "organizations" that he determines "planned, authorized, committed, or aided

in" the September 11 attacks. Al Qaeda is obviously an "organization" that "planned, authorized, committed, or aided in" those attacks. Thus, in my view, the AUMF has labeled al Qaeda an enemy force.[4] *See also Hamdi*, 542 U.S. at 518 ("There can be no doubt that individuals who fought against the United States in Afghanistan as part of the Taliban, an organization known to have supported the al Qaeda terrorist network responsible for those attacks, are individuals Congress sought to target in passing the AUMF."); *Padilla*, 423 F.3d at 389 (defining "al Qaeda" as "an entity with which the United States is at war"). In fact, al Qaeda provided the impetus for the enactment of the AUMF. Indeed, "read in light of its purpose clause . . . and its preamble . . ., the AUMF applies even more clearly and unmistakably to [al-Marri] than to Hamdi." *Padilla*, 423 F.3d at 396.

Certainly, the Constitution does not permit "a military trial . . . for any offence whatever of a citizen in civil life, in nowise connected with the military service." *Milligan*, 71 U.S. at 121-22. However, the result in *Milligan* followed because the petitioner Milligan was not "part of or associated with the armed forces of the enemy," *Quirin*, 317 U.S. at 45, and I see nothing in the Constitution that prohibits the President, operating with the express consent of the Congress, from declaring an individual associated with an organization that has undertaken acts of war against the United States to be an enemy combatant. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (Jackson, J., concurring) (noting Presidential power is "at its maximum" when the President operates with Congressional authorization).

I wish to emphasize that by permitting the President to militarily detain al-Marri pursuant to the AUMF I am not being expansive; in al-Marri we are dealing with someone *squarely* within the purposes of the AUMF, which was passed to target organizations, like al Qaeda, responsible for the September 11 attacks and to prevent future

---

[4]While I understand al-Marri's concern that, taken to its extreme, the AUMF's reference to organizations or persons who "aided in" the September 11 attacks might produce absurd results, I do not believe we need linger on that concern in this case. According to the Rapp Declaration, al-Marri is a member of al Qaeda, which "planned," "authorized," and "committed" those attacks.

terrorist attacks. This case does not present what to me are more diffi-cult issues regarding enemy combatants and the scope of AUMF, such as the status of an individual who joined al Qaeda after Septem-ber 11, 2001, or an individual who is part of a designated foreign ter-rorist organization, *see* U.S. Dep't of State, Office of the Coordinator for Counterterrorism, Foreign Terrorist Organizations Fact Sheet 2008 (Apr. 8, 2008), http://www.state.gov/s/ct/rls/fs/08/103392.htm (last visited May 5, 2008), that played no role in the September 11 attacks. Instead, al-Marri is clearly an "individual[ ] Congress sought to target in passing the AUMF." *Hamdi*, 542 U.S. at 518. In addition, while "indefinite detention" of enemy combatants is not permitted, *see generally Hamdi*, 542 U.S. at 519-20, we remain engaged against the forces of al Qaeda in the border regions of Afghanistan to this day.[5]

Moreover, it is important to note the breadth of *al-Marri*'s argu-ment. According to al-Marri, were authorities to have detained one of the hijackers on September 11, box-cutter in hand, that hijacker could have been militarily detained in the immediacy of the situation, but thereafter would have had to be turned over to civilian courts.[6] This result would follow despite the fact that the hijacker would have been poised to commit an act of war—in fact an act of unlawful belliger-ency, *see Quirin*, 317 U.S. at 31—against the United States. The result also seems in tension with the Court's reminder in *Quirin* that:

> By a long course of practical administrative construction by its military authorities, our Government has likewise recog-nized that those who during time of war pass surreptitiously from enemy territory into our own, discarding their uni-forms upon entry, for the commission of hostile acts involv-ing destruction of life or property, have the status of unlawful combatants punishable as such by military com-mission.

---

[5]I therefore need not address whether, if our military remained only engaged in the conflict in Iraq, al-Marri's ongoing detention would be permitted under the AUMF.

[6]Indeed, as I understand al-Marri's argument, if Osama bin Laden had been captured after September 18, 2001, but before actual military opera-tions in Afghanistan took place, he, too, would not be subject to military detention.

*Id.* at 35.

## B.

Notwithstanding the broad congressional authorization provided in the AUMF, al-Marri argues that Congress later circumscribed the President's power of detention by passing the Patriot Act, Pub. L. 107-56, 115 Stat. 272 (2001) (entitled "Mandatory Detention of Suspect Terrorists; Habeas Corpus; Judicial Review"). The Patriot Act, passed shortly after the AUMF, provides, in relevant part, for the short term "[d]etention of [t]errorist [a]liens." Patriot Act § 412(a). The power to detain is vested in the Attorney General, but the Act prohibits "indefinite detention." Instead, it requires that "not later than 7 days after the commencement of such detention," the Attorney General must either (1) begin "removal proceedings" or (2) "charge the alien with a criminal offense." *Id.* § 412(a). The Patriot Act does permit an extension of "additional periods of up to six months" if removal is "unlikely for the reasonably foreseeable future" and the alien's release "will threaten the national security of the United States or the safety of the community or any person." *Id.*

Al-Marri argues that these more-specific provisions governing the scope of detentions govern the more-general authorization found in the AUMF. *See Long Island Care at Home, Ltd. v. Coke*, 127 S.Ct. 2339, 2348 (2007) ("[N]ormally the specific governs the general."); *Warren v. N.C. Dept. of Human Resources*, 65 F.3d 385, 390 (4th Cir. 1995) (same). Of course, this maxim is only true if the two provisions deal with the same subject matter. Here, I view section 412 of the Patriot Act to refer to the President's power, under Article II § 3, to "take Care that the Laws be faithfully executed." U.S. Const., art. II, § 3. The statute refers to the Attorney General, the President's agent in implementing the Take Care Clause, and it is found nestled within the immigration code. Fairly read, the Patriot Act does not therefore purport to limit the President's separate Commander-in-Chief power. *See* Article II, § 2, cl. 1 ("The President shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States."). But the authorization granted in the AUMF, with its explicit reference to military force, relates to the Commander-in-Chief power. Whatever limitations are present in the Patriot Act, therefore, do not

restrict the separate and distinct grant of power effected by the AUMF.

## C.

I am left with a simple set of facts: the AUMF grants the President, who already has some inherent Article II power to wage war, *see, e.g.*, *Chicago & S. Air Lines, Inc. v. Waterman S. S. Corp.*, 333 U.S. 103, 109 (1948) ("The President . . . possesses in his own right certain powers conferred by the Constitution on him as Commander-in-Chief and as the Nation's organ in foreign affairs."), the power to use necessary and appropriate force against organizations and persons with a role in the September 11 attacks; the Supreme Court has stated that military detention is a "fundamental incident of waging war," *Hamdi*, 542 U.S. at 519; and, the Government alleges that al-Marri has been a member of al Qaeda since at least 1996. I think it clear under these circumstances that al-Marri can be detained as an enemy combatant and agree with the separate opinions of Judge Traxler, Judge Wilkinson, and Judge Niemeyer that so hold. As the Court wrote over half a century ago,

> [T]he detention and trial of petitioners—ordered by the President in the declared exercise of his powers as Commander in Chief of the Army in time of war and of grave public danger—are not to be set aside by the courts without the clear conviction that they are in conflict with the Constitution or laws of Congress constitutionally enacted.

*Quirin*, 317 U.S. at 25.

Finding no such "clear conviction," particularly given that the President is acting in concert with Congress, I would hold that the President, operating pursuant to the AUMF, had the power to detain al-Marri as an enemy combatant.

## II.

I do not agree, however, with Judge Traxler's separate concurrence, which concludes that a remand is necessary to permit al-Marri

to further challenge his detention. Instead, because al-Marri short-circuited the lower court's attempt to craft procedures meant to protect his due process rights, I would not reward his refusal to participate with a remand. To the contrary, the magistrate judge and district court judge are to be commended for the extent to which they responded to al-Marri's concerns, and, indeed accommodated his only specific request. In order to explain this conclusion, I briefly revisit the proceedings below.

A.

On July 8, 2005, the district court entered an order concluding that al-Marri could be detained as an enemy combatant and referring the case to the magistrate judge for development of the appropriate procedures.[7] On August 15, the magistrate judge held a telephonic conference with the Government and al-Marri's attorneys to discuss what procedures might be used in determining whether al-Marri was an enemy combatant. During the hearing, the magistrate judge requested that both parties "brief . . . the question of whether the Government's affidavit in this case is entitled to the presumption, as outlined in *Hamdi*, and if so, what must the petitioner do to rebut the presumption." (J.A. at 154.)

Following briefing from the parties, the magistrate judge entered an order on December 19, 2005, setting forth suggested procedures for addressing al-Marri's detention. Citing to *Hamdi*, the magistrate judge concluded "it appears that in the context of a classification of an individual as an enemy combatant by the Chief Executive, due process requires the petitioner receive notice of the factual basis for his classification, and a fair opportunity to rebut the government's factual assertions by presenting more persuasive evidence before a neutral decisionmaker." (J.A. at 182.) To this end, the magistrate judge indicated it would "review the government's credible evidence in the form of affidavits, such as the Mobbs Affidavit in the *Hamdi* case," and then would review "any responsive rebuttal evidence in the form of affidavits and documents" from al-Marri. (J.A. at 182.) The magistrate judge also noted "[a]dditional guidance by the court in *Hamdi*

---

[7]Because of this assignment by the district court, my discussion focuses in large part upon the actions of the magistrate judge.

indicates that presumption in favor of the government may be appropriate and hearsay may need to be accepted." (J.A. at 179.) Thereafter, however, the magistrate judge made no further use of the word "presumption," and instead explained that "[i]f the petitioner is unable to produce more persuasive evidence than that produced by the government, the inquiry will end there." (J.A. at 183.) If, however, al-Marri put forth "*more persuasive* evidence than that produced by the government," something more akin to a "full-blown adversarial hearing" would occur. (J.A. at 183 (emphasis added).)

In describing the protections that might attend to such a hearing, the magistrate judge noted, for instance, that objections under the Federal Rules of Evidence to material "gathered on the field of battle," might be inappropriate but "might lie as to domestic evidence obtained by law enforcement in the course of the war on terror." (J.A. at 184.) After finding that the Government had indeed provided al-Marri notice of the factual basis of his classification in the form of the Rapp Declaration, the magistrate judge concluded the order by requiring al-Marri to file "any rebuttal evidence within sixty days." (J.A. at 184.)

After the district court withheld ruling on the magistrate judge's order until the procedures before the magistrate judge concluded, al-Marri filed a response to the magistrate judge's order, stating that, without being permitted to review the Rapp Declaration in full, he was unable to respond as required by the December 19, 2005 order. The magistrate judge agreed, and on April 5, 2006, the Government filed a declassified copy of the Rapp Declaration. On May 4, 2005, al-Marri filed his response, contending that "he is unable to disprove the allegations contained in the Rapp declaration because he has been denied the opportunity to see the evidence upon which the allegations are based." (J.A. at 231.) The response further stated that al-Marri "has denied" and "continues to deny" the Government's allegations. (J.A. at 230-31.) Al-Marri's response concluded by noting that "Petitioner respectfully declines at this time the Court's invitation to prove his own innocence, a burden that is unlawful, unconstitutional, and un-American." (J.A. at 231.)

The magistrate judge entered a Report and Recommendation on May 8, recommending dismissal of al-Marri's § 2241 claim. It began

by referencing its earlier order and summarizing the Rapp Declaration, explaining that the "issue here is *which is more persuasive* on the issue of whether the petitioner falls outside the enemy combatant criteria, the government's credible evidence or the responsive rebuttal evidence which the petitioner wishes to present, with special attention to the 'risk of erroneous deprivation.'" (J.A. at 243 (emphasis added).) The magistrate judge proceeded to note al-Marri's statement that he declined "at this time" to submit evidence and his attendant failure to put forth anymore than a general denial of the Government's allegations.

It summarized: "Al-Marri brought this action and has now refused to participate in a meaningful way. As a result, there is nothing specific before the court to dispute even the simplest of assertions which al-Marri could easily dispute, were they not accurate." (J.A. at 244.) For example, "Al-Marri present[ed] no information concerning his graduate studies and [did] not dispute or offer easily obtainable evidence to counter the assertion that by December 2001 he had rarely attended classes and was in a failing status." (J.A. at 244.) The magistrate judge expressed frustration with al-Marri's failure to engage "fact-finding procedures that are intended to be both prudent and incremental," (J.A. at 248), and recommended that al-Marri's § 2241 petition "be dismissed," (J.A. at 249.) In so doing, the magistrate judge concluded that "it appears to the court that the Executive Declaration is more persuasive than Petitioner's general denial . . . and there is no basis for concluding that an erroneous deprivation has occurred." (J.A. at 248.)

Following a *de novo* review, the district court adopted the magistrate judge's Report "to the extent" it was consistent with the district court's order. (J.A. at 355.) In analyzing al-Marri's petition, the district court concluded that the framework created by *Hamdi* applied, that it *would* entertain a presumption in favor of the Government's evidence, and that once the Government put forth credible evidence the burden moved to al-Marri to "rebut that showing with more persuasive evidence." (J.A. at 347 (internal quotation marks omitted).) The district court first discussed the Rapp Declaration and rejected al-Marri's contention that, at the preliminary fact-finding stage, the Government could not rely on a hearsay declaration; it determined that "hearsay may be used to satisfy the Government's burden of provid-

ing an alleged enemy combatant with notice of the factual allegations
against him." (J.A. at 349.) The Rapp Declaration was thus permissi-
ble "at the initial phase," (J.A. at 349) and the district court expressly
noted "[w]hether the Rapp Declaration would be admissible during
the later phases of such a proceeding is not a question before the
Court today." (J.A. at 351.)

The district court found that the Rapp Declaration "met [the Gov-
ernment's] burden of providing a factual basis in support of [al-
Marri's] classification and detention as an enemy combatant." (J.A.
at 352.) The district court, like the magistrate judge, then recounted
al-Marri's complete refusal to offer anything more than a general
denial. Finding that al-Marri's "stance . . . ignores his responsibility
to prosecute this habeas action," the district court then ordered the
dismissal of al-Marri's § 2241 petition. (J.A. at 354.)

B.

In *Hamdi*, the Court provided three avenues of guidance for lower
courts when considering future enemy combatant cases. First, the
Court noted that due process requires that an "enemy combatant must
receive notice of the factual basis for his classification, and a fair
opportunity to rebut the Government's factual assertions before a neu-
tral decisionmaker." *Hamdi*, 542 U.S. at 533. Second, the Court noted
that "§ 2241 and its companion provisions provide at least a skeletal
outline of the procedures to be afforded a petitioner in federal habeas
review." *Id.* at 525. Thus, "Congress envisioned that habeas petition-
ers would have some opportunity to present and rebut facts and that
courts in cases like this retain some ability to vary the ways in which
they do so as mandated by due process." *Id.* at 526. Finally, the Court
explained that whatever process is to be utilized, it must be carried
out with "caution," and be "both prudent and incremental." *Id.* at 539.

In this case, the magistrate judge, and later the district court,
attempted to follow those guiding principles. First, both the magis-
trate judge and district court remained ever-cognizant of *Hamdi*'s
command that the enemy combatant be provided notice and an oppor-
tunity to be heard, structuring the proposed procedures around that
command. I see nothing in *Hamdi* that forbids a sworn statement—
like the Rapp Declaration—from providing sufficient "notice" of the

allegations against al-Marri. Moreover, as noted, the magistrate judge required the Government to provide al-Marri the declaration in response to his request.

With respect to the Supreme Court's guidance that the process resemble customary habeas review, the procedures the magistrate judge proposed for handling the initial stage of the proceedings—which the district court later adopted in substantial part—in many ways mirrored traditional habeas practice under 28 U.S.C.A. § 2254 and § 2255 by requiring both parties to put forth affidavits and other materials for an initial determination of which party's presentation was more persuasive.

In this regard, the initial procedures adopted by the magistrate judge also hewed to the common precept that "the habeas petitioner generally bears the burden of proof." *Garlotte v. Fordice*, 515 U.S. 39, 46 (1995); *see, e.g.*, *Vega v. U.S.*, 493 F.3d 310, 319 (3d Cir. 2007) (noting in adopting rule for sentencing credit cases under § 2241 that "[a]s with any habeas petition, this test puts the initial burden on the prisoner to show his right to relief"). Again, this approach appears consistent with the guidance provided in *Hamdi*, that § 2241 and its companion provisions may provide an outline for how to proceed in enemy combatant cases.

Finally, and most importantly, *Hamdi* stressed the need for a "prudent" and "incremental" process. The magistrate judge proposed just that, outlining an iterative process in which al-Marri failed to participate "in any meaningful way." (J.A. at 244.) Indeed, as the magistrate judge noted, al-Marri refused to deny allegations in the Rapp Declaration that were peculiarly within al-Marri's knowledge. He failed to dispute even the assertion that he was performing poorly in school. It is simply beyond the pale for al-Marri to contend that he was unable, without further discovery from the Government, to put forth evidence that he did or did not attend class. By failing to participate, Al-Marri simply short-circuited the entire "incremental" process.

I am unwilling to criticize the lower courts for, in essence, failing to be more creative. *Hamdi* is the *only* Supreme Court case providing *any* guidance on habeas procedures in enemy combatant cases, so it was only natural for the lower courts to start with *Hamdi*'s frame-

work. The magistrate judge was faced with al-Marri's position that only a criminal trial was adequate—a position that overlooked the fact that, under *Hamdi*, once the detention question is answered in the affirmative, it *a fortiori* follows that a criminal trial is *not* required. The magistrate judge reiterated its concern with al-Marri receiving a factual basis for his classification and having the opportunity to respond before a neutral decisionmaker. The magistrate judge then set forth a proposed two-stage process similar to the normal procedures of a habeas action that would have, if fully implemented, given al-Marri procedures far *beyond* those adopted in *Hamdi*, including discovery. But this process was not implemented fully precisely because al-Marri refused to participate in the proceedings, proceedings that contemplated the active participation of al-Marri—the *habeas petitioner*. Thus, it is because of al-Marri's own actions that we are here today, unsure of how those procedures would have worked. Given that the procedural posture of this case is a result of his own intransigence, I would not reward al-Marri, the petitioner and the party with the burden of prosecuting his habeas action, with a remand.

Judge Traxler, in contrast, believes the real problem is that the magistrate judge and district court engaged in a *presumption* in favor of the Government's evidence. Indeed, after recounting the detailed allegations of the Rapp Declaration, the district court "[a]fford[ed] this evidence a favorable presumption," (J.A. at 352), and found that the Government had met its initial burden, shifting the burden to al-Marri to rebut the Government's factual case against him. This "presumption" was nothing more than a finding that the Government's evidence was sufficient to move to the next step in the "incremental" fact-finding process—a process common to traditional habeas practice and embraced by *Hamdi* as the recipe for future cases. Beyond this initial stage, we simply do not know how the Government's evidence would have later been treated by the district court had al-Marri not declined to participate from the start.

## C.

In sum, I am certainly sympathetic to the concerns laid out by Judge Traxler that American citizens and resident aliens apprehended and detained on American soil have access to procedures to safeguard their due process rights, and I would likely view this case quite differ-

ently if I believed that the magistrate judge had presumed al-Marri to be an enemy combatant from the start. I likewise find merit in Judge Wilkinson's position that we not force the Government to release information bearing on national security unnecessarily. I simply find it unnecessary, in al-Marri's case, to try to strike this delicate balance. The magistrate judge suggested an "incremental" procedure that mirrored traditional habeas actions and would have, had al-Marri simply supplied "more persuasive" evidence in the form of affidavits and documents, ultimately provided al-Marri with process far beyond that required by *Hamdi*. In that context, al-Marri's total refusal to assist the magistrate judge is inexcusable. Because al-Marri has "hoist[ed] [himself] with his own petar," William Shakespeare, Hamlet Act 2, sc. 2, I would not remand the case for further proceedings.

III.

I would thus affirm the district court's denial of al-Marri's § 2241 petition.[8]

Judge Duncan has authorized me to indicate that she joins in this opinion.

WILKINSON, Circuit Judge, concurring in part and dissenting in part:

I respectfully dissent from the reversal of the judgment. I agree that we possess jurisdiction to entertain al-Marri's habeas petition. I also believe the district court to be right in all respects and that its judgment dismissing the petition should be affirmed.

I wish to express my respect for those who see this matter differently. I admire the skill with which my fine colleagues and the principal and amicus briefs have argued the case for reversal, and I respect the sense of conviction and principle that animates their views. I real-

---

[8]Although I, like Judges Wilkinson, Niemeyer, and Duncan, would decide this case differently than the plurality (Judges Michael, Motz, King, and Gregory) and Judge Traxler, I want to express my deepest respect for their views. My colleagues' efforts in this case are to be commended.

ize too that the opinions in this case are lengthy, but that reflects nothing more than the conscientious attention each member of the court has given this important case.

I quite disagree with the reversal of the judgment. I believe that Congress in the AUMF has authorized the military detention of al-Marri and that al-Marri has received the process he is due.

I recognize that the military detention of someone lawfully in this country is a momentous step, but a refusal to recognize Congress's ability to authorize such a detention in these circumstances would be more momentous still. The present case reminds that we live in an age where thousands of human beings can be slaughtered by a single action and where large swaths of urban landscape can be leveled in an instant. If the past was a time of danger for this country, it remains no more than prologue for the threats the future holds. For courts to resist this political attempt to meet these rising dangers risks making the judiciary the most dangerous branch.

I say this not as an exhortation to panic or fear, but rather as a call for prudence. The advance and democratization of technology proceeds apace, and our legal system must show some recognition of these changing circumstances. In other words, law must reflect the actual nature of modern warfare. By placing so much emphasis on quaint and outmoded notions of enemy states and demarcated foreign battlefields, the plurality (the opinion authored by Judge Motz) and concurrence (the opinion authored by Judge Traxler) misperceive the nature of our present danger, and, in doing so, miss the opportunity presented by al-Marri's case to develop a framework for dealing with new dangers in our future. There is a way to respect both our commitment to liberty and the need for security without which liberty cannot flourish. But it is not the way my fine colleagues have chosen, and I must respectfully dissent from the reversal of the judgment.[1]

---

[1] Given the nature of the court's judgment in this case, the matter of how to designate my colleagues' views has proven somewhat difficult. This is largely because the so-called *Screws* rule, adopted by Judge Motz and those who join her opinion, has traditionally been invoked by a smaller group of judges (usually one or two) joining the judgment of a larger

The essence of the plurality's view is that law deprives this country of those means of adjustment that the political branches deem essential to success in the struggle against those who launched and prepare again to launch attacks against America. I am happy indeed that the plurality did not prevail in its view that the AUMF fails to authorize the military detention at issue in this case. That the judiciary should embrace a sense of rigidity and complacency not elsewhere reflected in our democratic process seems both an expansion of judicial warrant and a course of error that may lead to tragic results and lasting regrets.

By ignoring the AUMF's plain language and patent meaning, the plurality comes all too close to holding that no person lawfully in the United States may be seized as an enemy combatant and subjected to military detention, and certainly not subjected to detention of any appreciable length. That to me is the plain import of the plurality's view, and its interpretation of the AUMF not only undermines Congress's intent but also suggests that the "serious constitutional questions" underlying the case compel a ruling in al-Marri's favor. *Ante* at 20.

Similarly, the concurrence, by forsaking the burden-shifting scheme established in *Hamdi* and imposing more rigorous procedural protections at the very outset of enemy combatant proceedings, implies that something more akin to a criminal trial is in order. In so doing, the concurrence accomplishes through constitutional interpretation much of what the plurality attempts to accomplish through stat-

---

number, rather than vice versa. *See Screws v. United States*, 325 U.S. 91, 113 (1945) (Rutledge, J., concurring in the result); *see also, e.g.*, *Hamdi v. Rumsfeld*, 542 U.S. 507, 553 (2004) (Souter, J., with Ginsburg, J., concurring in part, dissenting in part, and concurring in the judgment); *US Airways, Inc. v. Barnett*, 535 U.S. 391, 408 (2002) (O'Connor, J., concurring); *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 607-08 (1999) (Stevens, J., concurring in part and concurring in the judgment). Despite the "reverse-*Screws*" wrinkle of this case, I refer to the opinion authored by Judge Motz as the plurality because her opinion enjoys the largest number of judges in support of the ultimate judgment. Likewise, I refer to the opinion authored by Judge Traxler as the concurrence, inasmuch as he has not joined the plurality. For the sake of clarity, I refer to the other opinions filed in this case by the name of the author.

utory construction: an erosion of the elected branches' ability to pursue the current conflict in accordance with the laws of war.

The plurality and the concurrence thus both overlook the fact that our Constitution is a feat of architecture as well as a charter of cherished rights. To overlook the constitutional allocation of authority to Congress and the President in this case is to replace the Framers' design with our own precarious arrangements.

Moreover, with their judgment, the plurality and the concurrence abandon any recognized understanding of procedural due process and leave this case totally up in the air. The touchstone of procedural due process has always been accuracy. The plurality and concurrence, however, now mandate the imposition of some uncertain quantum of procedures despite the fact that al-Marri, although represented by counsel and given every opportunity by the trial court to do so, did not cast the slightest doubt on any of the government's extensive declarations. Additional procedures may of course be required when the accuracy of the government's evidence is called into question, and the burden on al-Marri in this regard is not high. Imposing additional process at the outset, however, — completely untethered from any need to ensure accuracy — will lead to more graymail, more fishing expeditions, and more thrashing litigiousness, all without any corresponding benefit in terms of reliable determinations or practical effect. Moreover, this novel procedural approach provides the district court with precious little direction on remand. I simply have no idea what constitutes "the most reliable available evidence," *ante* at 8, nor do I know what procedures should be used to determine whether the government's evidence meets this standard. The district court will be similarly mystified.

The problem presented here is greater than al-Marri's case and even than 9/11. The sources of this nation's vulnerability — its long borders, its multiple ports of entry, its densely-packed cities, the dispersions of lethal materials, the march of advancing technologies, and the widening distribution of knowledge as to the means and implements of mass destruction — long predated September 11th and will long continue even as the events of that day recede in memory.

Some of the scenarios are discounted as farfetched, until suddenly they are not. Nuclear devices capable of inflicting enormous casual-

ties can now fit inside a suitcase or a van. Congress can and has made clear that the use of such a device by persons or groups associated with the 9/11 attacks would be more akin to an act of war than to ordinary crime. Regrettably, however, the plurality and, to a somewhat lesser extent, the concurrence regard these acts quite differently — as mere criminal offenses to be tried through the criminal justice process or something that will become increasingly its equivalent. This reluctance to allow Congress to distinguish between war and crime will hinder the elected branches in their effort to tame the true tragedy of modern times: the indiscriminate slaughter of innocent life.

The events of 9/11 have afforded us an opportunity to address these non-chimerical concerns and to build a framework for this most dangerous future. Congress in the AUMF and the Supreme Court in *Hamdi* provided us with building blocks for a set of post-9/11 legal principles. By forsaking the evident intent of the AUMF, and departing from the *Hamdi* framework, however, the plurality and concurrence have missed this opportunity. It is for this reason too that I dissent in this case.

This need for some legal framework is not just an opportunity. It is our obligation. The military detention of American citizens or aliens lawfully within this country is a huge step. It is a mistake to take this step without asking where the journey leads. A failure to locate enemy combatant detentions within a general or principled framework will serve only to heighten concerns that open-ended detentions of American citizens lie in the offing. A principled framework, by contrast, addresses the limits of executive authority. While a minimalist method has much to commend it in many circumstances, it has its drawbacks here. This is not an area where *ad hoc* adjudication provides either guidance or limits, and it leaves the most basic values of our legal system — liberty and security — in limbo.

I thus have some points of difference with each of my good colleagues. I do not agree with the plurality, as I believe the AUMF does authorize al-Marri's detention. I do not agree with the concurrence or Judge Gregory, as I believe that al-Marri received the process he was due. I do not agree with the Chief Judge or Judge Niemeyer that we can resolve a question of this order of magnitude — namely the military detention of American citizens or lawful aliens in this country —

without addressing the serious constitutional issues that attend such a move. If I could approach this whole question in such a fashion, I would surely do so. But the Supreme Court's recent decision in *Boumediene v. Bush*, 553 U.S. ___ (2008), demonstrates that even coordinated action by the democratic branches is subject to constitutional limits. Indeed, the scope of the executive's detention authority turns not only on "whether the AUMF authorizes," but also on whether "the Constitution permits," military detention to take place. *Id.* at 59.

The danger of ignoring this constitutional inquiry is that we would proceed through increments and accretions to a system that features contradictory court rulings on military detentions throughout our land, gives no notice to Congress or the executive as to what the permissible boundaries of enemy combatant detentions might be, and, at worst, ends up inflicting grave damage to the constitutional fabric at the end that none of us intended at the start. Far better, it seems to me, to at least start this journey with a map, lest this case of first impression become an aimless voyage.

The plurality derides this attempt to delineate a constitutional framework as a policy-based exercise in "inventi[on]." *Ante* at 8; *see also ante* at 20-21 n.9, 43-44. But the policymaking in this case comes from those who would aggressively interfere with democratic prerogatives in the context of armed struggles, not from those who would interpret our foundational document with a proper respect for separation of powers and a proper demonstration of judicial restraint. The policymaking in this case comes from those who would so torture the text of the AUMF as to render it inapplicable even to al Qaeda members situated identically to those who perpetrated the 9/11 attacks. I certainly do not hold the position reflected in the judgment that courts should counteract Congress's plain intention or construct some set of unspecified procedures according to judicial designs. At the same time, the judiciary plays a vital role in ensuring that enemy combatant detentions are consistent with the constitutionally prescribed war powers and not a subterfuge for circumventing our cherished Bill of Rights. I make no apologies for regarding the restraint of the third branch as the starting point for all my inquiries in matters pertaining to the conduct of war. I make no apologies either for recog-

nizing that there are constitutional limits on the military detention power and for trying to determine what they are.

I shall thus attempt to provide some framework as to why al-Marri's detention is lawful and why, at the same time, the military detention authority is anything but open-ended. My own opinion proceeds as follows. In Section I, I discuss why the AUMF applies on its own terms to justify al-Marri's detention. In Section II, I address the basic premise of al-Marri's argument — that formal criminal charges are required in order for the government to detain him. In Section III, I address the serious constitutional questions that arise from, as well as the limits that apply to, the military detention of a citizen or lawful alien apprehended on American soil. In Section IV, I address my concurring colleague's argument that the procedures afforded al-Marri were constitutionally deficient. Finally, in Section V, I discuss, in a larger sense, why the dismissal of al-Marri's petition can be squared with America's cherished legal heritage.

To reverse this judgment because al-Marri was not captured on a foreign battlefield or foreign soil is akin to a judicial declaration that Congress and the executive may fight only the last war. This is wrong. Access to the courts is important, and I would certainly provide it here. But litigation is not the only friend of liberty. Democracy is a guarantor of human life and freedom, too.

I thus have no doubt that this detention is lawful. This detention has been authorized by Congress. This detention is, and remains, subject to judicial oversight. This detention is a direct outgrowth and response to massive attacks on the U.S. homeland. This detention is consistent with Supreme Court precedent. This detention is in accordance with the laws of war. And this detention should be sustained.

## I.   THE AUMF AUTHORIZES THE DETENTION OF AL-MARRI.

On September 18, 2001, one week after the most devastating attack on the U.S. homeland in its history, Congress passed the Authorization for Use of Military Force ("AUMF"). The plurality recognizes — as it must — that the AUMF authorizes the President to order the military detention of enemy combatants. *See ante* at 23-24 (Motz, J., con-

curring in the judgment). The plurality also notes that the primary issue before us in this case is whether the petitioner, Ali Saleh Kahlah al-Marri, is an enemy combatant within the meaning of the AUMF. *See ante* at 12-13.

Despite spending much of its opinion interpreting the AUMF, however, the plurality barely discusses the AUMF's purpose, so plainly reflected in its text: to hold those responsible for the September 11th attacks accountable, and to prevent similar acts of terrorism from ever happening again. This omission is telling. By failing to appreciate the entire reason for the AUMF, the plurality is able to produce an incredible result: it interprets the AUMF so that even the 9/11 attackers themselves would not be considered enemy combatants under it.

The plurality's conclusion is a paradox without parallel. A resolution designed to address a problem is read to leave the problem unaddressed. The reach of a resolution responding to hijacked domestic flights aimed at domestic targets and designed to inflict massive domestic casualties is confined to a foreign battlefield. In holding that the 9/11 hijackers would not be enemy combatants within the meaning of the foremost congressional response to 9/11, the plurality denies the legislative branch the ability to mean what it says. It deprives not only this congressional action of effect, but, in essence, grants the judiciary an expanding veto over future congressional efforts to protect this country.

To appreciate fully the error of the plurality's ways, one need consider nothing more than the AUMF itself, which, in the more than six years since its passage, has never been amended, much less rescinded:

> [T]he President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

AUMF, Pub. L. No. 107-40, 115 Stat. 224 (2001).

The AUMF grants the President broad power: the power to use "*all* necessary and appropriate force" to prevent "*any*" future acts of terrorism by those who perpetrated the September 11th attacks and their affiliates. The President's power is not limited temporally: he may use force against those who "planned" 9/11 as well as those who prepare "future" acts of terrorism. Nor is the President's power limited geographically: the preamble of the AUMF specifically directs the President "to protect United States citizens *both at home and abroad*." *Id.* (emphasis added). Finally, recognizing the new security risks presented by global terrorist organizations, such as al Qaeda, and global terrorists, such as Osama bin Laden, the AUMF authorizes the President to use force against not only the "nations," but also the "organizations" and "persons," that were responsible for the September 11th attacks.

Al-Marri does not so much as dispute the allegations against him, which we are obliged therefore to credit for purposes of this case. *See ante* at 6, 12. According to the Rapp Declaration, in which the government details the evidence supporting the detention of al-Marri as an enemy combatant, al-Marri was closely associated with al Qaeda, the terrorist organization that perpetrated the September 11th attacks. Al-Marri attended an al Qaeda terrorist training camp in Afghanistan for fifteen to nineteen months, and subsequently cultivated relationships with the most senior members of the al Qaeda organization: he met personally with Osama bin Laden and volunteered to martyr himself for the al Qaeda cause; he entered the United States as a sleeper agent under the direction of Khalid Shaykh Muhammed, the mastermind of the 9/11 attacks; and he received substantial funding for his mission from Mustafa Ahmed al-Hawsawi, the financial facilitator of 9/11. *Id.* at 11.

And that is not all. Al-Marri was actively planning terrorist attacks at the time of his arrest in the United States. Before he was apprehended, al-Marri had been gathering technical information about poisonous chemicals on his laptop, and was in communication with both Muhammed and al-Hawsawi. *Id.* Moreover, he had undertaken efforts to obtain false identification, credit cards, and banking information, including stolen credit card numbers. *Id.*

It should be clear that al-Marri is the paradigm of an enemy combatant under any reasonable interpretation of the AUMF. When Con-

gress directed the President to "use all necessary" force — including the power of military detention — "to prevent any future" attacks by those "organizations" responsible for 9/11, it must certainly have targeted al Qaeda "sleeper agents" planning similar attacks in the United States. To say that Congress did not have persons such as al-Marri in mind is to say that Congress had very little in mind at all.

In what I suppose is intended as a criticism, the plurality says I would give full effect to the "broad language" of the AUMF. *Ante* at 48. But of course. Judges take and treat with respect what Congress gives them. I do not pretend that there are not hard cases under the AUMF: for example, if the President were to detain an alleged terrorist with more tenuous links to al Qaeda or more ambiguous intentions than al-Marri has. There are indeed difficult questions as to the reach of the authority Congress has conferred upon the President. But the possibility of hard cases does not hide the fact that this case fits squarely within the bounds of the AUMF. Al-Marri was indisputably a member of al Qaeda, and he was indisputably planning terrorist attacks to kill American citizens and destroy American property. If al-Marri is not an "enemy combatant" under the AUMF, then who is?

The plurality's view also rests on four faulty premises. First, the plurality erroneously asserts that al-Marri cannot be considered an enemy combatant because the government has "never alleged that he is a member of any *nation's* military [or] has fought alongside any *nation's* armed forces." *Ante* at 6 (emphasis added). The plurality bases this "nation" affiliation requirement on a misguided reading of the Supreme Court's opinion in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) (plurality op.), and our circuit's opinion in *Padilla v. Hanft*, 423 F.3d 386 (4th Cir. 2005), which relied heavily on *Hamdi*. According to the plurality, a relationship with the Taliban, "the de facto government of Afghanistan at the time," *ante* at 23, was critical to each court's ultimate holding that the petitioner could be classified as an enemy combatant. Thus, the plurality contends, absent such an affiliation with an enemy nation, an individual cannot qualify as an enemy combatant. *Ante* at 25-26, 27 (asserting that enemy combatant status rests on an individual's "affiliation with the military arm of an enemy nation").

The plurality's "nation" affiliation requirement finds no basis in the text of the AUMF, misreads the opinions in *Hamdi* and *Padilla*, and

fails to recognize the backdrop against which the AUMF was passed. As noted earlier, the AUMF states quite explicitly that "the President is authorized to use all necessary and appropriate force against those nations, *organizations*, *or persons*" responsible for the September 11 attacks. AUMF, 115 Stat. 224 (emphasis added). Thus, the plurality's notion that enemy combatants under the AUMF must be affiliated with a "nation" at war with the United States flatly contradicts the AUMF's text.

Furthermore, the plurality erroneously limits the scope of the holdings in *Hamdi*, and therefore *Padilla*. According to the plurality, under these two cases, "affiliation with the military arm of an enemy *nation*" is a necessary condition for being labeled an enemy combatant under the AUMF. *Ante* at 26 (emphasis added).

Of course, the petitioners in both *Hamdi* and *Padilla* were at one time affiliated with Taliban units in Afghanistan. *See ante* at 23, 24. However, neither the *Hamdi* Court nor the *Padilla* court made this fact the lynchpin of its decision. For instance, in *Hamdi*, the Supreme Court made very clear that its decision only answered "the narrow question" of whether the detainee, based on the facts alleged, could be classified as an enemy combatant. *Hamdi*, 542 U.S. at 516. The Court never indicated that those facts circumscribed the outer bounds of the enemy combatant category. *Id.* at 517.

In fact, *Hamdi* specifically noted that the "permissible bounds of the [enemy combatant] category will be defined by the lower courts as subsequent cases are presented to them." *Id.* at 522 n.1. If the facts alleged in *Hamdi* were, as the plurality suggests, binding requirements for enemy combatant status, then the Court's observation and directive to lower courts would have been unnecessary. Thus, any claim that *Hamdi* sets forth the exclusive requirements of the enemy combatant category has a problem: it cannot be reconciled with the Court's own statements.

Finally, the plurality's "nation" affiliation requirement ignores the context in which Congress passed the AUMF. When interpreting legislation that authorizes the use of force against both "nations" and "organizations," I struggle to find any meaningful distinction between affiliating with a so-called "de facto government," like the Taliban,

and affiliating with a terrorist organization like al Qaeda. This is particularly true given the fact that, in many ways, it is impossible to distinguish al Qaeda from a "de facto government":

> [It] has a standing army; it has a treasury and a consistent source of revenue; it has a permanent civil service; it has an intelligence collection and analysis cadre; it even runs a rudimentary welfare program for its fighters, and their relatives and associates. It has a recognizable hierarchy of officials; it makes alliances with other states; it promulgates laws, which it enforces ruthlessly; it declares wars.

Philip Bobbit, *The Shield of Achilles* 820 (2002).

The second faulty premise of the plurality is the erroneous claim that al-Marri does not qualify as an enemy combatant because he was not allegedly "seized on, near, or having escaped from a *battlefield* on which the armed forces of the United States or its allies were engaged in combat." *Ante* at 11 (emphasis added). This purported "battlefield" requirement is also based on the plurality's mistaken interpretation of *Hamdi* and *Padilla*. *See ante* at 23 (noting that Hamdi was captured on a battlefield); *id.* at 24-25 (noting that Padilla had been on a battlefield).

Although I will discuss the relevance of the battlefield in more detail later, it suffices for now to say that the plurality's "battlefield" requirement also does not comport with the text of the AUMF, relevant case law, or the context in which the AUMF was enacted. It is every bit as much a gloss on the AUMF as the "nation" affiliation requirement is — and every bit as misplaced.

To begin, the text of the AUMF is in no way restricted to those persons who have fought or seen action on a foreign battlefield. As mentioned earlier, the AUMF contains no such location limitation and specifically states that its animating purpose is to "protect United States citizens both at *home* and *abroad*." AUMF, 115 Stat. 224. While the plurality attempts to support its conclusion that the AUMF was not meant to operate "right here in the United States" with statements made by members of Congress more than four years after the passage of the AUMF, see *ante* at 40, I would hope the judicial

branch would respectfully bypass post-hoc commentary by distinguished members of the legislative branch intended either to expand or restrict or otherwise reinterpret what Congress plainly expressed and just as plainly stands by.

Next, although Hamdi and Padilla had seen action on a battlefield, such a factor represents a potentially sufficient condition, not a necessary one, for qualifying as an enemy combatant under those cases. An absolute requirement that someone must have been on a battlefield in order to receive enemy combatant status would run headlong into *Ex parte Quirin*, 317 U.S. 1 (1942). In that case, the Nazi saboteurs were not captured on or near a battlefield, but rather in the United States, after surreptitiously entering "from enemy territory into our own." *Id.* at 35. The Court held that even though they had not "entered the theatre or zone of active military operations," i.e. the battlefield, the saboteurs were properly detained as enemy combatants. *Id.* at 38.

Finally, the notion that enemy combatants can only be found on the battlefield is completely antithetical to Congress's purpose for passing the AUMF. The September 11th hijackers targeted civilians on American soil, not a foreign battlefield. The thousands slaughtered in the Twin Towers, the Pentagon, and aboard United Flight 93 were not on any battlefield. To condition the enemy combatant category on battlefield participation is simply wrong.

Third, the plurality appears to be influenced by the fact that the length of the current struggle "has no bounds" and thus the current detention may be an "indefinite" one. *See ante* at 62. I do appreciate the plurality's concern in this regard. No formal armistice with al Qaeda or its offshoots is in the offing, and while 9/11 marked the beginning of widespread awareness that we were at war, no similarly defining event is likely to mark the end. But as much as I respect the plurality's concern on this point, I cannot ultimately accept it, because it is tantamount to an assertion that Congress should have repealed the AUMF or limited its duration, which Congress has not done.

There is in fact nothing in the text of the AUMF that limits the duration of its operational force — it applies both retrospectively to bring those responsible for 9/11 to justice and prospectively to prevent future attacks. And as noted, Congress has not repealed the

AUMF or modified its language in any way. I am not prepared to second guess its judgment. There is evidence that al Qaeda, which has announced an intent to launch further attacks upon America, is not a degraded force but a reconstituted one, operating, among other places, in the Waziristan regions of northwest Pakistan. *See, e.g.*, Scott Shane, *Same People, Same Threat*, N.Y. Times, July 18, 2007, at A1. Whatever the case may be, it is surely within the ambit of constitutional judgment for Congress to conclude that the AUMF should continue in effect and that an ongoing threat must be met with an ongoing resolution.

Until the AUMF undergoes some change from the body that enacted it, the courts must honor its express intent. To approach this war on terror otherwise would allow separation of powers in this long-protracted struggle to fall victim to a short judicial attention span.

The plurality's fourth faulty assumption is that *Ex parte Milligan*, 71 U.S. (4 Wall.) 2 (1866), precludes a determination that al-Marri is an enemy combatant under the AUMF. The plurality contends that Milligan's conduct "mirror[s] the Government's allegations against al-Marri." *Ante* at 37. But this overlooks the basic difference between the two cases: Congress *never* authorized the use of military force against the Sons of Liberty, Milligan's organization, *see Milligan*, 71 U.S. at 6, but Congress *has* authorized the use of force against al Qaeda, al-Marri's organization, *see* AUMF, 115 Stat. 224. *Milligan*'s constitutional force is felt only *after* it has been determined the individual may not be classified as an enemy combatant. *See Quirin*, 317 U.S. at 45. Because al-Marri plainly qualifies as an enemy combatant under the AUMF, the principles of *Milligan* do not preclude detention here.

Similarly, al-Marri argues that the Patriot Act's detention provisions supersede, and therefore abrogate, the President's authority under the AUMF to detain enemy combatants. *See Brief of Appellants* at 14-15. The plurality wisely rejects this contention, recognizing that "the Patriot Act does not eliminate the statutory authority provided the President in the AUMF to detain individuals who fit within the legal category of enemy combatant." *Ante* at 42 (internal quotation marks omitted).

Al-Marri's argument properly fails because the AUMF and Patriot Act have different spheres of operation. While the AUMF represents a specific response to the 9/11 attacks, authorizing military force against those responsible for the attacks, the Patriot Act has a different point of emphasis: providing law enforcement with additional tools and tactics — such as an increased ability to access records, regulate financial transactions, and perform surveillance — designed to prevent terrorism generally, regardless of whether the suspect was associated with 9/11. *See* Pub. L. No. 107-56, 115 Stat. 272 (2001). Thus, to the extent that there is even a hint of potential conflict, the AUMF undoubtedly controls in the present situation as it alone specifically addresses military detention in response to the 9/11 attacks. Therefore, like *Milligan*, the provisions of the Patriot Act are relevant only *after* it has been determined an individual does not constitute an enemy combatant — not before.

The particular errors in applying the AUMF lead to one transcendent flaw. By failing to give proper effect to the AUMF, the plurality has simply assumed the authority belonging to the legislative branch. The plurality states that Congress has not issued the "particularly clear statement . . . necessary to authorize" al-Marri's detention, *ante* at 39, but Congress has expressed its intentions quite plainly and emphatically, and to require more is to simply move the goal posts on the legislature. Courts cannot, under the guise of interpretation, require Congress to do what Congress has already done. To do otherwise vitiates the long accepted approach of Justice Jackson in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952). *See* Samuel Issacharoff & Richard H. Pildes, *Between Civil Libertarianism and Executive Unilateralism: An Institutional Process Approach to Rights During Wartime*, 5 Theoretical Inquiries L. 1, 5-6 (2004) (explaining that the Court has long followed the *Youngstown* approach when faced with questions concerning the scope of the executive's wartime authority); Cass R. Sunstein, *Minimalism at War*, 2004 Sup. Ct. Rev. 47, 83 (same). Under that rubric, the legality of executive action is fortified by congressional approval: "[w]hen the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum," while, conversely, the President's power is at its "lowest ebb" when he "takes measures incompatible with the expressed or implied will of Congress." *Youngstown*, 343 U.S. at 635-37 (Jackson, J., concurring).

With its decision in this case, the plurality, in the guise of interpreting the AUMF, has stood the Jackson approach on its head. In doing so, it has ushered in a novel constitutional arrangement: now, rather than the judiciary respecting the lead of the elected branches in the most consequential of all democratic decisions — those of life and death during periods of war — the elected branches are told they must once more take steps they have already taken to protect the nation.

One searches *Youngstown* for the slightest hint of imprimatur for this new arrangement — but it is nowhere to be found. In *Youngstown*, the Court declared President Truman's seizure of the nation's steel mills unconstitutional, despite the President's contention that the seizure was a necessary wartime measure. *Id.* at 583 (Opinion of the Court). While this demonstrates that the judiciary has a role, even during wartime, in making sure that the executive does not exceed its authority, one must not forget the force behind the Supreme Court's decision: the fact that, as even President Truman "conceded," his actions were not taken pursuant to a "congressional authorization." *Id.* at 638 (Jackson, J., concurring); *see also id.* at 585 (Opinion of the Court) ("Indeed, we do not understand the Government to rely on statutory authorization for [the] seizure."). *Youngstown* has thus always stood for the proposition that the judiciary serves as an important check on the executive's power when it acts without legislative approval.

What was absent when President Truman seized the nation's steel mills is present here: clear and explicit legislative approval of the executive's actions. By ignoring the plain text of the AUMF, the plurality ignores the teachings of *Youngstown* and negates the synchronized action of the President and Congress. It does this despite the fact that "it is difficult to conceive of an area of governmental activity in which the courts have less competence" than military affairs. *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973); *see also* Benjamin Wittes, *Law and the Long War* 103-04 (2008) (noting that "the judiciary's capacity to design the kind of creative policies America needs in this conflict is exceptionally limited"); Mark Tushnet, *Controlling Executive Power in the War on Terrorism*, 118 Harv. L. Rev. 2673, 2679 (2005) (arguing that federal courts lack the capabilities necessary to determine "whether some particular response to a threat to national security imposes unjustifiable restrictions on individual liberty or is an

unwise allocation of decisionmaking power"). Thus, the plurality's approach is not only constitutionally problematic and patently undemocratic. It is dangerously unsound.

## II.   THE CRIMINAL JUSTICE SYSTEM IS NOT THE ONLY LAWFUL MEANS OF ADDRESSING THE TERRORIST THREAT.

Notwithstanding Congress's explicit mandate authorizing the executive to detain all persons affiliated with the "organizations" that "planned" the 9/11 attacks, the plurality reaches a strikingly different conclusion: the Government cannot "subject them to indefinite military detention." *Ante* at 7. The plurality holds that it is unlawful for the President to detain al-Marri without criminal process, and finds that the President must subject al-Marri to formal "charge[s], trial, and punishment in a civilian court." *Ante* at 33. While the plurality seeks to pose the dispute as a mere matter of statutory interpretation, it goes well beyond that. By brushing aside the AUMF's plain text and rejecting accepted notions of separation of powers, the plurality asserts its unabashed preference for using the criminal justice system in all instances involving suspected terrorists similarly situated to al-Marri.

Al-Marri and several amici express every bit as forcefully their preference for criminal prosecution in all instances. Al-Marri argues that he cannot be detained "without charge in civilian court" and that "[a]ll persons in the United States have the right to be charged and tried in a criminal proceeding for suspected wrongdoing." *Brief of Appellants* at 15, 26. Likewise, several amici contend that the executive's only option for detaining al-Marri is to bring formal charges through the criminal justice system. *See, e.g.*, *Brief for U.S. Criminal Scholars and Historians as Amici Curiae Supporting Appellants* at 5 (arguing that "to the extent the government believes [al-Marri] acted against the welfare of the United States, it should proceed with criminal charges within the civilian justice system"); *Brief for Center for National Security Studies et al. as Amici Curiae Supporting Appellants* at 14-15.

In the alternative, al-Marri seeks, if not a criminal trial in name, then what is essentially a criminal trial in practice. Even if he may be

detained by military authorities without a criminal charge, al-Marri claims that he is entitled to processes that are part and parcel of a criminal prosecution, such as the right to discovery and "the right to confront and cross-examine witnesses in an evidentiary hearing." *Brief of Appellants* at 11; *see also Reply Brief of Appellants* at 31-32; *Brief for Professors of Evidence and Procedure as Amici Curiae Supporting Appellants* at 12-26 (asserting that the Federal Rules of Evidence and the Due Process Clause render the Rapp Declaration inadmissible). These processes far exceed those suggested by the Supreme Court in *Hamdi*. *See Hamdi*, 542 U.S. at 533-34 (noting that in "enemy-combatant proceedings," hearsay "may need to be accepted as the most reliable available evidence from the Government" and a "burden-shifting scheme" that includes a rebuttable "presumption in favor of the Government's evidence" may be warranted).

Based on these various assertions, the only reasonable inference I can draw is that the plurality, as well as petitioner and his amici supporters, endorse a ringing preference for the criminal justice system to the exclusion of any other option for dealing with suspected al Qaeda associates apprehended on American soil. By defining the scope of the AUMF and the enemy combatant category so narrowly, it is hard to find anything other than a desire by the plurality to establish a requirement of criminal prosecution in almost every case.[2]

While I would be the first to agree that the criminal justice system retains an important place in our constitutional system when handling the terrorist threat, the notion that it is the *only* manner of dealing with

---

[2]In his concurrence, Judge Gregory expresses a similar preference for criminal prosecution. He suggests that because the executive *chose* to criminally prosecute several individuals who might potentially have been detained under the AUMF — e.g., Moussaoui, Padilla, and Abu Ali — it *must* provide al-Marri with procedures that at least resemble a criminal trial. *Ante* at 104-106, 110 n.5. This argument, of course, overlooks the executive's discretion to choose between criminal prosecution and military detention in those instances where Congress has deemed the latter appropriate. The fact that the executive has judiciously chosen to forego using its detention power under the AUMF in some cases where it is available does not deprive it of the power in other instances where it is necessary. The question before the courts in either circumstance is whether the executive action is a lawful one.

such threats, or is constitutionally compelled in all cases involving apprehensions on American soil, is simply wrong. The democratic branches cannot be compelled to wage a struggle with so many of the attributes of war through the exclusive medium of the criminal justice system. Nothing in our constitution requires the elected branches to treat terrorism invariably as a criminal offense rather than as an act of belligerency. Indeed, such a constitutional approach would burden the Congress and the Executive to a greater extent than the war powers will allow. As discussed below, the prosecution of terrorists associated with organizations such as al Qaeda often presents intractable evidentiary and logistical difficulties. These difficulties underscore the fact that the judiciary has no right in the name of constitutional law to compel criminal prosecution of terrorist suspects in all instances. By forcing a particular approach over the wishes of Congress as expressed in the AUMF, the plurality undercuts the role of the legislative branch in allocating to the executive options to deal with the most dangerous al Qaeda members in our midst.

One wishes in vain for the plurality to evince some glint of recognition that *two* models exist to manage the threat presented by suspected terrorists: prosecuting them through the criminal justice system or detaining them as enemy combatants. Neither approach alone will achieve the appropriate balance between individual liberty and national security. As such, judicial directives that the AUMF or the Constitution itself mandate reliance on the single model of criminal prosecution in all cases involving terrorism suspects is neither satisfactory nor tenable. Indeed, by formally routing all terrorist suspects apprehended in this country through the criminal justice system, the plurality has succeeded in impairing the warmaking powers of Article I and Article II. The warmaking powers conferred upon Congress and the Executive must likewise confer latitude in prosecuting or detaining those who wage war; else they are empty grants, bestowing the power without its necessary incidents. *See Hamdi*, 542 U.S. at 518.

A.

I respect the aspiration that criminal prosecutions be the preferred way of addressing every threat that awaits the nation. But, as the Court and constitutional tradition have long recognized, this is not an

ideal world, and not every threat to community safety can be handled by the criminal justice system.

The Framers attached profound importance to just criminal trials, and the Bill of Rights reflects their commitment. The Fourth, Fifth, Sixth, and Eighth Amendments grant all persons a number of protections against the coercive power of the government in the context of a criminal investigation and prosecution. The importance of these constitutional guarantees is consistent with a preference for using the criminal justice system to try and punish suspects.

This preference, however, is by no means absolute: the Constitution has never laid down a "categorical imperative" that the criminal justice system be the sole mode of apprehending suspected wrongdoers. *United States v. Salerno*, 481 U.S. 739, 748 (1987). For instance, pragmatic concerns of "community safety" may, in some circumstances, allow the executive to deprive an individual of liberty without a traditional criminal proceeding. *See id.* As the plurality properly recognizes, *see ante* at 15-16, this is true in contexts as diverse as the detention of dangerous suspects before a criminal trial, *see Salerno*, 481 U.S. at 755 (adults); *Schall v. Martin*, 467 U.S. 253 (1984) (juveniles); the civil commitment of the mentally ill, *see Addington v. Texas*, 441 U.S. 418 (1979); and the confinement of recidivist sex offenders unable to control their behavior, *see Kansas v. Hendricks*, 521 U.S. 346 (1997).

As the plurality acknowledges, each of the cases noted above constitutionally allows "detention based on process less than that attendant to a criminal conviction." *Ante* at 15. Although the plurality mentions these examples, *see id.*, it fails to recognize their import. In all of these cases, the Supreme Court acknowledged two key facts: first, a failure to act may leave unaddressed a serious threat to community safety and, second, special circumstances present significant barriers to criminal prosecution. As a result, the Court has consistently held that, in certain limited situations, the executive may use alternatives — such as military detention — to formal criminal charges so long as it does so pursuant to a proper legislative authorization. The plurality acknowledges this point, *ante* at 16 & n.6 (citing cases), but, at the same time, refuses to recognize that the AUMF is just such an authorization. By denying Congress's clear intent in this

manner, the plurality essentially mandates that the criminal justice system is the only tool for pursuing a struggle that, in Congress's view, bears many of the salient characteristics of a modern war. This simply cannot be the case.

Indeed, the Court's recognition of alternatives to criminal prosecution is not thought to compromise our constitutional values, and the plurality is wrong for suggesting that the present detention does just that. Though I recognize the detention at issue here is military rather than civil in nature, the relevant analysis is no different. This, at least, was the Supreme Court's view in *Boumediene*, when it said that enemy combatant "proceedings need not resemble a criminal trial." *Boumediene*, slip op. at 54. In fact, if anything, enemy combatants, such as al-Marri, present an even greater need for an alternative to the criminal justice system than do the categories of persons at issue in *Salerno* and *Hendricks*.

It is unquestionable that a failure to incapacitate individuals such as al-Marri may have dramatic consequences. As the plurality rightly notes, the law of war permits enemy combatants to be detained until the end of hostilities, in order to prevent their return to battle. *See ante* at 23 (quoting *Hamdi*, 542 U.S. at 519). The same concern is present with those responsible for the 9/11 attacks. Indeed, there is evidence that suspected combatants released by the United States have subsequently been found fighting against American troops in Afghanistan. *See* John Mintz, *Released Detainees Rejoining the Fight*, Wash. Post, Oct. 22, 2004, at A1. Moreover, the risks of failing to restrain an enemy combatant are even more pronounced when the combatant is a suspected terrorist like al-Marri. Rather than return to a foreign battlefield, al-Marri, upon his release, may well resume his efforts to launch a catastrophic attack against American interests either on U.S. soil or abroad. *See* Cass R. Sunstein, *National Security, Liberty, and the D.C. Circuit*, 73 Geo. Wash. L. Rev. 693, 702 (2005) (noting that the costs of error when dealing with terrorism "may turn out to be disastrous rather than merely harmful").

## B.

There exists not only the obvious need to immobilize enemy combatants, particularly suspected terrorists; there are also often serious

barriers to their criminal prosecution. To begin, the arrest of terror suspects will sometimes necessarily be based on evidence that does not meet the constitutional and statutory requirements of a traditional criminal proceeding. The "fog of war" creates confusion, and, in active combat zones such as Afghanistan and Iraq, it is often difficult to respect the evidentiary standards, such as an unbroken chain of custody, that are the hallmarks of criminal trials. *See* Ruth Wedgwood, *Al Qaeda, Terrorism, and Military Commissions*, 96 Am. J. Int'l L. 328, 330-31 (2002). In addition, it will often be implausible to allow a terror suspect to confront the witnesses against him because of the difficulties in having American combat personnel leave the front lines to testify. *See, e.g.*, *Hamdi*, 542 U.S. at 531-32.

While the plurality implicitly recognizes, as it must under *Hamdi*, that such evidentiary problems support the detention of enemy combatants who have fought on a battlefield, it inexplicably limits that detention to those who have battlefield experience.[3] In reaching this conclusion, the plurality fails to realize that some of the significant difficulties associated with criminal prosecution are equally present when a suspected terrorist has never been on a foreign battlefield. Indeed, these obstacles are present both before and during trial.

For instance, pretrial protections afforded criminal defendants, such as a right to a speedy trial and the immediate assistance of counsel, may hinder the government's need to gather information that could save hundreds, if not thousands, of lives. While all agree that "indefinite detention for the purpose of interrogation" is not allowed, *Hamdi*, 542 U.S. at 521, and torture must not be tolerated under any circumstance, this does not negate the fact that terror suspects are likely the "best source of information" on how to prevent future terrorist attacks. *See* William J. Stuntz, *Local Policing After the Terror*, 111 Yale L.J. 2137, 2162 (2002). Obviously, this information will often be accessible only after interrogation. *See id.* at 2161-62. And interrogation, particularly effective non-torturesome interrogation,

---

[3]The plurality notes that in *Hamdi* I made the suggestion that domestic detentions and detentions of enemy combatants on foreign battlefields present different sets of problems. *See ante* at 29 n.15 . I agree with this, and I have approached the issue in this case with these differences in mind.

typically takes time and may necessitate "[h]olding a terrorist suspect incommunicado." *See* Richard A. Posner, *Not a Suicide Pact: The Constitution in a Time of National Emergency* 63 (2006). Thus, even if the government has no plans to interrogate a terror suspect indefinitely, the criminal justice system may impede the ability to gather critical information, even in the short term, because of a criminal suspect's pretrial rights.

The problems presented by the criminal prosecution of terrorists are even more pronounced at trial. Of course, there is a strong argument for bringing all suspected terrorists to trial: a trial conducted pursuant to the open and public requirements of the criminal justice system provides a showcase of American values and demonstrates our commitment to fairness for even the most pernicious members of society. *See* Michael German, *Trying Enemy Combatants in Civilian Courts*, 75 Geo. Wash. L. Rev. 1421, 1426 (2007). But while the benefits of a criminal trial may carry the day in most instances, I do not believe that the argument is so one-sided as to rule out the ability of Congress to adopt other approaches. This is because the public prosecution of a suspected terrorist entails several serious problems.

First, while a showcase of American values, an open and public criminal trial may also serve as a platform for suspected terrorists. Terror suspects may use the bully pulpit of a criminal trial in an attempt to recruit others to their cause. Likewise, terror suspects may take advantage of the opportunity to interact with others during trial to pass critical intelligence to their allies. For instance, before his appointment as Attorney General, former federal Judge Michael B. Mukasey recounted the story of how, "in the course of prosecuting Omar Abdel Rahman (the so-called 'blind sheik') and others for their role in the 1993 World Trade Center bombing and other crimes, the government was compelled . . . to turn over a list of unindicted co-conspirators to the defendants." Michael B. Mukasey, *Jose Padilla Makes Bad Law*, Wall St. J., Aug. 22, 2007, at A15. One of those co-conspirators, it turns out, was Osama bin Laden. Within ten days, a copy of the list was in bin Laden's hands, "letting him know that his connection to that case had been discovered." *Id.*

Second, and relatedly, the prosecution of some terrorists could present security concerns of a different sort: witnesses and jurors may

be subjected to threats of violence or become the targets of attack. The willingness of terrorist organizations to retaliate against civilian participants in a terrorist trial cannot be overlooked. Al Qaeda has already "carried out a mass killing abroad and left a written message stating that the killing was in retaliation for the actions of [a] federal trial judge." Wedgwood, *supra*, at 331. It is not unreasonable to believe that such a ruthless organization could easily target the trial participants themselves in the future. *See* 18 U.S.C. § 1512 (2000) (prohibiting tampering with a witness, victim, or informant).

To place jurors and witnesses in this sort of danger goes far beyond the price that we fairly ask citizens to pay as responsible members of a free society. For while it may of course be possible to protect jurors and witnesses during trial, it likely will prove very difficult to fully protect them after a trial has been concluded. *See* Wedgwood, *supra*, at 331. The plurality, by insisting on criminal prosecution in nearly all instances, fails to consider that a highly publicized international terror trial may perfectly suit the interests of an organization, such as al Qaeda, that thrives on propaganda and intimidation.

Third, and finally, the plurality also neglects to discuss another serious concern: traditional criminal proceedings, especially public trials, may not be responsive to the executive's legitimate need to protect sensitive information. Neither the plurality nor anyone else suggests that suspected terrorists, such as al-Marri, are arrested pursuant to anything other than intelligence of the most sensitive sort.

If such highly classified intelligence were disclosed to suspected terrorists, the consequences would be devastating. Any further use of that intelligence to either prevent future attacks or capture other suspected terrorists would be jeopardized, if not lost. Moreover, the loss of secrecy would place the sources of sensitive information in danger of reprisal. It is for these reasons that the Court has recognized that the "[g]overnment has a compelling interest in protecting . . . the secrecy of information important to our national security." *CIA v. Sims*, 471 U.S. 159, 175 (1985) (quoting *Snepp v. United States*, 444 U.S. 507, 509 n.3 (1980) (per curiam)) (internal quotation marks omitted).

However, the government's desire to protect such sensitive intelligence may conflict with a defendant's confrontation and compulsory

process rights. By employing those rights, a terror suspect like al-Marri may, in a tactic commonly referred to as "graymail," request highly sensitive materials. *See* William H. Simon, *The Ethics of Criminal Defense*, 91 Mich. L. Rev. 1703, 1705 (1993). Such a request leaves the government facing a Hobson's Choice. The government can withdraw all or part of its case to protect its information, or proceed and surrender its sensitive intelligence and possibly its source. And even if the government is able to suppress the defendant's request, defense counsel will be able to insinuate that the government is hiding information that is favorable to the defendant.

I do not suggest these concerns should carry the day. But Congress may certainly take them into account in deciding that the criminal justice system is not the sole permissible means of dealing with suspected terrorists. In light of these concerns, it seems apparent that the criminal justice system may be ill-suited to deal with the unique problems presented by the prosecution of terrorists such as al-Marri. This, at least, was the calculus of Congress in passing the AUMF. By ignoring these concerns and the clear text of the AUMF, however, the plurality sends the unmistakable message that the criminal justice system is the unquestioned template for dealing with domestic terrorists, regardless of the consequences.

## C.

To be sure, corrective measures have been adopted by Congress to alleviate many of the problems presented by the criminal prosecution of suspected terrorists. For instance, the Classified Information Procedures Act was specifically designed to handle classified information in the course of a criminal proceeding in a manner that balances the legitimate need of national security against the legitimate need for the assertion of basic rights. *See* Classified Information Procedures Act ("CIPA"), 18 U.S.C. app. III §§ 1-16 (2000); *see also United States v. Fernandez*, 913 F.2d 148 (4th Cir. 1990). Courts and parties have become familiar with the customary tools employed in these cases, such as in camera hearings, redactions, and placing information under seal. In addition to such statutory measures, there is also case law designed to balance a variety of pressing governmental interests with a defendant's criminal process rights. *See, e.g.*, *Maryland v. Craig*, 497 U.S. 836, 853 (1990) (balancing the state's "interest in the physi-

cal and psychological well-being of child abuse victims" against a defendant's desire for face-to-face confrontation); *Roviaro v. United States*, 353 U.S. 53, 62 (1957) (holding that the determination of whether an informant's identity must be disclosed requires "balancing the public interest in protecting the flow of information against the individual's right to prepare his defense").

But if the plurality's insistence on using the criminal justice system to prosecute all domestic terrorists rests on the presence of corrective measures such as CIPA, it must also recognize that these corrective measures are not always available and, even when available, are not able to address every difficulty. Despite CIPA's purpose, it is not a panacea for the problems presented by the criminal prosecution of some suspected terrorists. This is because CIPA does not pretend to overcome all limitations on the judicial perspective. Because courts understandably tend to be focused on the specific cases before them (that is, after all, the nature of the judicial process), there is a risk that they, understandably, will fail to appreciate the broader dangers associated with a potentially sensitive piece of information. *See Sims*, 471 U.S. at 176 (explaining that judges have "little or no background in the delicate business of intelligence gathering" and that "[t]here is no reason . . . to have great confidence in the ability of judges to make" intelligence-related judgments correctly).

And there is no guarantee that even the most conscientious attempts to protect classified information will always be effective. For instance, during the criminal trial of Ramzi Yousef, "an apparently innocuous bit of testimony in a public courtroom about delivery of a cell phone battery was enough to tip off terrorists still at large that one of their communication links had been compromised." Mukasey, *supra*, at A15. Given al Qaeda's ambitions, such mistakes have ramifications that last far beyond a specific trial — mistakes Congress sought to prevent in granting the President the authority to detain enemy combatants under the AUMF, and mistakes the plurality fails to acknowledge when suggesting that the criminal justice system is the only model for dealing with al-Marri and those similarly situated.

In the long run, the plurality's preference for making the criminal justice process the exclusive vehicle for dealing with domestic terrorism may disserve nothing so much as the criminal justice system

itself. In adopting corrective measures to deal with the unique problems presented by terrorism prosecutions, courts may dilute the core protections of the criminal justice system in other cases. In the past, the "urgency involved in terrorism cases" has "led courts to accept conduct by the government that might well have been disapproved in other contexts." John Farmer, *A Terror Threat in the Courts*, N.Y. Times, Jan. 13, 2008, § 4, at 14. Furthermore, in order to effectively prosecute terrorists, courts have been much more willing to extend the "reach" of material witness and conspiracy statutes "to conduct that has never before been punishable as a crime." *Id.*

It is naive to think that this sort of dilution of our procedural and substantive criminal law will have no effect on the prosecution of criminal suspects who are not terrorists. The government will seek to take advantage of "terrorist precedents" in other cases. Thus, despite the plurality's protestations to the contrary, the best way to maximize liberty for all may in fact be to minimize the instances when such dilutions of criminal process are needed in the first place.

The unintended consequences of the plurality's insistence on the criminal justice model do not end with the dangers of dilution. In pushing for the full panoply of criminal process for all suspected terrorists arrested in this country, the plurality risks pushing the executive, understandably intent on protecting the nation, in a more extreme direction. The difference between the elaborate procedural protections required by the plurality in the United States and those required elsewhere will give the executive branch the incentive to pursue more extraterritorial detentions and more acts of rendition — not because these actions are necessarily dictated by the struggle against terror but because of the disparities between refined procedural regimes at home and more rudimentary ones abroad. It is far better for true liberty to seek some balance between criminal prosecution and military detention for suspected terrorists in this country than to pursue the plurality's one-sided path.

To sum up, while corrective measures such as CIPA are possible and adaptations in criminal procedures have certainly been undertaken, the fact remains that prosecutions of terrorist suspects have frequently proven to be difficult, both as a practical and logistical matter and as a broader gauge of what the judiciary's proper role

should be on matters touching quite intimately on the conduct of war. It is often argued that these difficulties are nothing more than a function of the fact that these post-9/11 cases are ones of first impression. This is only partly true. These difficulties are inherent, and no accumulation of experience is going to make the underlying evidentiary dilemmas and problems go away.

Moreover, it cannot be forgotten that CIPA was enacted by Congress to apply to criminal prosecutions, not to military detentions. *See, e.g.*, 18 U.S.C. app. III § 8 (stating that the protections of CIPA are designed to "prevent unnecessary disclosure of classified information involved in any *criminal* proceeding" (emphasis added)). There has been no indication from Congress that CIPA should be extended wholesale beyond its original scope, and we therefore should not do so here. Likewise, it cannot be forgotten that Congress passed the AUMF fully cognizant of CIPA and other available corrective measures. When Congress authorized the use of necessary force, including the military detention of enemy combatants such as al-Marri, it did so knowing full well that other alternatives were possible. Nevertheless, it authorized the President, when "appropriate," to detain enemy combatants, a power long recognized as a fundamental incident of waging war. This authorization must not be undermined, as the plurality attempts, through judicial subversion in the name of criminal process. *See* William H. Rehnquist, *All the Laws But One: Civil Liberties in Wartime* 205 (1998) (stating that "[j]udicial inquiry" is "ill-suited" to address issues of "military necessity").

Thus, while many terrorist threats can and should be treated through the criminal justice system, that preference should by no means be absolute. Indeed, it has *never* been the case that the criminal justice system is used to the exclusion of all other forms of detention. By effectively reducing the legislature's allocation of detention options to the executive and all but directing that our government deal with such threats in a single, invariable manner, the plurality is not just wrong, but dangerously so. For the reasons discussed above, it is neither practical nor possible to prosecute all terrorism suspects using the criminal justice system. And it is not constitutionally required.

### D.

I do not wish to be misunderstood. If the prosecution of suspected terrorists is simply not possible in all circumstances, neither is the use

of military detention. While the ability to detain eliminates many of the problems associated with criminal prosecution, open-ended detention is not an acceptable way to conform our historic commitments to liberty to the exigencies of this different kind of conflict.

Under the military detention model, the President may detain enemy combatants without trying them in the criminal justice system. *See Hamdi*, 542 U.S. at 516-23. This is an awesome power and, as such, must be properly circumscribed. Detainees are not afforded the full protections of the Bill of Rights or the Federal Rules of Criminal Procedure, and the executive's actions are not subject to the accountability that is inherent in the criminal justice system. *See, e.g.*, Harold Hongju Koh, *The Case Against Military Commissions*, 96 Am. J. Int'l L. 337, 338-42 (2002).

To turn every crime that might be tenuously linked to terrorism into a military matter would breach this country's most fundamental values. Our acceptance of jurisdiction in al-Marri's case bespeaks the recognition that indefinite detention with no prospect of review is not an option. Such a broad extension of the executive's detention powers would suspend not only the Constitution, but the very essence of liberty itself.

The hard question is thus not between a full-blown prosecution and an unsupervised detention. The hard question involves the identification of those who must be formally charged and prosecuted in the traditional manner and those who may be detained pursuant to more limited procedures set forth by congressional proclamation or Supreme Court precedent. *See, e.g.*, *Hamdi*, 542 U.S. at 524-39 (detailing procedures that must be afforded American citizens detained as enemy combatants).

The dilemma thus is clear: while we have a constitutional preference for traditional criminal proceedings, the prosecution of many terror suspects presents unprecedented challenges. Conversely, while the ability to detain avoids many of the problems inherent in the criminal justice system, the threat to liberty presented by executive detention commands that it be carefully circumscribed. The choice of which path to take is anything but easy, and the plurality and al-Marri are absolutely wrong to suggest otherwise.

Instead, there must be a set of criteria that enable us to identify when military detention is a constitutionally permissible option. This is what I shall try to do in Section III. These criteria must endeavor to respect the preference for the criminal justice system to the extent possible, while not compromising the unquestioned constitutional prerogative of Congress and the executive to wage war and ensure the security of this nation and its people.

## III. THE DETENTION OF AL-MARRI IS CONSISTENT WITH THE LIMITS ESTABLISHED BY OUR CONSTITUTION ON THE MILITARY DETENTION OF THOSE LAWFULLY ON AMERICAN SOIL.

The text of the AUMF clearly authorizes al-Marri's detention. Our inquiry cannot end here, however. There are constitutional limits on what Congress can authorize the executive to do. Those limits must respect both the legitimate operation of the war powers and simultaneously protect against their abuse — for military detentions that bear no relationship to the conduct of war serve only to erode the basic charter of our rights. Those of us who believe the AUMF applies simply cannot avoid the serious constitutional issues that result. Because Congress plainly cannot authorize the President to sweep people off the street without a constitutional basis for doing so, we must also address whether "the Constitution permits" Congress to authorize the military detention of someone, such as al-Marri, who was lawfully residing in this country when seized on American soil. *Boumediene v. Bush*, 553 U.S. ___, slip. op. at 59 (2008).

At some point the obligation arises not just to ask whether, but why — as in why the military detention of those lawfully in this country is a constitutionally permissible exercise. And not just why, but when — as in when the detention of lawful residents is permissible, and when it is not. If the basic "wh" questions do not arise in this case, then I doubt they ever will. The American constitutional tradition is not consonant with the prospect of martial law in other than necessitous circumstances. *See* U.S. Const. art. I, §9, cl. 2; *Ex parte Milligan*, 71 U.S. (4 Wall.) 2 (1866); *see also* The Posse Comitatus Act, 18 U.S.C. § 1385 (2000). But the American constitutional tradition likewise does not countenance judicial interference in democratic efforts to ward off war's gravest dangers. *See* U.S. Const. art. I, §8, cl. 11-

16; *id.* at art. II, §2, cl. 1; *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635-37 (1952) (granting presidential action taken pursuant to a congressional authorization "the widest latitude of judicial interpretation") (Jackson, J., concurring). So our obligation becomes one of treading carefully, lest we cross lines without reflection.

It is here I believe the plurality falls short. By interpreting the AUMF in a manner so plainly contrary to its text, the plurality all but states that Congress is devoid of any constitutional authority to authorize detention of al-Marri. Indeed, it proclaims that the application of the AUMF to allow the military detention of an individual apprehended on American soil and with no foreign battlefield experience "would have disastrous consequences for the Constitution — and the country." *See ante* at 62-63. In holding the AUMF not to authorize al-Marri's detention in the face of a plain textual instruction otherwise, the plurality lays bare its constitutional misgivings about this detention. In fact, the plurality suggests as much by noting the "constitutional concerns" and "serious constitutional questions" that would attend an interpretation of the AUMF that permits the detention of persons such as al-Marri. *Ante* at 20.

So the plurality proposes to avoid all these issues. The plurality is surely right that, "whenever possible," a statute such as the AUMF should be construed to avoid "serious constitutional problems." *Ante* at 48 (internal quotation marks omitted). But there is a limit to the extent to which courts may disregard statutory text in the name of ducking difficult constitutional questions. As *Boumediene* puts it: "The canon of constitutional avoidance does not supplant traditional modes of statutory interpretation. . . . We cannot ignore the text and purpose of a statute in order to save it." *Boumediene*, slip op. at 58. Several members of this court have made clear that the AUMF simply cannot be read in the manner the plurality proposes. Our basic task remains that of giving a text some semblance of the meaning that Congress intended for it, and the doctrine of constitutional avoidance does not absolve us of that duty.

Thus, in the name of constitutional avoidance, the plurality has denied the AUMF its plain effect. At the same time, however, the government has failed to develop principled limitations on its position, thus causing concern that the executive is seeking an authority

that is uncomfortably open-ended. *See Hamdi*, 542 U.S. at 516 (noting that "the Government has never provided any court with the full criteria that it uses in classifying individuals as" enemy combatants). Because no absolute approach is tenable, there must be appropriate criteria for determining when the government may constitutionally detain a suspected terrorist as an enemy combatant. This is consistent with the Supreme Court's plurality opinion in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004).[4]

The "threshold question" in *Hamdi* was "whether the Executive has the authority to detain citizens who qualify as 'enemy combatants.'" *Id.* at 516. The Court found that the AUMF did authorize the President to engage in the "fundamental incident[s] of waging war." *Id.* at 519. This, the Court explained, included the military detention of persons properly classified as enemy combatants. *Id.* at 518-19 (quoting *Ex parte Quirin*, 317 U.S. 1, 28, 30 (1942)).

The Court then addressed who was an enemy combatant. Rather than delineate the term's full scope, the Court answered only the "narrow question" of whether Hamdi, based on the facts alleged, qualified as an enemy combatant. *Hamdi*, 542 U.S. at 516. The Court held that someone who was "part of or supporting forces hostile to the United States or coalition partners in Afghanistan and who engaged in an armed conflict against the United States there," could be treated as an enemy combatant. *Id.* (internal quotation marks omitted).

The plurality has consistently overread *Hamdi*, to the effect that *only* those engaged in armed conflict on a foreign battlefield fall into the enemy combatant category. *See ante* at 22-25. But that is not at all what *Hamdi* said. Recognizing "[t]here is some debate as to the proper scope of this term," 542 U.S. at 516, *Hamdi* observed that the

---

[4]Of course, to say that military detention is available is not to say that it is required. Rather, if military detention is a permissible option, then the specific decision of whether to detain or prosecute should be left to the sound discretion of the executive branch. *See Padilla v. Hanft*, 423 F.3d 386, 394-95 (4th Cir. 2005) (noting "that the availability of criminal process cannot be determinative of the power to detain, if for no other reason than that criminal prosecution may well not achieve the very purpose for which detention is authorized in the first place").

"legal category of enemy combatant has not been elaborated upon in great detail," *id.* at 522 n.1. Instead, "[t]he permissible bounds of the category will be defined by the lower courts as subsequent cases are presented to them." *Id.*

This is such a case. Because al-Marri's case raises such fundamental questions about the executive's power to militarily detain suspected terrorists lawfully residing in this country, it imposes the obligation to examine the precise contours of the enemy combatant category and to develop a framework for determining who under our Constitution may be lawfully detained.[5]

My analysis thus begins with an examination of traditional law of war principles that must underlie any understanding of the enemy combatant category (subsection A). Next, I shall explain how these principles have consistently accommodated changes in the conduct of war and in international relations (subsection B). I shall then discuss the recent changes associated with the war on terrorism, namely the threat of stateless actors who primarily target innocent civilians and may come to possess weapons of mass destruction (subsection C). Based on the principles underlying the law of war and in light of the new circumstances in this particular conflict, I will elucidate what I

---

[5]The plurality asserts that any constitutional limits placed on the executive's ability to abrogate the Bill of Rights amount to what is in effect a limiting construction on the AUMF itself. *See ante* at 20-21 n.9. This is quite mistaken: there is a difference between statutory and constitutional interpretation, and the plurality is wrong to conflate the two. Recognizing that there are constitutional limits as to who the executive may militarily detain is thus a far cry from placing a limiting construction on the AUMF.

Moreover, the limiting construction that the plurality places upon the plain language of the AUMF — namely that it does not apply to the military detention of any enemy combatant within this country — is a far more dramatic restriction of congressional language and executive authority than the Constitution requires. Quite apart from the different result we reach in al-Marri's case, the plurality's willingness to intrude upon the exercise of the warmaking powers in the guise of statutory interpretation bears no resemblance to any constitutional structure I have known.

believe to be the proper criteria for determining who may qualify con-
stitutionally as an enemy combatant (subsection D) and demonstrate
that these criteria are consistent with existing Supreme Court and cir-
cuit precedent on the matter (subsection E). Finally, I will apply these
criteria to the facts of al-Marri's detention (subsection F). I can dis-
cern no shortcut to this inquiry. Indeed, I think this is the only way
to approach and resolve al-Marri's case.

## A.

At first glance, any discussion of traditional law of war principles
may seem quite antique. These principles are rooted in times long
past, when war was synonymous with classic battlefield combat
engaged in by the uniformed armies of rival nation-states. Our current
enemy has, of course, shown only contempt for long-established rules
of armed conflict. Nevertheless, the law of war remains of primary
importance in determining the proper contours of the enemy comba-
tant category. This is true for two reasons. First, as the Court
explained in *Hamdi*, "longstanding law-of-war principles" should
inform our understanding of the AUMF and, therefore, the scope of
the President's power to detain enemy combatants in the current con-
flict. *See Hamdi*, 542 U.S. at 521; *see also ante* at 22 (stating that
"American courts have repeatedly looked to . . . the law of war in
identifying which individuals" are enemy combatants). Second, and
more fundamentally, traditional law of war principles are consistent
with the belief that indiscriminate detention is antithetical to constitu-
tional norms and cannot be tolerated under our system of justice.

Thus, while I do not claim any special expertise in the law of war
and its history, I begin my analysis by looking to "longstanding law-
of-war principles." Although there are those far more knowledgeable
about these matters than am I, certain rudimentary principles do sug-
gest themselves and, as the Supreme Court has indicated, these princi-
ples provide context and assistance for the inquiry at issue here.

The law of war is not binding of its own force, but rather informs
our understanding of the war powers in Articles I and II and of the
enemy combatant category. The law of war likewise serves as a
source of guidance during times of armed conflict, and courts look to
the law of war when interpreting the content and scope of a congres-

sional authorization to use military force, such as the AUMF. *See, e.g.*, *Hamdi*, 542 U.S. at 518-19; *Ex parte Quirin*, 317 U.S. 1, 30-31 & n.7 (1942); *Padilla v. Hanft*, 423 F.3d 386, 391 (4th Cir. 2005). Indeed, the "generally accepted view" is that "a broad and unqualified authorization to use force empowers the President to do to the enemy what the laws of war permit." Curtis A. Bradley & Jack L. Goldsmith, *Congressional Authorization and the War on Terrorism*, 118 Harv. L. Rev. 2047, 2093 (2005).

The law of war represents a "distinct canon of the Law of Nations." William Winthrop, *Military Law and Precedents* 773 (2d. ed., Beard Books 2000) (1896). In the United States, it "encompasses all international law for the conduct of hostilities binding on the United States or its individual citizens, including treaties and international agreements to which the United States is a party, and applicable customary international law." Dep't of Defense, DoD Law of War Program, DoD Directive 2311.01E, sec. 3.1 (May 9, 2006), available at http://www.fas.org/irp/doddir/dod/d2311_01e.pdf; *see also* Jack M. Beard, *The Geneva Boomerang: The Military Commissions Act of 2006 and U.S. Counterterror Operations*, 101 Am. J. Int'l L. 56, 56 n.5 (2007) (quoting the DoD Directive).

1.

Several principles animate the law of war. Foremost among them is the cardinal principle of discrimination, which seeks to minimize the unnecessary destruction of life and property that results from "purposeless or wanton violence." Michael Walzer, *Just and Unjust Wars* 129 (3d ed. 2000). The principle of discrimination requires warring nations to limit their military targets to those persons who actually pose a military threat. At the same time, it allows warring nations to detain those who do represent a military threat, ensuring that such persons, but only those persons, are removed from the field of conflict. While mistakes are inevitable in the often confused environment that is warfare, the principle of discrimination recognizes the indisputable value, even in wartime, of sparing innocent life.

This principle of discrimination is effectuated through the category of "enemy combatant." Only "enemy combatants" may be the intended targets of military force or militarily detained. Two major

distinctions define the enemy combatant category: (1) the distinction between enemies and non-enemies and (2) the distinction between combatants and non-combatants. *See, e.g.*, Walzer, *supra*, at 135-37; Bradley & Goldsmith, *supra*, at 2107-16.

The first level of classification determines who qualifies as the "enemy." Traditionally, the definition of "enemy" has been state-based: after the United States declares war on another nation, all residents of that country are deemed enemies of the United States. *Lamar v. Browne*, 92 U.S. 187, 194 (1875) ("In war, all residents of enemy country are enemies."); *In re Territo*, 156 F.2d 142, 145 (9th Cir. 1946) (same). A country's enemies include "not merely the opposed military forces but all the inhabitants of the belligerent nations or districts." Winthrop, *supra*, at 776. Consequently, those who reside in neutral countries, even if politically, but not militarily, sympathetic to the enemy nation, are immune from detention and targeting by military forces.

After determining that a person is an "enemy," the second level of classification distinguishes combatants from non-combatants. "By universal agreement and practice, the law of war draws a distinction between the armed forces and the peaceful populations of belligerent nations." *See Quirin*, 317 U.S. at 30-31. Indeed, the "distinction between combatants and civilians is a cardinal principle of the law of war." Beard, *supra*, at 60.

Combatants have traditionally included "most members of the armed forces," Bradley & Goldsmith, *supra*, at 2114, and those "who associate themselves with the military arm of the enemy government," *Quirin*, 317 U.S. at 37. The paradigmatic example of a combatant is a soldier who actively serves in his nation's military. *See* Protocol Additional to the Geneva Conventions of 12 August 1949, and relating to the Protection of Victims of International Armed Conflicts art. 43(2), June 8, 1977, 16 I.L.M. 1391 (hereinafter "Protocol I") (stating that "[m]embers of the armed forces of a Party to a conflict" are "combatants"). However, "surgeons, assistants and employees charged with the care and transport of the wounded on the field," even if they are formally part of the country's military organization, generally have not been considered combatants. Winthrop, *supra*, at 779; Richard J. Regan, *Just War: Principles and Cases* 89 (1996)

(noting that "the law of nations and international conventions prohibit attacks on medical military personnel"); *see also* Military Commissions Act of 2006, Pub. L. No. 109-366, § 950v(a)(2)(C), 120 Stat. 2600, 2625 (classifying "military medical or religious personnel" as "protected person[s]").

Several factors have traditionally been considered relevant to the determination of whether someone is a combatant. These include an individual's "self-identification through the wearing of a uniform or some other distinguishing characteristic" and "participation within the command structure of a party to the conflict." Bradley & Goldsmith, *supra*, at 2114; *see also* Military Commissions Act of 2006, Pub. L. No. 109-366, § 948a(2)(B), 120 Stat. 2600, 2601 (including the "wear[ing] [of] a fixed distinctive sign recognizable at a distance" and being "under responsible command" as part of the determination of "lawful enemy combatant"); Geneva Convention Relative to the Treatment of Prisoners of War art. 4, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135 (hereinafter "Third Geneva Convention"). A person's presence on a battlefield has also been considered particularly relevant to the combatant determination. *See, e.g.*, *Padilla*, 423 F.3d at 391-92 (citing *Hamdi*, 542 U.S. at 522 n.1).

**Volume 4 of 4**

No single factor must exist in order to qualify a person as a combatant, however. For instance, the Supreme Court has made clear that an individual may be a combatant even if he is not acting on the battlefield. In *Quirin*, the Court held that the petitioners, who had buried their military uniforms after secretly arriving in the United States, were no "less belligerents [i.e. combatants]" even if they had "not actually committed or attempted to commit any act of depredation or entered the theatre or zone of active military operations." 317 U.S. at 38. The failure of the plurality to appreciate this aspect of *Quirin* results in a faulty premise. The plurality mistakenly presumes that in order to be an enemy combatant, an individual must have been present, at one time or another, on an active battlefield. *See ante* at 28 (finding that al-Marri was not an enemy combatant because, among other reasons, he was "not alleged to have been on the battlefield during the war in Afghanistan"). *Quirin* makes plain the concept of a combatant is much broader.

Likewise, a person's citizenship status is not determinative of his combatant status. The plurality discusses at length the fact that al-Marri, as an alien who lawfully entered the United States, receives "certain [legal] protections — including those rights guaranteed by the Due Process Clause" — while within the United States. *Ante* at 14. The plurality emphasizes this point to demonstrate that allowing the detention of al-Marri, a lawful alien, would also permit the detention of American citizens. *See, e.g.*, *ante* at 6 (arguing that the detention of al-Marri would also allow the "military detention of a similarly situated American citizen"); *id.* at 14 (noting that "the Due Process Clause protects not only citizens but also aliens"); *id.* at 33 (noting that "even ordinary American citizens" could be detained).

Once again, the plurality has indefensibly narrowed the concept of a combatant. Any implication that an individual's citizenship status prevents his detention as an enemy combatant also runs directly afoul of the Supreme Court's holding in *Quirin*. *Quirin* makes clear that the law of war trumps any claim based on American citizenship: "Citizenship in the United States of an enemy belligerent [i.e. combatant] does not relieve him from the consequences of a belligerency which is unlawful because in violation of the law of war." 317 U.S. at 37-38.

2.

Depending on one's status as a combatant or non-combatant, different rights and obligations attach.[6] For instance, combatants are the only ones who may legitimately carry out "the operations of war," namely the use of force. Winthrop, *supra*, at 778. Consequently, only they may lawfully kill the opposing forces. However, in exercising this awesome power, combatants may only target fellow combatants. And, of course, "once war has begun," combatants may be "attack[ed] at any time (unless they are wounded or captured)." Walzer, *supra*, at 138.

Combatants are also required to follow the laws of war. Offenses against the law of war may be defined by Congress, *see* U.S. Const. art I., § 8, cl. 10, or based on "the common law of war," *see Hamdan v. Rumsfeld*, 126 S. Ct. 2749, 2780 (2006). Offenses include "engaging in illegal warfare as a guerilla," "acting as a spy," "abuse or violation of a flag of truce," disguising oneself in the uniforms of the opposing forces, and the "unlawful, unreasonably harsh, or cruel, treatment of prisoners." Winthrop, *supra*, at 785, 791, 839-40; *see also Quirin*, 317 U.S. at 35-37 (holding that persons who "pass surreptitiously from enemy territory into our own, discarding their uniforms upon entry, for the commission of hostile acts involving destruction of life or property, have the status of unlawful combatants punishable as such by military commission"); Military Commissions Act of 2006, Pub. L. No. 109-366, § 950v(b), 120 Stat. 2600, 2626-30 (defining twenty-eight offenses that are triable by military commission as law of war offenses); Third Geneva Convention art. 3.

If a combatant acts in accordance with the law of war, he is a lawful combatant and entitled to the rights thereof. This includes being treated as a prisoner of war if captured. *See* Third Geneva Convention; Regan, *supra*, at 88. Because lawful combatants are simply following the orders of their belligerent nation, the law of war dictates that they not be punished for their role in the hostilities. Third Geneva

---

[6]Non-combatants, also known and referred to by the plurality as civilians, are by definition anyone who is not deemed a combatant. *See, e.g.*, Beard, *supra*, at 60; Bradley & Goldsmith, *supra*, at 2107, 2113-14; *see also* Walzer, *supra*, at 138-59; Winthrop, *supra*, at 778-79.

Convention art. 13 ("Measures of reprisal against prisoners of war are prohibited."); Winthrop, *supra*, at 791. Instead, they are held as prisoners of war, treated humanely, and released or returned to their home country when the conflict is over. *See* Third Geneva Convention art. 13 ("Prisoners of war must at all times be humanely treated."); *Hamdi*, 542 U.S. at 520; Winthrop, *supra*, at 790 (noting that captured lawful combatants must be "treated with humanity" and "on the same footing as regards food and clothing as the troops of the Government who made them prisoners").

If a combatant violates the law of war, however, he becomes an unlawful combatant. Unlawful combatants "are subject to trial and punishment by military tribunals for acts which render their belligerency unlawful." *Quirin*, 317 U.S. at 31; *see also Johnson v. Eisentrager*, 339 U.S. 763, 786 (1950) (noting that the "jurisdiction of military authorities, during or following hostilities, to punish those guilty of offenses against the laws of war is long-established"). Unlawful combatants are to be tried by military commissions. *See* Military Commissions Act of 2006, Pub. L. No. 109-366, § 948c, 120 Stat. 2600, 2602 (establishing military commissions for alien unlawful enemy combatants); *Hamdan*, 126 S. Ct. at 2775-78. After trial by military authorities, unlawful combatants may be punished in any number of ways, including imprisonment or death. Winthrop, *supra*, at 842-43.

Non-combatants also have unique rights and obligations under the law of war. First and foremost, civilians should not "be the objects or the targets of military activity," Walzer, *supra*, at 151, and "[e]xcept where unavoidable," they "are not to be involved in injury to life, person, or property," Winthrop, *supra*, at 778; Protocol I, art. 51. Those who violate this "rule of immunity of non-combatants . . . become liable to the severest penalties as violators of the laws of war." Winthrop, *supra*, at 779.

In light of this immunity from the brunt of armed conflict, civilians have a related obligation to not "take a direct part in hostilities." Protocol I, art. 51(3). If a non-combatant does take a direct part in the

conflict, he forfeits his status as a civilian and may be treated as an unlawful combatant.[7] *See* Bradley & Goldsmith, *supra*, at 2115.

3.

The above is no more than a concise presentation of the classical model of the laws of war. No one is so naive as to believe that the classical model governs the behavior of all warring parties. The classical model often cracks under the strain of actual warfare, as the devastation to civilians in World War II, among other things, bears full testament. And, as was plain from 9/11, al Qaeda and other terrorists hold the laws of war in open contempt. Thus, the classical model is not introduced to suggest guidelines to which warring parties in fact adhere or standards that would subject the conduct of war in this country to pervasive litigation.

Instead, I discuss the classical model for a discrete and narrow purpose. The attacks of 9/11 left this country on the horns of a dilemma: between having our hands tied with Marquess of Queensberry rules and being so indifferent to the law of war that we ourselves became a rogue and lawless nation. The Supreme Court, in attempting to alleviate this tension, suggested that the law of war serves as a useful guide as to whom the President may constitutionally detain. *See Hamdi*, 542 U.S. at 518, 521. In other words, an understanding of the traditional law of war is the first step in defining the concept of an enemy combatant.

In sum, the law of war has historically classified individuals during times of armed conflict into one of several categories. The process of classification involves two major steps. The first inquiry is whether a person is an enemy. If so, the second inquiry is whether that person is a combatant or a civilian. Different rights attach depending on these

---

[7]The exact line between direct and indirect participation is not a clear one. *See* Beard, *supra*, at 60 (noting that "[d]etermining precisely when noncombatants lose their protected status . . . has not always been easy"); Bradley & Goldsmith, *supra*, at 2115 (noting that "there is uncertainty about where the line should be drawn"). However, there is universal agreement that a civilian who engages in military-like actions, such as discharging a weapon against the enemy, directly participates.

classifications. Most importantly for our purposes, only enemy com-batants, both lawful and unlawful, (and civilians who take a direct part in hostilities) may be detained by the military in accordance with the laws of war.

## B.

The classical model is just that: a classical model. War changes. So too the law of war has not remained static. Rather, it has responded to the ever-evolving nature of combat and the dynamic quality of international relations.

To that end, the recent past has witnessed dramatic changes in the manner in which wars are conducted. War is less a state-based enter-prise: the greatest threats to our nation's security now include those from stateless actors intent on unleashing weapons of mass destruc-tion against civilian populations. Thus, while the principle of discrim-ination and the category of enemy combatant surely remain a vital part of the law of war, they most definitely must accommodate the new threats to the security of nations. The plurality's perspective, by contrast, is mired in the models of the past, and completely fails to accommodate the changing nature of warfare.

Changes in military strategy, technology, and international rela-tions are synonymous with war itself. As the following historical examples demonstrate, the law of war has always accommodated new circumstances in order to effectuate its core principles and purposes.

An early example of such accommodation is the adaptation of the combatant category to the emergence of "guerilla" fighters. Before the Civil War, guerilla fighters, defined as "[i]rregular armed bodies or persons not forming part of the organized forces of a belligerent . . . who engaged in the killing, disabling and robbing of peaceable citi-zens or soldiers . . . from motives mostly of personal profit or revenge," were relatively unknown. Winthrop, *supra*, at 783-84.

Because this type of warrior was new, Union military commanders were unsure whether these guerilla fighters should be treated as "ordi-nary belligerents and be given the same rights as prisoners of war" or

as unlawful belligerents, subject to trial and punishment by the military. Louis Fisher, *Military Tribunals & Presidential Power: American Revolution to the War on Terrorism* 73 (2005). The leading military scholar of the day, Dr. Francis Lieber, opined that the treatment of such guerillas depended on whether they were fighting lawfully or unlawfully and that an absence of uniform should not be considered decisive. *Id.* at 73-74. If captured during a "fair fight and open warfare," then guerillas should be treated as prisoners of war. However, if fighting in stealth, such as by disguise or concealment, then guerillas could be punished as unlawful belligerents. *Id.* This opinion would later appear in Dr. Lieber's landmark military code, which "heavily influenced" the future Hague and Geneva Conventions. *Id.* at 71-75.

Likewise, the category of unlawful weapons, though consistent in principle, has "increased in modern times" with the development of new and more devastating weaponry. Winthrop, *supra*, at 784. Given the frequency of technological changes and advancements in war weaponry, the list of legitimate and illegitimate weapons has necessarily changed "with the progress of inventive science." *Id.*; *see also* Protocol I, art. 36 (requiring Parties to determine whether any "new weapon, means or method of warfare" is permissible). Thus, in just the last century, various types of chemical and biological weapons have been deemed to be unlawful means of warfare, probably because "in disabling or causing death, [they] inflicted a needless, unusual and unreasonable amount of torture or injury." Winthrop, *supra*, at 784.

In addition to changes in who participates in wars and how wars are fought, the law of war has also accommodated transformations in international relations. Historically, the law of war only applied when nation-states declared war against each other. However, the United Nations Charter now regulates "armed conflict," in the form of "'armed attack,' 'use of force,' and 'threat[s] to the peace.'" Bradley & Goldsmith, *supra*, at 2061 (quoting U.N. Charter art. 2, 42, 51). Given this, "the international law role for declarations of war has largely disappeared" and "armed conflict" is now the "relevant jurisdictional concept" for the law of war. Bradley & Goldsmith, *supra*, at 2061. The Geneva Conventions of 1949 recognized this change when it stated that the law of war applies not only when there is a declared war but also when there is "any other armed conflict which

may arise." *See, e.g.*, Third Geneva Convention art. 2; *see also* Bradley & Goldsmith, *supra*, at 2061.

My purpose is not to applaud or condemn this or that particular in the changing law of war. I list but a few examples of how the law of war has accommodated altered circumstances, but they serve to demonstrate a larger point: in order to effectuate its purposes, the law of war has never remained static. If other principles of the law of war have changed, there should be nothing changeless or immutable about the definition of enemy combatant.

## C.

The current struggle against global terrorism bears some of the hallmarks of traditional war: it consists of armed enemies fighting over political and ideological goals. However, other characteristics are clearly new.

First, and most importantly, is the change in who fights war. The law of war was initially designed to regulate encounters between nation-states. However, the greatest threats to our nation's security now include stateless actors. No longer are our enemies tethered to individual nations; instead, they are diffuse organizations comprised of citizens from many different countries around the globe. Put simply, while terrorism may find support and sponsorship from nation-states, it does not need to be a state-based enterprise.

Congress specifically recognized the emergence of the threat presented by stateless actors when it authorized the President "to use all necessary and appropriate force against those nations, *organizations*, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001." AUMF, 115 Stat. 224 (emphasis added).

Second, the means employed by terrorists "represent[ ] [a] breakdown" in the "political code first worked out in the second half of the nineteenth century and roughly analogous to the laws of war worked out at the same time." Walzer, *supra*, at 198. Although terrorist-like acts have always occurred in war, modern terrorism — that is, "the

random murder of innocent people" — "emerged as a strategy of revolutionary struggle only in the period after World War II." *Id.* Modern terrorists typically blend into the surrounding community and deliberately strike at soft targets, such as office buildings and other venues in the public square. This makes the "battlefield" in the current conflict essentially unbounded, and renders the traditional indicia used to determine enemy combatant status, such as appearance on a battlefield and the wearing of a uniform, woefully unreflective of the risks posed by terrorist organizations.

Finally, the changes in warfare discussed previously — the presence of stateless terrorists intent on targeting innocent civilians — are magnified by the fact that weapons of mass destruction, whether chemical, biological, or nuclear in nature, are more readily available. *See* Richard A. Posner, *Not a Suicide Pact: The Constitution in a Time of National Emergency* 2 (2006) (discussing the potential effects of a terrorist strike with weapons of mass destruction). Put simply, the consequences of not addressing these risks are vastly greater today than they were a generation ago. Today, a single terrorist can kill thousands upon thousands of civilians in an instant. It simply cannot be the case that the law of war must be so bound in obsolescence that it hinders a nation's ability to recognize new threats.

The plurality surprisingly resists the idea that the law of war has evolved as it applies to these changed circumstances. *Ante* at 49. This would seem to ignore the fact that the events of 9/11 even happened; all who witnessed or remember them have no doubt that warfare has reached a new and more dangerous phase. Still, the plurality insists that I offer "*no* legal authority" for the assertion that the law of war has in fact been evolving. *Id.* But the legal authority is there. In fact, the legal authority is right before the plurality's eyes. In the AUMF Congress certainly accepted what the plurality does not: that the traditional principles of the law of war can be adapted to changed circumstances. The text of the AUMF recognizes that traditional concepts such as "battlefield" and "nationality" do not capture the risks presented by terrorists bent on replicating the events of 9/11. The plurality contends, however, that Congress's view of law of war principles should make not the slightest constitutional difference. *See ante* 49 n.24. In not permitting the democratic branches to take into account changes in modern warfare the plurality plainly traps this nation in a

time warp. And in denying Congress's expression under the AUMF any and all constitutional effect, the plurality continues its course of reading the Article I § 8 war power right out of the document. *Id.*

In passing the AUMF, Congress sought to recognize that the world around us changes; in contrast, the plurality's view of that world remains quite dangerously static. In fact, while the plurality propounds its view in the guise of interpreting the AUMF, its interpretation — and its commitment to quaint notions of battlefields and nationality — is so textually incorrect, that it is hardly speculative to suppose that the plurality's interpretation is propounded as a constitutional limitation on the executive as well. Whatever the case may be, it binds the nation to law of war concepts that even the most casual observer of modern terrorist tactics would never accept.

## D.

It is undisputed that enemy combatants, if properly classified as such, may be detained by the military. *See Hamdi*, 542 U.S. at 516-19, 533-35. Who then may be classified by Congress, acting pursuant to our Constitution, as an enemy combatant? The Supreme Court insists we consult the law of war. Having examined the law of war and considered the recent changes in warfare and international relations, I believe that three criteria best identify who qualifies as an enemy combatant in the current conflict.

I do not suggest that these are the only criteria that might be set forth. Nor would I be so presumptuous as to suggest that these criteria will eliminate the prospect of difficult cases. I do, however, think it is critical to develop some general rules so that cases such as al-Marri's may be resolved on a principled rather than an ad hoc basis. In fact, until some general guidance is set forth, the executive will have no idea which military detentions are permissible and which are plainly beyond constitutional bounds. And without general guidance, the fear and specter of an open-ended executive detention power of persons lawfully in this country will remain.

Thus, while I do not for a moment contend that any set of criteria will be free from difficulty, I do emphatically contend that these three criteria conform to the evolving principles of the law of war; that they

apply the limiting principle on enemy combatant detentions that the government has failed to suggest; and that they should avoid the serious "constitutional concerns" that the plurality and various amici raise, if the AUMF were held, as I believe it must be, to allow the detention of an enemy combatant apprehended on American soil. *See ante* at 20.

The first two criteria determine who constitutes an "enemy." Historically, the conception of "enemy" has been nation-based. However, as discussed in the prior section, nations are no longer the only entities that engage in armed conflict. Rather, stateless actors, most prominently terrorist organizations, are now a pressing military threat to the security of America.

Given these realities, an "enemy" is any individual who is (1) a member of (2) an organization or nation against whom Congress has declared war or authorized the use of military force. Taken together, these two criteria closely track traditional law of war concepts that distinguish enemies from non-enemies. At the same time, they recognize that modern military threats include those posed by non-state actors.

I first address the criterion of membership. While the traditional requirement of residency or other affiliation with an enemy nation still applies, the advent of enemy organizations requires a functional equivalent to residency for this new stateless actor. This is achieved by the requirement of membership in the enemy organization. Because membership may be considered more amorphous than residency or citizenship, it is important that there be identifiable facts that indicate such affiliation with the enemy organization. Such indicia of membership may include: self-identification with the organization through verbal or written statements; participation in the group's hierarchy or command structure; or knowingly taking overt steps to aid or participate in the organization's activities. *See, e.g.*, Bradley & Goldsmith, *supra*, at 2114-15.[8] Thus, for example, someone who

---

[8]The plurality chides me for referencing the works of "distinguished legal academics. " *Ante* at 40 n.20 . I of course make no apologies for drawing upon the work of distinguished scholars when attempting to dis-

sends money to "a nonprofit charity that feeds Afghan orphans" that unknowingly makes "its way to al Qaeda" would not be a member of the al Qaeda organization, and it is beyond hyperbole for the plurality to suggest otherwise. *Ante* at 19. Furthermore, the membership requirement is important because it aids in distinguishing those who are the enemy from those who merely sympathize with the enemy.

The second criterion — congressional authorization — recognizes that Congress may authorize the use of military force against non-state actors, such as terrorist organizations, as it has already with the AUMF. By contemplating such authorization, this second criterion appropriately excludes from the category of "enemy" those persons or groups against whom Congress has *not* authorized the use of military force. Thus, the notion that any individual affiliated with an organization engaged in purported terrorist activities — such as the "environmental group" mentioned by the plurality — could be considered an enemy combatant is completely unfounded. *Ante* at 37 n.18. For certain, there are many individuals and organizations engaged in unlawful conduct, and even terrorism. But most of these individuals and organizations have nothing to do with al Qaeda, its affiliates, or the September 11 attacks. Under this criterion, such persons would not be eligible for military detention under the AUMF. This is both consistent with our traditional conception of who should and should not be eligible for detention and appropriate in light of the constitutional imperative that military detention be the exception and not the rule. Indeed, not to require congressional authorization for such detentions in this country splits the ground beneath the war powers right in two.

If the first two criteria address who in modern warfare is the enemy, the third criterion addresses who is the combatant. Historically, this distinction has separated those with military aims from those who do not present a threat to opposing forces. Though yesterday's soldier has been replaced, at least in part, by those who eschew

---

cern the constitutional framework within which this question of first impression must be located. Indeed, to rule out any reliance upon those who have studied and reflected on these questions seems to me a form of "know-nothingism" in which my distinguished colleagues in the plurality have also wisely declined to indulge.

the conventions of lawful warfare, the purpose underlying this distinction remains unchanged. In light of today's realities, a "combatant" is a person who knowingly plans or engages in conduct that harms or aims to harm persons or property for the purpose of furthering the military goals of an enemy nation or organization. Like the first two criteria, this requirement closely tracks the relevant traditional law of war rules.

Under this criterion, those who use military-like force against American soldiers or civilians obviously qualify as combatants. Similarly, members of an enemy sleeper terrorist cell that have taken steps, even if preliminary in nature, toward an act of destruction are also considered combatants. Conversely, persons traditionally considered civilians, such as members of the enemy organization who do *not* possess hostile or military designs, are non-combatants and may not be detained by the military. This includes persons who would clearly be non-combatants, such as a "physician who treated a member of al Qaeda," because they intend no harm to persons or property. *Ante* at 20. Such persons would not be subject to military detention.

Two further examples may help illustrate the scope of this framework. First is a person who joins a terrorist organization after Congress has authorized the use of military force against the respective group. In the present conflict, this would include new recruits to al Qaeda or its affiliates after 9/11. Under the above criteria, such persons are clearly part of the "enemy," even if they were not members of the targeted organization at the time Congress initially acted. This is because it was the organization and its affiliates, and not just the then-members of such groups, against whom Congress authorized the use of force. *See* AUMF, 115 Stat. 224 (authorizing the use of "all necessary and appropriate force against those . . . organizations [that] . . . committed" the 9/11 attacks, "in order to prevent any future acts of international terrorism"). Thus, in the current conflict, any "individual can become part of a covered 'organization' by joining it after the September 11 attacks." Bradley & Goldsmith, *supra*, at 2110. As a result, such a person, if also a combatant, would be eligible for military detention.

Second is a person who commits, or plans to commit, a terrorist act but is not otherwise affiliated with an organization or country covered

by a congressional proclamation. Timothy McVeigh is one example that comes to mind. Because such a person is not a member of an enemy organization, he may not be detained as an enemy combatant under the above criteria. Indeed, Congress has never declared war against a single individual or even a discrete conspiracy (unless the Barbary pirates qualify), and it is difficult to envision a scenario in which it would. This is unsurprising, in part because prosecutions of individual terrorists do not ordinarily present the same sort of logistical, informational, and evidentiary problems as large scale terrorist networks or nations. *See supra* Section II.

However, this in no way suggests that the executive is prohibited from acting preventively in such instances. Rather, it simply means that the threat posed by such an individual must be addressed pursuant to more traditional statutory procedures, such as a material witness warrant, *see* 18 U.S.C. § 3144, or indictment under any number of potentially relevant criminal statutes, *see, e.g.*, 18 U.S.C. § 2332a (prohibiting the threatened, attempted, or actual use of a weapon of mass destruction); 18 U.S.C. § 2332b (prohibiting acts of terrorism transcending national boundaries); 18 U.S.C. § 2332f (prohibiting the bombing of places of public use or government facilities); 18 U.S.C. § 1751 (prohibiting assassinating or conspiring to assassinate the President or Vice President of the United States); 49 U.S.C. § 46502(a)(2) (prohibiting committing or conspiring to commit aircraft piracy); 18 U.S.C. § 844(f) (prohibiting the damage or destruction of any personal or real property of the United States). In short, such a person can surely be detained and neutralized, but not through the means of military detention.

In sum, the following three criteria must be met in order for someone to be classified as an enemy combatant: the person must (1) be a member of (2) an organization or nation against whom Congress has declared war or authorized the use of military force, and (3) knowingly plans or engages in conduct that harms or aims to harm persons or property for the purpose of furthering the military goals of the enemy nation or organization.

These three criteria reach beyond those of the plurality because they may constitutionally include, if Congress so authorizes, persons arrested outside any formal battlefield, persons not in uniform, and

persons arrested on American soil. The criteria are at the same time limited, however, and should not be construed as granting the executive a blank check to brand certain domestic groups as subversive and militarily detain whomever it pleases. Indeed, under these criteria, there are at least three significant limitations on the executive's ability to militarily detain persons lawfully residing in the United States.

First, there is the significant political check of congressional authorization. Specifically, absent some limited inherent authority needed during times of emergency, the executive may only detain those persons against whom Congress has authorized the use of force. If history is any indicator, Congress does not take such a decision lightly. Indeed, it was the dire events of September 11th that gave rise to the use of military force in the present instance, and it is likely that only emergencies of similar magnitude will trigger a similar response.

Second, even if Congress were to authorize the use of military force against a particular group, it would not be authorizing the executive to make a sweep on the basis of mere membership. This is because membership, without more, is not enough to qualify as an enemy combatant under my proposed criteria. Rather, the person in question must have taken steps to further the military goals of the organization. Thus, McCarthy-like accusations of mere group membership would not suffice as a basis for detention.

Third, persons subject to military detention are afforded the opportunity to challenge the accuracy of their detention before a neutral decisionmaker in accordance with the framework articulated in *Hamdi*. This ensures that the government possesses sufficient evidence to justify a measure as serious as military detention.

Given these checks on executive power, any fear of massive round-ups or reckless disregard for human liberty would be misplaced.

Furthermore, these criteria accommodate recent changes in a manner that is consistent with the law of war's principles and purposes. For instance, one of the purposes of the enemy combatant category is to limit the number of people subject to military force, including military detention, to those who threaten military harm. Each of the above criteria serve that purpose, as they exclude persons who are not

members of enemy organizations as well as persons in such groups who do not try to do harm. Another purpose of the category is to determine which persons may be properly detained in order to eliminate the threat they pose. The above criteria are also consistent with that purpose, as they allow the military to detain, without fear of having to release because of an inability to prosecute, those who present real and serious threats to our security and safety.

### E.

In addition to comporting with traditional law of war principles and purposes, these three criteria are also in line with all Supreme Court and circuit precedent on the matter. *See Ex parte Quirin*, 317 U.S. 1 (1942); *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) (plurality op.); *Padilla v. Hanft*, 423 F.3d 386 (4th Cir. 2005). Although each of those cases declined to delineate the full scope of the category, *see Quirin*, 317 U.S. at 45-46; *Hamdi*, 542 U.S. at 516; *Padilla*, 423 F.3d at 391-92, the criteria articulated here are plainly consistent with their pronouncements about who, at a minimum, qualifies as an enemy combatant. *See Quirin*, 317 U.S. at 37-38 (finding that people who "associate themselves with the military arm of the enemy government, and with its aid, guidance and direction enter this country bent on hostile acts" qualified as enemy combatants); *Hamdi*, 542 U.S. at 516 (finding that someone who was "part of or supporting forces hostile to the United States or coalition partners in Afghanistan and who engaged in an armed conflict against the United States there" qualified as an enemy combatant) (internal quotations omitted); *Padilla*, 423 F.3d at 389 (finding that someone "who is closely associated with al Qaeda, an entity with which the United States is at war; who took up arms on behalf of that enemy and against our country in a foreign combat zone of that war; and who thereafter traveled to the United States for the avowed purpose of further prosecuting that war on American soil, against American citizens and targets" qualified as an enemy combatant) (emphasis omitted).

Moreover, these criteria clearly do not run afoul of three potential constitutional concerns. First is the scope of the executive's power under Article II. It is widely accepted that the President has some inherent constitutional powers, particularly to act in times of emergency when large numbers of American lives may be at stake. *See*

*The Federalist No. 70*, at 392 (Alexander Hamilton) (Clinton Rossiter ed., 1999) (noting that the executive branch possesses many qualities, such as "[d]ecision, activity, secrecy, and dispatch," that are essential to the prosecution of a war); *The Federalist No. 74*, at 415 (Hamilton) ("Of all the cares or concerns of government, the direction of war most peculiarly demands those qualities which distinguish the exercise of power by a single hand."). Though the scope of those powers is much debated, we need not address the specific contours of the powers here. This is because the Court in *Hamdi* — a case much like this one where no immediate exigency was present — implicitly found no Article II problem when defining the scope of the enemy combatant category, as I do here, in accordance with the law of war. *See Hamdi*, 542 U.S. at 518-521. In addition, no other relevant authority indicates that these criteria would impinge on the President's inherent operational authority as commander-in-chief or his ability to act in times of true emergency.

Second is the Court's decision in *Hamdi*, which required under the due process clause that American citizens detained as enemy combatants "be given a meaningful opportunity to contest the factual basis for that detention before a neutral decisionmaker." *Hamdi*, 542 U.S. at 509. Whereas *Hamdi* established the procedures to which at least one type of enemy combatant was entitled, the criteria discussed above address the antecedent question of who qualifies as an enemy combatant. Put another way, this approach articulates a substantive legal definition of enemy combatant, whereas *Hamdi* enables one class of alleged combatants to procedurally challenge the factual basis of their detention. In short, *Hamdi* does not present any constitutional problem to the category of enemy combatant as defined by these criteria.

Finally, these criteria do not contravene the principles established in *Ex parte Milligan*, 71 U.S. (4 Wall.) 2 (1866). In that case, the Court established the bright-line rule that civilians may not be tried by military authorities if the civilian courts are open and functioning. *Id.* at 121. However, as the Court made clear in *Quirin*, this principle only applies to persons who are *not* enemy combatants. *See Quirin*, 317 U.S. at 45 (emphasizing that Milligan "was a non-belligerent" and thus "not subject to the law of war"). Put simply, the Court in *Milligan* was not addressing the definition of enemy combatant but

rather the circumstances under which martial law (which permits the military trial of civilians) may be declared. Thus, the principles laid down in *Milligan* apply only *after* it has been determined that the individual in question is a civilian, not a combatant. The framework delineated above addresses the earlier question of who qualifies as a combatant and thus any reliance on *Milligan* would be misplaced.

Thus, the plurality's suggestion that the detention of al-Marri would "so alter the constitutional foundations of our Republic" as to "render [them] lifeless" is patently incorrect. *Ante* at 63. For the reasons discussed, al-Marri's detention perfectly accords with the Constitution. In fact, it is difficult to square the plurality's expressed concern over the constitutionality of al-Marri's detention with its express questioning of our effort to establish constitutional limits that bind "both the executive and legislative branches." *Ante* at 49. It is further curious that the plurality should take exception to an inquiry that *Boumediene* instructs us to undertake. *See Boumediene*, slip op. at 59 (stating that the executive's authority depends not only on what the AUMF authorizes, but also on what "the Constitution permits"). Regardless, to the extent that the plurality's erroneous interpretation of the AUMF in this case was influenced by constitutional concerns, these concerns were unfounded.

F.

The description of the general framework makes possible a straightforward resolution of the specific question of whether the executive has the authority to detain al-Marri as an enemy combatant. The framework also permits the decision to be made in a principled, rather than ad hoc, fashion, and consistent with the constitutional limitations on who may be militarily detained.

As discussed earlier, the Supreme Court held that the AUMF grants the President the authority to detain enemy combatants. *See Hamdi*, 542 U.S. at 518. Since Congress did not articulate a specific definition of "enemy combatant" in the AUMF, I have looked to the law of war for guidance in determining the scope of the President's detention authority under the statute. *Id.* at 518-21.[9]

---

[9]In the Military Commissions Act of 2006 ("MCA"), Congress defines "lawful enemy combatant" as a person who is:

Based on the criteria identified and the facts alleged, al-Marri easily qualifies as an enemy combatant. To begin, he satisfies the two criteria used to define an "enemy." The AUMF authorizes the use of force against al Qaeda, and al-Marri has clearly taken the steps necessary to be considered a member of the organization. Not only did he attend an al Qaeda terrorist camp in Afghanistan, but he also subsequently cultivated relationships with the most senior members of the al Qaeda organization: he met personally with Osama bin Laden and

(A) a member of the regular forces of a State party engaged in hostilities against the United States;

(B) a member of a militia, volunteer corps, or organized resistance movement belonging to a State party engaged in such hostilities, which are under responsible command, wear a fixed distinctive sign recognizable at a distance, carry their arms openly, and abide by the law of war; or

(C) a member of a regular armed force who professes allegiance to a government engaged in such hostilities, but not recognized by the United States.

Military Commissions Act of 2006, Pub. L. No. 109-366, § 948a(2), 120 Stat. 2600, 2601.

Furthermore, the MCA defines "unlawful enemy combatant" as "a person who has engaged in hostilities or who has purposefully and materially supported hostilities against the United States or its co-belligerents who is not a lawful enemy combatant (including a person who is part of the Taliban, al Qaeda, or associated forces)," or "who, before, on, or after the date of the enactment of the [MCA], has been determined to be an unlawful enemy combatant by a Combatant Status Review Tribunal or another competent tribunal." *Id.* § 948a(1).

Though informative in some respects, these definitions are of limited assistance and relevance in this case. This is because they apply only to the detainees tried by military commissions established by the MCA, namely aliens who are unlawful enemy combatants as defined by the MCA. *Id.* § 948b-c. Thus, these provisions do not specifically address the scope of the President's detention power under the AUMF nor the definition of "enemy combatant" for purposes other than the military commissions under the MCA. *See* Richard H. Fallon, Jr. & Daniel J. Meltzer, *Habeas Corpus Jurisdiction, Substantive Rights, and the War on Terror*, 120 Harv. L. Rev. 2029, 2109 (2007).

volunteered to martyr himself for the al Qaeda cause; he entered the United States as a sleeper agent under the direction of Khalid Shaykh Muhammed, the mastermind of the 9/11 attacks; and he received substantial funding for his mission from Mustafa Ahmed al-Hawsawi, the financial facilitator of the 9/11 attacks.

Furthermore, al-Marri's behavior was that of a "combatant." He did not arrive here with peaceful purposes in mind. At the time he was detained, al-Marri was in the process of preparing cyanide attacks against American civilians and technological attacks on the U.S. financial system. Therefore, it is clear that he knowingly planned to engage in conduct that aimed to harm both life and property. In addition, the direction he received from the hierarchy of al Qaeda indicates that his terrorist actions were undertaken to further the military goals of that enemy organization.

Although al-Marri fits easily within the definition of enemy combatant and may therefore be militarily detained, there will undoubtedly be harder questions concerning the scope of the President's detention authority in the future. Novel legal problems concerning the proper balance between liberty and security will continue to arise as the struggle against terrorism proceeds. While I respect those who feel differently, I believe the constitutional authority of the executive to detain al-Marri pursuant to clear congressional directive is evident. It matters not that al-Marri was not in uniform, that he was not on some foreign battlefield, or that he was not in the service of a nation's armed forces. It matters not that his status was that of a lawful alien, that he was arrested on American soil where the threat of belligerency may be greatest, or that he was detained militarily rather than prosecuted by civil authority. To hold that these things mandate a grant of the writ requires this country to face contemporary threats of grave dimension shackled by outmoded notions of the law of war. To rule for al-Marri is to set judicial authority in matters of armed conflict above the combined will and expression of both Congress and the executive. To hold in petitioner's favor would hobble the political branches in performing the most basic function that the Framers allocated to them — that of providing for the safety and protecting the lives of those they represent, the people of America.

## IV.   AL-MARRI RECEIVED THE PROCESS HE WAS DUE.

The concurring opinion in this case (the opinion authored by Judge Traxler) finds that al-Marri may be detained as an enemy combatant under the AUMF. As expressed earlier in this opinion, I share fully my good colleague's views on this matter.

My agreement ends there, however. The concurrence asserts that "the process afforded al-Marri" to challenge his detention "did not meet the minimal requirements of due process guaranteed by the Fifth Amendment." *Ante* at 64-65. I think this view is in error, and its consequences are serious.

The district court offered al-Marri each of the procedures required by the Supreme Court's *Hamdi* decision, but al-Marri believed he was entitled to something akin to a full criminal trial and refused to avail himself of any of these protections. As a result, it is quite wrong to suggest that al-Marri did not receive the full benefits of due process as articulated by what all concede is the most relevant Supreme Court decision. In addition, al-Marri also received protections that satisfied any requirements that the Supreme Court's recent decision in *Boumediene* could reasonably be read to impose.

Al-Marri asserts that due process requires additional procedures be afforded him because he was not a "person initially detained . . . on a battlefield in Afghanistan." *Ante* at 85-88. But these additional procedural safeguards are not required by *Hamdi*, and there is no necessary connection between the lack of a foreign battlefield presence and the need for enhanced procedural protections. In fact, as discussed earlier in this opinion, a sleeper agent hiding in the United States may present a more serious security threat and raise more pronounced evidentiary problems than an enemy soldier located on a battlefield.

Moreover, nothing could be more contrary to the Supreme Court's due process jurisprudence than the *ab initio* imposition of inflexible procedural requirements based on artificial and categorical distinctions. Procedures should be ordained not at the outset but as necessary to ensure accurate determinations. To impose such requirements *ab initio* disregards the "prudent and incremental" approach required by *Hamdi* and neglects the fact that accuracy must be the touchstone of

any procedural due process inquiry. *Hamdi*, 542 U.S. at 539; *see also Boumediene*, slip op. at 52.

The approach of my concurring colleague will thus have significant consequences. By forsaking *Hamdi* and categorically insisting on more rigorous procedural safeguards at the outset of al-Marri's habeas hearing, the concurrence would accomplish through constitutional means much of what the plurality would accomplish through statutory interpretation, namely a future disablement of legitimate legislative efforts to authorize *Hamdi*-style proceedings for even the most dangerous terrorist suspects within this country.

A.

A brief review of the proceeding below will illustrate the soundness of the district court's approach. In July 2004, counsel filed a petition for a writ of habeas corpus on al-Marri's behalf in the District of South Carolina. The petition claimed that al-Marri could not be detained as an enemy combatant, and that the government had to either criminally charge or release him. In the alternative, al-Marri sought a hearing at which he would be able to challenge, with the assistance of counsel, the factual basis for his detention. It should be noted that al-Marri has had the assistance of counsel in every proceeding since the filing of this habeas petition.

One year later, after further pleadings from each party, the district court determined that, based on the facts alleged, al-Marri could be detained as an enemy combatant. *See Al-Marri v. Hanft*, 378 F. Supp. 2d 673, 680 (D.S.C. 2005). The district court further recognized that, under the Supreme Court's *Hamdi* decision, al-Marri had the right to challenge the factual basis of his detention at a hearing that satisfied the constitutional requirements of procedural due process. *See id.* at 681-82. The district court referred the case to a magistrate judge to determine what process was constitutionally due al-Marri under *Hamdi*. *See id.* at 682.

In proceedings before the magistrate judge, al-Marri sought procedural protections similar to those afforded civilian criminal defendants, such as extensive discovery rights and an opportunity to cross-examine the government's sources, including high-level Department

of Defense officials. *See ante* at 83 & n.8. The magistrate judge refused to provide al-Marri with these extensive protections, however, and instead adopted incremental procedures consistent with the burden-shifting approach outlined in *Hamdi*. *See Al-Marri v. Wright*, 443 F. Supp. 2d 774, 778-80 (D.S.C. 2006). First, it required the government to provide notice of the factual basis for al-Marri's detention. Next, if the government was able to produce credible evidence that al-Marri was indeed an enemy combatant, the burden would shift to al-Marri to rebut the government's evidence. Finally, the magistrate judge noted that, if al-Marri met his burden by presenting "more persuasive evidence," the government would either have to release al-Marri or participate in a "full-blown adversary hearing," which would include "greater procedural and evidentiary safeguards" than the first stage of the burden-shifting process. J.A. 191.

Pursuant to these procedures, the magistrate judge found that the Rapp Declaration — which, as described earlier, presented the government's evidence supporting al-Marri's detention, *see supra* at 135 — satisfied the government's initial burdens of providing al-Marri with notice of the factual basis for his detention and producing credible evidence that al-Marri was indeed an enemy combatant. The magistrate judge then gave al-Marri sixty days to present rebuttal evidence.

During this sixty day period, al-Marri protested that his ability to respond to the Rapp Declaration was impeded by the fact that large portions of the Declaration were classified and, therefore, unavailable to him. The magistrate judge agreed with al-Marri and advised the parties that, in determining whether an adversary hearing was necessary, he would only consider evidence disclosed to al-Marri. In response to this ruling, the government filed an updated version of the Rapp Declaration, with many portions declassified.

Al-Marri subsequently filed a response to the updated Rapp Declaration. In his response, al-Marri generally denied the government's claims, but "decline[d] . . . to assume the burden of proving his own innocence." *Al-Marri*, 443 F. Supp. 2d at 784. Claiming that the procedures developed by the magistrate judge were "unconstitutional, unlawful, and un-American," al-Marri refused to offer any sort of rebuttal to the government's evidence. *Id.*

Because al-Marri failed to offer "*any* evidence on his behalf," the magistrate judge recommended the dismissal of al-Marri's petition. *Id.* at 785 (emphasis in original). The district court subsequently conducted a *de novo* review of the proceedings before the magistrate judge, and over al-Marri's objections, adopted the magistrate judge's recommendations in full. *See id.* Because al-Marri failed "beyond question" to rebut his "classification and detention . . . as an enemy combatant," the district court dismissed al-Marri's habeas petition. *Id.*

### B.

The district and magistrate judges handled this case admirably. I can find no fault with their conclusion that the habeas proceedings provided al-Marri satisfied *Hamdi*'s due process requirements.

As *Hamdi* made clear, a detainee held in the United States has the right to challenge his classification as an enemy combatant.[10] Though not entitled to a full criminal trial, enemy combatants are entitled to the "core" protections that constitute the "minimum requirements of due process." *Hamdi*, 542 U.S. at 535, 538. These core procedural rights are threefold: first, a detainee "must receive notice of the factual basis for his classification"; second, a detainee must have "a fair opportunity to rebut the Government's factual assertions"; and, third, the hearing must occur "before a neutral decisionmaker." *Id.* at 533. The *Hamdi* opinion repeatedly makes clear that it is these three "essential constitutional promises [that] may not be eroded." *Id.*

Even a brief examination of al-Marri's proceedings demonstrate that he received the benefit of each of these "essential promises." To begin, the district court was unquestionably a "neutral decisionmaker." Similarly, al-Marri certainly received sufficient "notice of the factual basis for his classification." In fact, the magistrate explicitly

---

[10]Specifically, *Hamdi* established a framework for adjudicating the habeas petitions of "citizen-detainee[s]." *Hamdi*, 542 U.S. at 533. Although both the government and al-Marri address the issue of whether lawful aliens are entitled to the same level of protection as citizens, I need not resolve the issue for the purposes of this case. This is because the procedures provided al-Marri are sufficient under any reading of *Hamdi*.

stated that he would only consider information made available to al-Marri when determining whether al-Marri was indeed an enemy combatant.

To this end, the government put forth the Rapp Declaration, which contained extensive evidence of al-Marri's affiliation with al Qaeda and his destructive designs. For instance, it alleged that al-Marri attended an al Qaeda terrorist training camp in Afghanistan for fifteen to nineteen months; that he subsequently cultivated personal relationships with the most senior members of the al Qaeda hierarchy, including Osama bin Laden, Khalid Shaykh Muhammed, and Mustafa Ahmed al-Hawsawi; that he wanted to martyr himself for the al Qaeda cause; and that he was planning to commit chemical and technological attacks in the United States. *See supra* at 135. This detailed information certainly provided al-Marri with sufficient notice of the factual basis for his detention.

Likewise, al-Marri was provided a "fair opportunity to rebut the Government's factual assertions." The magistrate judge gave al-Marri sixty days to respond to the Rapp Declaration, and stated that a "full-blown adversary hearing" would follow if al-Marri was able to adequately rebut the government's evidence. Since the government relied almost exclusively on evidence directly imputable to him, al-Marri had personal knowledge of the government's factual basis, and, therefore, ample ability to offer a meaningful response. Put simply, the procedures developed by the magistrate judge provided al-Marri a "fair" and "meaningful" opportunity to be heard in his own defense, and thus were more than sufficient under *Hamdi*. *Hamdi*, 542 U.S. at 533.

The Supreme Court's recent decision in *Boumediene* does not change this analysis. To begin, the Court in *Boumediene* explicitly distinguished the question of what procedures are required under the Suspension Clause from the question of what procedures are required under the Due Process Clause. *See Boumediene*, slip op. at 55-56. In doing so, the Court explicitly stated that it made "no judgment" as to the issue addressed in *Hamdi* and presented by al-Marri's case: what process is constitutionally due to a detainee when "[t]he § 2241 habeas corpus process remained in place." See *Boumediene*, slip op. 55, 56.

Thus, *Hamdi* is still the controlling opinion for our inquiry, and it is therefore our duty to apply it. Moreover, even if *Boumediene* were applicable to the matter before us, the process employed by the district and magistrate judges would still be constitutional. Al-Marri received each of the protections required by *Boumediene*: (1) he was given a "meaningful opportunity" to challenge the legal basis for his detention, (2) his petition was considered by a court that had the remedial power to order his release, and (3) he was granted the "ability to rebut the factual basis for the Government's assertion that he is an enemy combatant." *Boumediene*, slip op. at 50-54. Al-Marri benefitted from the assistance of counsel and was aware of the allegations against him from the very outset of his proceedings, and *Boumediene* recognized these protections as necessary to the extent they aid in challenging the factual accuracy of a detention, something al-Marri did not do in this case. *Id.* at 54-55.

In fact, there is every indication that al-Marri would have received the procedures that *Boumediene* could reasonably be read to impose if he had sought to contest the government's allegations in some way. It is true that *Boumediene* recognizes that both the ability to confront witnesses and some limit on the government's use of hearsay evidence may be necessary to ensure that a detainee has the capacity "to rebut the factual basis" for his detention. *Id.* at 54-55. But the Court in *Boumediene* never indicated that it was establishing procedures to be followed inflexibly in every case. *See id.* at 49-50, 57, 58 (noting that the "extent of the showing required of the Government in these cases is a matter to be determined"). Instead, the Court emphasized that habeas corpus procedures must be "adaptable" so that they can assure the petitioner a "meaningful opportunity" to contest the legal and factual bases for his detention. *Id.* at 50-54. If al-Marri had cast any doubt on the accuracy of his detention, there was every indication that the magistrate and district judges would have done what was needed to confirm or to dispel that doubt, including the provision of those procedures that *Boumediene* could reasonably be read to require. But severing the need for procedural protections from the need to reach accurate determinations loses sight of the whole purpose of due process.

Thus, the problem here was not, as the concurrence alleges, a failure on the part of the lower court to provide al-Marri with constitu-

tionally adequate procedures, but rather the unwillingness of al-Marri to participate in the process set forth under *Hamdi* in any meaningful way. Neither the magistrate nor the district judge gave al-Marri short shrift, and both were open to any evidence al-Marri had to offer. Instead, al-Marri offered nothing. In fact, if a general denial were deemed sufficient to bring the accuracy of the Declaration into question, then the whole *Hamdi* burden-shifting framework would be rendered useless. I thus find it remarkable that al-Marri now complains about procedures he did not even attempt to utilize. Indeed, a civilian criminal defendant cannot refuse to avail himself of the protections offered him at trial and then claim a procedural due process violation; there should be no reason to treat al-Marri any differently. As the district court correctly recognized, "[n]either due process nor the rule of law in general grant a party the right to participate only in the court procedures he deems best or to present his proof whenever it suits him." *Al-Marri*, 443 F. Supp. 2d at 785.

### C.

Although al-Marri received the full benefit of *Hamdi*'s protections, the concurrence argues that because al-Marri is not "a battlefield detainee," he is entitled to more rigorous procedural safeguards than those afforded him by the district court. *See ante* at 86-89. In particular, the concurrence contends that al-Marri has the right to "requir[e] the government to demonstrate through 'the most reliable available evidence' that he is an enemy combatant." *Ante* at 93. Since the district court did not afford al-Marri this right, the concurrence insists that the proceedings below were unconstitutional.

I cannot agree for two reasons. First, the battlefield/non-battlefield distinction is not to be found in *Hamdi* and is unreflective of the realities of the current conflict. Second, the imposition of a "most reliable available evidence" requirement rests on a misreading of *Hamdi* and contradicts the basic tenets of procedural due process.

### 1.

I begin with the lynchpin of the concurrence's opinion: the notion that al-Marri is entitled to more rigorous procedural protections than those guaranteed by *Hamdi*, because al-Marri was apprehended in the

United States, rather than on a foreign battlefield, and thus subject to a higher risk of being erroneously detained. *Ante* at 86-89 & n.13. This categorical imposition of different procedural requirements based on a neat division between battlefield and homeland is unsound for several reasons.

To begin, the battlefield/non-battlefield distinction is nowhere to be found in *Hamdi*, the case on which the concurrence relies. *See ante* at 86-90. *Hamdi*'s discussion of the constitutional requirements for "enemy combatant proceedings" contains no limitation or qualification based on locus of capture. *Hamdi*, 542 U.S. at 533; *see also id.* at 524 (framing the issue as "what process is constitutionally due a citizen who disputes his enemy-combatant status"); *id.* at 532 (applying the *Mathews* framework to identify a process that "strikes the proper constitutional balance when a United States citizen is detained in the United States as an enemy combatant"). Indeed, *Hamdi* makes plain that the procedures required in "the enemy-combatant setting" apply equally to *all* enemy combatants, not just those captured on a foreign battlefield. *Id.* at 535.

Furthermore, although the concurrence claims that the "risk of erroneously detaining a civilian" is "much greater inside the United States than" on "a conventional battlefield within the borders of a foreign country," this is often not the case. *Ante* at 90. Indeed, the modern battlefield is often cluttered with shifting alliances and the lack of distinguishing uniforms. One only need to think of the villages in Vietnam or the hills of Afghanistan to recognize that discerning friend from foe can be very elusive on a foreign battlefield.

*Hamdi*'s refusal to categorically distinguish detainees based on their locus of capture reflects the true nature of the current conflict. As Congress recognized in the AUMF and as the nature of the 9/11 attacks made pellucidly clear, the struggle against al-Qaeda is not bound to foreign lands or distant shores. *See supra* at 173-75. The need for legislatively sanctioned procedures in accordance with the laws of war does not dissipate simply because an enemy combatant is apprehended domestically rather than on a foreign battlefield. *See supra* at 147-54. In fact, the concerns underlying the need for more limited procedures in enemy combatant hearings, such as the presence of highly sensitive information and the risk of such information being

transmitted to terrorist networks, confederates, and affiliates, is equally, if not more, pronounced when dealing with a sleeper al Qaeda agent operating within our borders.

Despite its contention to the contrary, *see ante* at 90 n.14, the concurrence thus commits the same error as the plurality: it categorically rests its decision on an artificial distinction between battlefield and non-battlefield capture. Indeed, it offers no other meaningful rationale for distinguishing between the procedures approved of in *Hamdi* and the procedures afforded al-Marri. *See, e.g.*, *ante* at 85, 86-89 & n.13, 89-90. The Supreme Court has refused to resolve issues concerning the process due enemy combatants based on the faux simplicity of inflexible categories, and we should not deny the realities of contemporary conflict by contravening its directive.

2.

In addition to its distinction between battlefield and non-battlefield detainees, the concurrence develops another procedural innovation: the "most reliable available evidence" requirement. The requirement posits that al-Marri has the right to require the government to produce "'the most reliable available evidence' that he is an enemy combatant." *Ante* at 91. This requirement is just as problematic as the attempt to dictate the appropriate level of procedure based on the locus of capture.

In deriving this standard, the concurrence relies on the following observation made in *Hamdi*: "[E]nemy combatant proceedings may be tailored to alleviate their uncommon potential to burden the Executive at a time of ongoing military conflict. Hearsay, for example, may need to be accepted as the most reliable available evidence from the Government in such a proceeding." *Hamdi*, 542 U.S. at 533-34; *see ante* at 81, 88 (quoting *Hamdi*). Rather than take this comment for what it clearly is — an example of how the procedures afforded enemy combatants need to account for the evidentiary burdens that are frequently present in such cases — the concurrence develops a hardline requirement that the government must always show, in its *initial* presentation, that the evidence offered is the most reliable evidence available.

Imposing a "most reliable available evidence" standard at the very outset would be a fundamental misapplication of *Hamdi*. To begin, this approach abandons the careful incrementalism and the actual "burden-shifting scheme" set forth by the Supreme Court in that decision. *Hamdi*, 542 U.S. at 534. As discussed earlier, *Hamdi* only requires the government to initially "put[ ] forth credible evidence that the habeas petitioner meets the enemy-combatant criteria." *Id.* The government need not put on further evidence unless the detainee responds with at least some evidence that "he falls outside the criteria." *Id.* By forsaking the framework envisioned by *Hamdi*, the concurrence relieves al-Marri of any obligation to contest the factual basis of his detention.

The concurrence, however, indicates that the Rapp Declaration may be insufficient under *Hamdi*. This is simply not the case. Indeed, *Hamdi* expressly recognized that the government's initial burden may be satisfied by "a knowledgeable affiant" who "summarize[s]" the evidence on which the detention was based. *Hamdi*, 542 U.S. at 534. Likewise, *Hamdi* explicitly held that in an enemy combatant proceeding, "a habeas court . . . may accept affidavit evidence like that contained in the Mobbs Declaration, *so long as* it also permits the alleged combatant to present his own factual case to rebut the Government's" evidence. *Id.* at 538 (emphasis added). Because the Rapp Declaration is far more extensive and detailed than the Mobbs Declaration, the former satisfies the government's initial burden and serves the basic purpose of affording notice to al-Marri of why he is detained.

Moreover, beyond being a misapplication of *Hamdi*, this "most reliable available evidence" approach is also plainly contrary to the fundamental tenets of procedural due process. As the Supreme Court has repeatedly held, the touchstone of any due process inquiry must be *accuracy*. Indeed, the imposition of additional procedural protections has traditionally been linked to the ability of those safeguards to prevent erroneous deprivations of protected interests. *See Mathews v. Eldridge*, 424 U.S. 319, 343 (1976); *Boumediene*, slip op. at 50-52; *Hamdi*, 542 U.S. at 529, 534; *see also Teague v. Lane*, 489 U.S. 288, 313 (1989) (noting that due process requires the retroactive application of "procedures without which the likelihood of an accurate conviction is seriously diminished"); Laurence H. Tribe, *American Constitutional Law*, § 10-13, at 714 (2d ed. 1988) (noting that the

"value [of] procedural safeguards" is primarily determined by their potential to minimize "factual error in the application of the relevant substantive rules").

In order to allow for adjustments that help ensure accuracy, the Supreme Court has consistently emphasized the need for *flexible* procedures that would permit district courts to employ protections pursuant to the "demands" presented by a "particular" case. *See Morrissey v. Brewer*, 408 U.S. 471, 481 (1972); *see also Boumediene*, slip op. at 50 (noting that habeas is an "adaptable remedy," requiring more protections in situations of greater factual uncertainty); *Mathews*, 424 U.S. at 334-35; Tribe, *supra*, § 10-14, at 718 (noting that the Court's "flexible approach" to procedural due process allows courts to apply protections on a "case to case" basis). In fact, the Court has made plain that due process never requires any "fixed" set of procedures that cannot be adapted to the circumstances of the case at hand. *Mathews*, 424 U.S. at 334 (quoting *Cafeteria & Restaurant Workers Union, Local 473, AFL-CIO v. McElroy*, 367 U.S. 886, 895 (1961)). Furthermore, as the Court explained in *Hamdi*, the procedures for reviewing enemy combatant detentions should be "both *prudent* and *incremental*," with adjustments made only as the need for additional protections became apparent in a given case. *Hamdi*, 542 U.S. at 539 (emphasis added).

By imposing a "most reliable available evidence" requirement on the government at the very outset of a *Hamdi* hearing, the concurrence has adopted an approach that neglects these foundational principles of procedural due process. Indeed, by categorically applying its additional requirement even though al-Marri has never cast the slightest bit of doubt on the accuracy of his enemy combatant status, the concurrence fails to recognize that due process is first and foremost about accuracy. And by forcing the government to produce the "most reliable available evidence" at the outset of all cases involving non-battlefield detainees, the concurrence diminishes the ability of district courts to prudently and incrementally apply procedures based on the particular circumstances and need for accuracy in the case at hand.

This approach threatens large consequences. As the concurrence recognizes, the breadth of al-Marri's procedural demands are staggering. *Ante* at 83 & n.8. Not only does al-Marri request the opportunity

to depose various government officials, including "high-level" officers in the Executive Branch, but he also seeks discovery of the following evidence:

> all statements made by al-Marri; all documents relied upon by Rapp or describing the sources of information referenced in the Rapp Declaration; all documents upon which the government intended to rely; all documents upon which the CIA, Department of Justice, Department of Defense, and the President relied in determining whether al-Marri was an enemy combatant; all documents describing the standard for the designation; [ ] any exculpatory evidence; . . . [and] all documents pertaining to interrogations and interviews conducted by United States officials or others acting on their behalf.

*Id.*

The "most reliable available evidence" requirement would provide al-Marri with access to this evidence unless the government demonstrated that its production was "impractical, outweighed by national security interests, or otherwise unduly burdensome." *Id.* at 94. In other words, under this approach, the default scenario would grant al-Marri extensive discovery rights regardless of whether he could raise even the slightest doubt as to the basis of his detention.

It is difficult to think of a more dangerous way to handle the highly sensitive information that is invariably used to apprehend terrorist sleeper agents such as al-Marri. The fuzzy "most reliable available evidence" standard provides district courts with precious little guidance. Indeed, district courts are given little direction as to what constitutes the "most reliable available evidence" or as to the procedures that should be used to make such a determination. Instead, district courts are merely told to resolve these threshold evidentiary questions to their "satisfaction." *Id.* at 94. This lack of clarity provides detainees with nothing less than an invitation to engage in "graymail" and other harassing tactics. *See supra* at 151.

Judge Gregory recognizes that the concurrence's approach "will leave the district court with more questions than answers." *Ante* at

100. He attempts, however, to resolve this uncertainty by suggesting procedures of his own. In particular, he suggests that the district court employ at the outset of proceedings an "in-camera, ex-parte hearing," modeled after circuit precedent and CIPA, to determine which evidence should be turned over to al-Marri. *Id.* at 109-112. While I respect my good colleague's attempt to provide guidance for the district court on remand, I find the procedures he proposes to be equally as problematic as those suggested by the concurrence. To begin, relying on CIPA at the outset risks transporting wholesale a statute specifically passed to address criminal prosecutions into the completely different context of military detention. *See, e.g.*, 18 U.S.C. app. III § 8 (stating that the protections of CIPA are designed to "prevent unnecessary disclosure of classified information involved in any *criminal* proceeding" (emphasis added)). As discussed earlier in Section II, Congress passed the AUMF fully aware of the existence of CIPA, but it nevertheless authorized the President to detain enemy combatants because of the inherent limitations of the criminal justice system in dealing with matters of war. Moreover, under this "in-camera hearing" approach, al-Marri is once again provided with all sorts of procedures before having to cast the slightest doubt on the accuracy of his detention. There is simply no reason to risk, at the very outset of every enemy combatant habeas proceeding and without any benefit in ensuring accurate determinations, the extraordinary costs that may result from the compelled disclosure of sensitive information.

Of course, the sorts of procedures requested by al-Marri and contemplated by the concurrence's "most reliable available evidence" requirement may eventually come into play in some *Hamdi* proceedings. So too may CIPA protections. But these procedures should only be used if they are *necessary* to ensure the *accuracy* of a detention. Applying additional procedures at the outset is, to understate the matter, ill-advised.

*Hamdi* recognized that the imposition of additional safeguards in the enemy combatant setting has the "uncommon potential to burden the Executive at a time of ongoing military conflict." *Hamdi*, 542 U.S. at 533; Ernest A. Young, *The Constitution Outside the Constitution*, 117 Yale L.J. 408, 440 (2007). Granting al-Marri the benefit of additional protections, even though he has never used the procedures available to him, and even though no evidence has emerged to suggest

that these additional protections are needed, imposes procedural burdens without any indication that these burdens will produce a corresponding reduction in the likelihood of erroneous deprivation. Due process simply does not require such a result.

D.

Process is of inestimable value to law. It is vital in ensuring fair treatment to individuals, in preventing the arbitrary exercise of power by the state, and in holding the vast arsenal of executive authority in check. And yet, as with so much else, there is a balance. Taken to sufficient lengths, process can accomplish the dismemberment of meaningful democratic prerogatives and the frustration of vital substantive ends. Taken too far, process can essentially paralyze public officials in their attempts to promote the public welfare and, in this area, to provide even the most basic assurances of public safety.

The Supreme Court in *Hamdi* sought to strike the balance between the beneficial use of process, on the one hand, and its detrimental overuse on the other. As noted, *Hamdi* placed the initial burden in enemy combatant proceedings on the government, required the government to give notice of the factual basis for detention, and provided the detainee with an opportunity to controvert the government's evidence before a neutral decisionmaker. At the same time, however, *Hamdi* was keenly conscious of the need not to deprive the executive and legislative branches of the tools to deal with the new danger in our midst. Its seminal requirement is that the detainee place the government's evidence in some doubt before the refinements of the criminal justice process come into play. By relieving the detainee of that threshold burden, we take at least the first initial steps toward making *Hamdi* hearings ever more replicative of the criminal justice process — a process whose full and familiar regalia our profession may soon enough adopt.

This would be a mistake. The transgressions that al-Marri is accused of committing are not ordinary crimes, although both the plurality and the concurrence appear to treat them in varying degrees as such. Instead, the destructive acts of 9/11 are more akin to warfare than to crime. That was the view that Congress expressed in passing the AUMF. That was the view the Supreme Court expressed in its

*Hamdi* decision. Whether by declining to apply the AUMF or by casting aside the *Hamdi* framework, we move toward the criminal justice model, the concurrence accomplishing procedurally much of what the plurality attempts to accomplish substantively — a limitation on the elected branches' ability to prosecute the ongoing struggle against global terror in accordance with the laws of war. I am reluctant to supplant the wisdom of others on so grave a matter with my own, and I would hold that under the AUMF and in accordance with *Hamdi*, al-Marri was accorded the process he was due — the process which he never once sought to utilize.

## V. THE DETENTION OF AL-MARRI ACCORDS WITH AMERICA'S LEGAL TRADITION.

I wish finally to take a step back. In the aftermath of September 11, judges have experienced their own distinctive tensions. As guardians of the nation's constitutional tradition, courts have struggled to avoid placing a judicial imprimatur on anything inimical to the nation's priceless heritage of liberty and timeless respect for human rights. At the same time, we dread seeing again the faces of the stricken and the fallen, and being left to wonder if some grave constitutional miscalculation of our own played even some small part in sealing a fellow countryman's sad fate. These conflicting concerns — of sacrificing values or jeopardizing lives — are not absent in the debate over the detention in al-Marri's case.

Writing in the heyday of Jacksonian democracy, Alexis de Tocqueville sketched the elements of American life that he thought set us apart: our devotion to the equality of man, our individualism, our commitment to enterprise, our practice of religion, our profound patriotism, our commitment to a free press, and our devotion to the rule of law. *See* Alexis de Tocqueville, *Democracy in America* (J.P. Mayer ed., George Lawrence trans., Perennial Classics 2000). On this last point, it is said, the last years of struggle have done their greatest damage — with "executive unilateralism" lessening our commitment to due process, "mock[ing] the very notion of constitutionalism and [making] light of any aspiration to live by the rule of law." Neal K. Katyal & Laurence H. Tribe, *Waging War, Deciding Guilt: Trying the Military Tribunals*, 111 Yale L.J. 1259, 1259-60 (2002). Likewise, it is alleged, a rejection of al-Marri's petition in this case "would so

alter the constitutional foundations of our Republic," that it "would have disastrous consequences for the Constitution — and the country." *Ante* at 62-63. I do not think these indictments fair, and I believe it essential to explain why al-Marri's detention would leave the beacon of our constitutionalism bright and undimmed.

Any sound perspective on al-Marri's detention must start with the magnitude of what brought it on. It bears lasting remembrance that what happened on September 11 was an attack upon the symbols of American freedom and democracy. It was a three-thousand person slaughter whose victims, going about their daily lives in an effort to do something meaningful, were innocent of any wrong against those who attacked them. The AUMF expressed this nation's sorrow and outrage at what happened. To credit its intended scope respects Congress's intention and those who died that day.

The notion that the military detention of suspected al Qaeda terrorists such as al-Marri somehow threatens to drag us even incrementally towards the degraded level of our adversaries is simply unfathomable. Al-Marri's detention is one of only two domestic detentions of enemy combatants conducted in the seven years since the 9/11 attacks. This country has no equivalent of jihad, no appetite for suicide bombs in public squares and markets, no thought of destroying places of worship, no intent to cause harm that is greater than necessary to defeat a determined enemy. Military detention, circumscribed carefully by the law of war's cardinal principle of discrimination, is no disproportionate response to those who aim to murder scores of thousands of civilians; there is no moral equivalence, only contrast, and nothing in our constitutional tradition makes the detention of terrorists with strong al Qaeda ties unlawful simply because they prefer mass killings here rather than on some foreign battlefield. *See Quirin*, 317 U.S. at 38.

The immense controversy over al-Marri's detention obscures the historical perspective. I do not mean to whitewash wrongs we have committed in the last seven years — Abu Ghraib stained and sullied all we stand for; the government's roundup and detention of Muslim immigrants in the immediate aftermath of 9/11 transgressed our commitment to due process and individualized consideration; and Guanta-

namo Bay has proven controversial, to be sure. We have stumbled on an unknown landscape, and sometimes worse.

But consider, for example, the Red Scare and roundup of social dissidents after World War I, or the internment of Japanese-Americans during World War II, or the surge of McCarthyism during the Cold War, or the bludgeoning of dissent during the last stages of Vietnam. What makes those moments in our history so very sad was that so much of the country approved of them. A fever took hold, and minorities in our country often bore the brunt of it. But al-Marri's detention — and the capture of al Qaeda members in our midst — presages no anti-Muslim rage, no attacks on Muslims' basic rights of free religious exercise and speech, no intent to deny our fellow citizens of Muslim faith inclusion in the American embrace. As the terrorist threat has persisted, there has been no demand for dragnet measures that would sweep in innocent and culpable alike, and there has been no demagogic figure attempting to demonize our friends of Muslim faith at home because they may happen to share a loose national or religious identity with enemies abroad.

Our domestic response to 9/11 has been, to judge by the magnitude of the event and the lessons of history, largely measured. But that alone does not carry the argument. Indeed, the reason for our measured response has not chiefly been executive forbearance, but rather a faithfulness to the path laid down by our Founders, with all three branches of our tripartite form of government playing their constitutionally assigned role in charting our course. *See* David A. Martin, *Judicial Review and the Military Commissions Act: On Striking the Right Balance*, 101 Am. J. Int'l L. 344, 347-48 (2007) (noting the "productive" "interbranch colloquy" that took place after 9/11).

The Constitution is not merely an assignation of rights; it is also an allocation of authority. And it is the structural features of our Constitution that allowed a nation bemused in August to yet recover its residue of fiber in September. Article II embodies the great and immediate assertion of national will. It is the *constitutional* function of the executive to act energetically in time of national peril; no other branch of government is remotely capable of doing so. But executive power can promote liberty through the provision of security, or it can threaten liberty through the disregard of rights. So the balance must

be struck. In this regard, Separation of Powers does not mean Hostility of Powers. It is the obligation of each branch to check the excesses of another, but each branch is equally obliged not to forsake its own limitations in thwarting another's legitimate role.

Rejection of al-Marri's petition does not signal some pattern of surrender by a co-equal Congress and judiciary to a rampaging executive branch. The legislative branch has not forfeited its constitutional function. In the last seven years, Congress has passed at least seven resolutions or statutes delineating the appropriate scope of our nation's response to the terrorist threat: the Authorization for Use of Military Force in 2001, Pub. L. No. 107-40, 115 Stat. 224; the USA PATRIOT ACT of 2001, Pub. L. No. 107-56, 115 Stat. 272, which was revised and reauthorized in 2006, Pub. L. No. 109-177, 120 Stat. 192; Pub. L. No. 109-178, 120 Stat. 278; the Authorization for Use of Military Force Against Iraq Resolution of 2002, Pub. L. No. 107-243, 116 Stat. 1498; the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135; the Detainee Treatment Act of 2005, Pub. L. No. 109-148, §§ 1001-06, 119 Stat. 2680, 2739-44; the Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600; and the Protect America Act of 2007, Pub. L. No. 110-55, 121 Stat. 552, which amended the Foreign Intelligence Surveillance Act of 1978. Those who think these acts ceded too much power to the executive may be right or they may be wrong. But they miss a crucial point: these congressional actions have been fought on "the boisterous ocean of political passions," *see* Letter from Thomas Jefferson to Monsieur DuPont de Nemours, March 2, 1809, *quoted in The Life and Selected Writings of Thomas Jefferson* 545 (Adrienne Koch & William Peden eds., 1993), and while the results of any fight are never pleasing to everyone, it is precisely the way our system is supposed to work.

Nor would the rejection of al-Marri's petition signal an atrophied judicial role. The courts have been more actively involved in our current struggle than in any other war in our history. The amount of litigation surrounding the struggle against terrorism would have been unthinkable in any prior conflict. By my count, well over two dozen cases on the subject have been heard in federal court, including those whose names are now familiar: *Hamdi*; *Rasul*; *Hamdan*; *Padilla*; *Moussaoui*; *Boumediene*. The critics who see these decisions as too supine may be right or they may be wrong. But as al-Marri's appeal

shows, they have had their day and more in court, and that too is how our system is supposed to work.

Al-Marri's case — like so many others in this struggle — has been for the judiciary one of deep silences. We may never know whether we have struck the proper balance between liberty and security, because we do not know every action the executive is taking and we do not know every threat global terror networks have in store. So our belief in ourselves and our institutions has to persevere in this unprecedented world of imperfect understanding where the definitions of victory and progress and proportionate response are forever open to debate.

I feel firmly, however, based on the facts presented, that al-Marri's petition should be dismissed. The executive's decision to detain him — or any similarly situated member of al Qaeda, lawfully in this country or not — is a proportionate response targeted precisely at those terrorists who slaughtered thousands of civilians on our soil and threaten to do the same to tens of thousands more. His detention is consistent with the law of war, and our constitutional requirements of due process as well. It is a product of executive action that has been legislatively sanctioned and it reflects the core understanding of our constitutional system that at the end of the day, when momentous questions of life and death are at stake, this nation places its deepest bets upon democracy, and the people's safety must reside and rest with those who have the people's sanction.

I do not mean to minimize the step of detaining militarily someone of lawful status, seized within this country, and I have tried throughout to suggest the limits that the laws of war, the need for congressional sanction, and the requirement of some meaningful form of access to the courts impose upon this executive practice. *See Hamdi*, 542 U.S. at 524-39. By reviewing the lawfulness of the detention, we confirm that there is access to the courts and that there are limits on actions impinging liberty that can be taken in the name of national security. By rejecting this petition, we would have the chance to recognize that the democratic branches have taken reasonable and constitutional steps to address unprecedented threats of unforeseeable magnitude against our country.

It is possible to protect American values and American lives. Indeed, this was the promise of our Founding, when a government was "instituted among Men, deriving [its] just powers from the consent of the governed" in order to secure the "unalienable Rights" of both "Liberty" and "Life." *See* Declaration of Independence para. 2 (U.S. 1776). I disagree with the result reached here, but I do so in the belief that my colleagues have helped in some small way to demonstrate the good and earnest values that animate this country — values that require America prevail.

NIEMEYER, Circuit Judge, concurring in the judgment in part and dissenting in part, as indicated herein:

After we received briefs and heard argument in this case, the Supreme Court handed down its decision in *Boumediene v. Bush*, 553 U.S. ___, No. 06-1195 (June 12, 2008), holding that foreign nationals detained at the U.S. Naval Station at Guantanamo Bay as enemy combatants under the Authorization for Use of Military Force ("AUMF"), Pub. L. No. 107-40, 115 Stat. 224 (2001), have the privilege of habeas corpus. Slip op. at 41. The Court also held that when judicial power to issue habeas corpus is properly invoked by a detainee having the habeas privilege, "the judicial officer must have adequate authority to make a determination in light of the relevant law and facts and to formulate and issue appropriate orders for relief, including, if necessary, an order directing the prisoner's release." Slip op. at 58. The *Boumediene* Court rejected the government's argument that the Detainee Treatment Act of 2005, Pub. L. No. 109-148, 119 Stat. 2739, provided an adequate and effective substitute for habeas corpus and held that the Act's limitation of habeas corpus violated the Suspension Clause of the Constitution.

Focusing on the *essential* process to which such detainees are entitled, whether through habeas corpus or some other procedure that Congress might provide, the Court stated that a detainee must have a "meaningful opportunity to demonstrate that he is being held pursuant to the erroneous application or interpretation of relevant law" before a court that has "the power to order the conditional release of an individual unlawfully detained" — both of which are provided by the habeas corpus process. Slip op. at 50 (internal quotation marks omitted). Thus, the Court held, the process for designated enemy

combatants detained at Guantanamo Bay must provide the detainee with the right to present exculpatory evidence and to supplement the record, and the process must be administered by a court with authority "to assess the sufficiency of the Government's evidence against the detainee," "to admit and consider relevant exculpatory evidence," to make determinations "in light of the relevant law and facts," "to correct errors that occurred during the [executive] proceedings," and to issue appropriate relief, including release of the detainee. Slip op. at 57-58. In short, enemy combatants detained at Guantanamo Bay under the AUMF must be provided the habeas corpus process or a process closely equivalent to it. *See* slip op. at 63-64.

Because the *Boumediene* Court treated Guantanamo Bay as part of the United States for the limited purpose of its holding, its holding, a fortiori, extends also to persons detained in the United States as enemy combatants under the AUMF.

In my judgment, the Supreme Court's holding in *Boumediene* disposes of the procedural issues before us. Because the district court in this case afforded al-Marri the habeas corpus process and dismissed his petition under procedures fully consistent with traditional habeas corpus process, I would conclude that al-Marri has received all the process he was due. And with respect to the district court's legal conclusion that al-Marri was properly detained, I agree generally with the views expressed by Chief Judge Williams, Judge Wilkinson, and Judge Traxler, and I specifically join in Part II of Judge Traxler's opinion. Accordingly, I would affirm.

I

Al-Marri was initially arrested by civilian authorities pursuant to charges of credit card fraud. While in civilian custody, however, the President of the United States determined, on June 23, 2003, that al-Marri was an enemy combatant because he was "closely associated with al Qaeda"; he "engaged in conduct that constituted hostile and war-like acts, including conduct in preparation for acts of international terrorism that had the aim to cause injury to or adverse effects on the United States"; he possessed "intelligence about personnel and activities of al Qaeda"; he represented a "continuing, present, and grave danger to the national security of the United States"; and there-

fore it was necessary to detain him "to prevent him from aiding al Qaeda in its efforts to attack the United States." Acting under the authority of the AUMF, the President ordered the Attorney General to deliver al-Marri to the Secretary of Defense to be detained "as an enemy combatant." Al-Marri was then detained at the Consolidated Naval Brig in Charleston, South Carolina.

On July 8, 2004, al-Marri filed a petition for a writ of habeas corpus in the district court under 28 U.S.C. § 2241, alleging (1) unlawful detention, (2) the right to counsel, (3) the right to be charged, (4) a denial of due process, and (5) unlawful interrogation. His second and fifth claims are no longer a part of his petition in this proceeding but are now the subject of a separate civil action pending before the district court. In response to al-Marri's petition, the district court entered an order directing service of al-Marri's petition upon the Commander of the Consolidated Naval Brig and setting a date for his answer.

In his answer, the Commander asserted that al-Marri's detention under the AUMF was proper, based on the President's determination that al-Marri was an enemy combatant. The answer included a copy of the President's determination and order, as well as an affidavit from Jeffrey N. Rapp, the Director of the Joint Intelligence Task Force for Combating Terrorism (the "Rapp Declaration"), which offered the specific factual basis for al-Marri's classification as an enemy combatant. Portions of the Rapp Declaration were redacted to protect classified information.

Al-Marri filed a reply to the government's answer, generally denying the facts and challenging his detention as a matter of law. He also requested a hearing to determine facts.

The district court first addressed the legal issues, and, assuming the facts asserted by the government to be true, it concluded as a legal matter that al-Marri's detention was "proper pursuant to the AUMF." *Al-Marri v. Hanft*, 378 F. Supp. 2d 673, 680 (D.S.C. 2005). But the court left open al-Marri's right to challenge the facts.

At a status conference before a magistrate judge, the court outlined the procedure that would be followed to resolve al-Marri's dispute of the facts. By an order dated December 19, 2005, the magistrate judge

adopted an incremental factfinding approach based on the guidance provided by the Supreme Court in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004). It required that al-Marri be given the government's factual basis for his classification as an enemy combatant and a fair opportunity to rebut those facts with "more persuasive evidence." For this purpose, the court indicated that it would accept affidavits from both the government and al-Marri. The court stated that if al-Marri were to make a showing "more persuasive" than the government's showing, it would then conduct a full-blown hearing to take evidence.

Although al-Marri had received a redacted copy of the Rapp Declaration, he objected that he had not received notice of the factual basis for his detention because his attorneys were prohibited from discussing with him the classified portions of the Rapp Declaration. The district court expressed displeasure with the government's provision of a redacted copy and gave the government the option of either relying only on the unclassified portions of the Rapp Declaration or of allowing al-Marri access to the classified portions. In response, the government declassified most of the Rapp Declaration and accepted the sanction that it could not rely on the remaining classified portions to satisfy its burden.

In its summary, the declassified Rapp Declaration stated:

> [Al-Marri] is closely associated with al Qaeda, an international terrorist organization with which the United States is at war. As detailed below, Al-Marri is an al Qaeda "sleeper" agent sent to the United States for the purpose of engaging in and facilitating terrorist activities subsequent to September 11, 2001. Al-Marri currently possesses information of high intelligence value, including information about personnel and activities of al Qaeda. Prior to arriving in the United States on September 10, 2001, Al-Marri met personally with Usama Bin Laden (Bin Laden) and volunteered for a martyr mission or to do anything else that al Qaeda requested. Al-Marri was assisted in his al Qaeda assignment to the United States by at least two high-level al Qaeda members: September 11, 2001 mastermind Khalid Shaykh Muhammed (KSM); and al Qaeda financier and September 11, 2001 moneyman Mustafa Ahmed Al-Hawsawi (Al-Hawsawi). Al

Qaeda sent Al-Marri to the United States to facilitate other al Qaeda operatives in carrying out post-September 11, 2001 terror attacks. Al Qaeda also asked Al-Marri to explore computer hacking methods to disrupt bank records and the U.S. financial system. In addition, Al-Marri was trained by al Qaeda in the use of poisons and had detailed information concerning poisonous chemicals stored on his laptop computer. Information about Al-Marri's relationship with and activities on behalf of al-Qaeda has been obtained from and corroborated by multiple intelligence sources.

The Declaration then proceeded, through 15 pages, to offer the highly specific details. For example, it stated that: (1) "Al-Marri trained at Bin Laden's Afghanistan terrorist training camps for 15-19 months between approximately 1996 and 1998"; (2) although al-Marri allegedly entered the United States to pursue a graduate degree in computer science at Bradley University, "he had rarely attended classes and was in failing status"; (3) al-Marri traveled to the United Arab Emirates at al Qaeda's request in August 2001, where he met with Mustafa Ahmed al-Hawsawi, al Qaeda's treasurer, at the Dubai airport and was provided with approximately $10,000 to $13,000 for his travels and education in the United States, along with an additional approximately $3,000 to purchase a laptop computer; (4) al-Marri's computer contained evidence that he was conducting research regarding the use of chemicals as weapons of mass destruction (providing very detailed descriptions of the evidence found on the computer); (5) al-Marri's computer also contained records of e-mail drafts sent from accounts registered to al-Marri to an account that has been linked to Khalid Shaykh Muhammed, a known al Qaeda terrorist and mastermind behind the September 11 attacks (providing the exact language of the messages); (6) al-Marri's computer contained files of lectures by bin Laden as well as lists of websites titled "Jihad arena," "Taliban," "Arab's new club — Jihad club," "Tunes by bullets," and "martyrs," along with photographs of the attacks on the World Trade Center, various photographs of Arab prisoners of war held by authorities in Kabul, an animated cartoon of an airplane flying at the World Trade Center, and a map of Afghanistan; (7) calling cards attributed to al-Marri were utilized after the terrorist attacks of September 11, 2001, to contact the United Arab Emirates telephone number of al-Hawsawi (providing very specific dates and details regarding where

and when the calls were made); (8) al-Marri's computer case contained lists of credit card numbers and the details of the relevant cardholders, and his computer files contained over 1,000 other apparent credit card numbers, along with lists of internet websites related to computer hacking, fake driver's licenses and other fake identification cards, buying and selling credit card numbers, and processing credit card transactions; and (9) fraudulent purchases were made on several of the credit card numbers in al-Marri's possession, at a fraudulent online business set up by an individual purporting to be named "Abdulkareem A. Almuslam," who had a signature in handwriting similar to al-Marri's, was identified by an eye doctor as actually being al-Marri, and had fingerprints that matched al-Marri's.

When al-Marri received this declassified Rapp Declaration (in which only small portions remained redacted), he again objected because he could not see the few passages that had been blacked out. With respect to what was disclosed, he "respectfully decline[d]" to come forward with evidence. Because al-Marri elected not to make a factual showing, the magistrate judge prepared a report and recommendation to the district court based on al-Marri's refusal to take issue with the facts.

In the magistrate judge's report and recommendation, he noted that al-Marri had received most of the Rapp Declaration, with only a few passages blacked out because they were classified, and stated that al-Marri "ha[d] been given notice and opportunity, but ha[d] responded with merely a general denial and an election not to further participate in these proceedings." The judge noted that "[a]lthough [al-Marri] apparently has evidence he believes relevant, he refuses to present it before this court." The magistrate judge concluded:

> Accordingly, while recognizing the importance of respecting the acts of the Executive Branch in times of national emergency, and after providing the petitioner a threshold opportunity reasonable under the circumstances to contest the Executive Branch's actions and factual assertions in an incremental and deliberate manner, it appears to the court that the Executive Declaration is more persuasive than Petitioner's general denial on the issue of whether the petitioner

meets the enemy combatant criteria, and there is no basis for concluding that an erroneous deprivation has occurred.

Al-Marri filed objections to the magistrate judge's report and recommendation, and the district court considered al-Marri's petition for writ of habeas corpus *de novo*. In its opinion, the court stated:

> Despite being given numerous opportunities to come forward with evidence supporting this general denial, Petitioner has refused to do so.

> * * *

> Petitioner's refusal to participate at this stage renders the Government's assertions uncontested. This leaves the Court with "nothing specific . . . to dispute even the simplest of assertions [by the Government] which [Petitioner] could easily" refute were they inaccurate.

*Al-Marri ex rel. Berman v. Wright*, 443 F. Supp. 2d 774, 784-85 (D.S.C. 2006) (quoting magistrate judge's report) (alterations and omission in original). The court concluded:

> Given Petitioner's refusal to participate in the initial evidentiary process and his failure to offer *any* evidence on his behalf, it is beyond question that he has failed to present "more persuasive evidence" to rebut Respondent's classification and detention of him as an enemy combatant. Further, given the imbalance between the evidence presented by the parties, the Government clearly meets any burden of persuasion which could reasonably be imposed on it at this initial stage. Proceeding incrementally, as *Hamdi* directs, the Court need go no further today. Accordingly, under *Hamdi*'s outline of the procedures applicable in enemy combatant proceedings, the Court finds that Petitioner has received notice of the factual basis supporting his detention and has been afforded a meaningful opportunity to rebut that evidence. As a review of that evidence does not indicate that an "erroneous deprivation" has occurred, *Hamdi*, 542 U.S. at 534, this petition should be dismissed.

*Id.* at 785. From the district court's order of dismissal, al-Marri filed this appeal.

II

I conclude that the district court in this case provided al-Marri all the procedure that was due. While the court was disposing of a habeas corpus petition under 28 U.S.C. § 2241, it also kept its focus on the procedure described in *Hamdi*, the only guidance then available to the district court for application of habeas corpus to detained enemy combatants. But it can be readily demonstrated that the procedure the district court provided al-Marri satisfied not only *Hamdi* but also § 2241, which the Court in *Boumediene* found to be sufficient.

A

*Hamdi* remains relevant to our consideration even in light of *Boumediene*. While *Boumediene* considered whether the Detainee Treatment Act was an adequate substitute for § 2241 habeas corpus, *Hamdi* considered the appropriate process due *in a § 2241 habeas proceeding. See Boumediene*, slip op. at 55 ("[*Hamdi*] does not control the matter at hand. None of the parties in *Hamdi* argued there had been a suspension of the writ. Nor could they. The § 2241 habeas corpus process remained in place"). As in *Hamdi*, the § 2241 habeas corpus process "remain[s] in place" here.

In *Hamdi*, a plurality of the Court articulated that process which is constitutionally owed to an American citizen seeking to challenge his classification and detention as an enemy combatant. There, Yaser Esam Hamdi, a United States citizen, was detained by the government on allegations that he had taken up arms with the Taliban during the conflict in Afghanistan. Hamdi had been seized in Afghanistan by members of the Northern Alliance, a coalition of military groups opposed to the Taliban, and was eventually turned over to the United States military and detained as an enemy combatant. *Hamdi*, 542 U.S. at 510. Subsequently, Hamdi's father filed a petition for a writ of habeas corpus under 28 U.S.C. § 2241. *Id.* at 511.

Although Hamdi's habeas petition contained no details regarding the factual circumstances of his capture or detention, other documents

that were part of the record asserted that Hamdi "went to Afghanistan to do 'relief work,' and that he had been in that country less than two months before September 11, 2001, and could not have received military training." *Id.* Furthermore, Hamdi's father explained his view of the case — that Hamdi, who was 20 years old at the time, "was traveling on his own for the first time," and "'[b]ecause of his lack of experience, he was trapped in Afghanistan once the military campaign began.'" *Id.* at 511-12 (alteration in original). The sole evidence offered by the government against Hamdi was contained in an affidavit from Michael Mobbs, the Special Advisor to the Under Secretary of Defense for Policy (the "Mobbs Declaration"). *Id.* at 512.

In its review, a plurality of the Supreme Court first looked at whether the detention of Hamdi, a U.S. citizen taken into custody in Afghanistan as an enemy combatant, was authorized. Confining its holding to the specific factual scenario before it and expressing no view as to the bounds of the enemy-combatant category, *id.* at 516, the plurality held that Congress authorized the detention of enemy combatants, at least in the circumstances alleged in Hamdi's case, *id.* at 516-17.

The plurality then turned to the question of what process was constitutionally due a citizen who, in a habeas proceeding, disputed his status as an enemy combatant, ultimately declining to adopt either the narrow view of process advocated by the government or the broad view advocated by Hamdi. *Id.* at 524-34. The plurality explained that "[b]oth of [the] positions highlight legitimate concerns. And both emphasize the tension that often exists between the autonomy that the Government asserts is necessary in order to pursue effectively a particular goal and the process that a citizen contends he is due before he is deprived of a constitutional right"; "[i]t is beyond question that substantial interests lie on both sides of the scale in this case." *Id.* at 528, 529. Recognizing that "the risk of erroneous deprivation of a citizen's liberty in the absence of sufficient process . . . [was] very real," *id.* at 530, the plurality held that a citizen-detainee seeking to challenge his classification as an enemy combatant must (1) "receive notice of the factual basis for his classification"; (2) be given "a fair opportunity to rebut the Government's factual assertions"; and (3) have this process conducted "before a neutral decisionmaker," *id.* at

533. But the plurality was quick to point out the consequences of the practical requirements attending the government's interests:

> At the same time, the exigencies of the circumstances may demand that, aside from these core elements, enemy-combatant proceedings may be tailored to alleviate their uncommon potential to burden the Executive at a time of ongoing military conflict. Hearsay, for example, may need to be accepted as the most reliable available evidence from the Government in such a proceeding.

*Id.* at 533-34. In addition to allowing for hearsay in specified circumstances, the plurality recognized that a presumption in favor of the government's evidence could be acceptable:

> Likewise, the Constitution would not be offended by a presumption in favor of the Government's evidence, so long as that presumption remained a rebuttable one and fair opportunity for rebuttal were provided. Thus, once the Government puts forth credible evidence that the habeas petitioner meets the enemy-combatant criteria, the onus could shift to the petitioner to rebut that evidence with more persuasive evidence that he falls outside the criteria.

*Id.* at 534. The plurality explained that such a burden-shifting scheme "would sufficiently address the 'risk of an erroneous deprivation' of a detainee's liberty interest," *id.* (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)), and would "meet the goal of ensuring that the errant tourist, embedded journalist, or local aid worker has a chance to prove military error while giving due regard to the Executive once it has put forth meaningful support for its conclusion that the detainee is in fact an enemy combatant," *id.*

Finally and particularly apropos here, the *Hamdi* plurality stated that "a habeas court in a case such as this may accept [hearsay] affidavit evidence like that contained in the Mobbs Declaration, so long as it also permits the alleged combatant to present his own factual case to rebut the Government's return." *Hamdi*, 542 U.S. at 538. Ultimately, the plurality envisioned "a factfinding process that is both *prudent and incremental*." *Id.* at 539 (emphasis added).

Here, the government detained al-Marri, based on facts much better developed and more detailed than those presented in *Hamdi*, and al-Marri was given a habeas corpus process consistent with the process described in *Hamdi*. He was given notice of the factual basis for his designation as an enemy combatant and "a meaningful opportunity to contest the *factual basis* for that detention before a neutral decision-maker."\**Hamdi*, 542 U.S. at 509 (emphasis added).

First, as for notice, al-Marri was provided the Rapp Declaration, which contained a full statement of the factual basis for the government's determination that he was an enemy combatant. The Rapp Declaration set forth clearly and comprehensively the government's theory of the case, providing specific details of the basis for the government's assertions.

Second, al-Marri was undoubtedly given "a fair opportunity to rebut the Government's factual assertions." *Hamdi*, 542 U.S. at 533. In its statements to the district court, the government invited and urged al-Marri "to actually respond in a substantive way to the factual allegations" made by the government, observing that "[t]his is [al-Marri's] opportunity to be heard on . . . his version of [the] events. That's the primary purpose for this process, as we read the Supreme Court's *Hamdi* decision." (J.A. 132-33, 134). In addition, the district court directed al-Marri to respond to the government's factual assertions. In its December 19, 2005 order, the court instructed al-Marri "to file any rebuttal evidence [to the government's factual assertions]

---

\*Al-Marri objects to the district court's denial of his motion for disclosure by the government of an array of sources and witnesses, and Judge Traxler's opinion suggests al-Marri may be entitled to such discovery even before placing any of the government's facts in dispute. But in a factfinding process that is to be "both prudent and incremental," taking into account the Executive's unique interests in detaining enemy combatants during wartime, *Hamdi*, 542 U.S. at 539, it would be inappropriate for us to consider these discovery requests without first requiring the petitioner to at least constructively respond to the government's detailed factual submission, particularly in a case such as this in which all relevant facts are within the petitioner's personal knowledge. Absent some credible theory to rebut the government's factual case, a court has no basis to contemplate further steps such as discovery or an evidentiary hearing.

within sixty days from the date hereof." Yet, al-Marri did not respond in any substantive way. Even though he had been given the government's factual assertions — indeed, many months before the court ordered him to respond, during which time he had unmonitored access to his attorneys — he still refused to provide any explanation to the court or to state his own version of the facts. Rather, his response was simply to give a general denial and to decline further engagement in the process.

In *Hamdi*, the plurality stated that "once the Government puts forth credible evidence that the habeas petitioner meets the enemy-combatant criteria" (which could be satisfied by a hearsay affidavit such as the Rapp Declaration, *see* 542 U.S. at 533-34, 538), the burden shifts to the detainee "to rebut that evidence *with more persuasive evidence that he falls outside the criteria*." *Id.* at 534 (emphasis added). Al-Marri did not even attempt to carry this burden.

The *Hamdi* plurality explained that this burden-shifting scheme did not impose a large burden on the detainee but rather was designed to allow him to show that he is an innocent "tourist, . . . journalist, or . . . aid worker." 542 U.S. at 534. The approach of this scheme was "limited to [rebutting or challenging] the alleged combatant's acts." *Id.* at 535. Thus, this narrow focus required al-Marri only "to present *his own factual case* to rebut the Government's return." *Id.* at 538 (emphasis added). Indeed, in this case, almost every important fact on which the government relied was imputable to al-Marri directly and could be responded to through his own personal knowledge.

For example, the Rapp Declaration cited specific dates and times when the government alleged al-Marri was in specific places taking specific actions — all facts that would have been known to al-Marri personally. Al-Marri could thus have contested or explained, among other things: (1) the source of his financial support, if it was not al-Hawsawi, as alleged; (2) the assertions that he rarely attended his graduate courses and was in failing status; (3) the allegations that his laptop computer contained research regarding the use of chemical weapons and poisons, as well as files concerning jihad and martyrdom, lectures of Osama bin Laden, and thousands of false credit card numbers and other fraudulent financial documents; and (4) the facts that he possessed and used telephone credit cards, telephone numbers,

and e-mail accounts connected to known al Qaeda operatives and leaders. Because the accuracy of these facts would have been known by al-Marri personally, he could have offered an explanation for or denial of each, if the government's characterizations and explanations were untrue. Yet, he chose to "respectfully decline" the district court's "invitation" to respond to or contest them. His failure to rebut such facts amounted to a total failure to meet his burden under the burden-shifting scheme of *Hamdi*. As a result, there was nothing specific before the district court, and there remains nothing specific before our court, to dispute even the simplest of assertions against al-Marri, despite the fact that he was given "a fair opportunity to rebut the Government's assertions." *Hamdi*, 542 U.S. at 533.

Finally, the third prong of the process articulated in *Hamdi* was fulfilled. Al-Marri unquestionably received the opportunity to challenge the government's factual assertions "before a neutral decisionmaker." *Hamdi*, 542 U.S. at 533. A duly appointed and experienced federal district court judge entertained al-Marri's arguments regarding his habeas petition, and ultimately decided to reject them and deny his petition. There has been no allegation that the district court was in any way biased. Indeed, the court gave al-Marri ample opportunity to make his case.

In sum, al-Marri was given notice of the government's facts, allowing for a presumption in its favor under *Hamdi*; he was given a fair opportunity to respond to the asserted facts; and his proceeding in which he could contest the facts was before a neutral decisionmaker. This is all of the process that was due him under *Hamdi*.

B

Although the district court in this case was functioning under 28 U.S.C. § 2241 and was attempting at the same time to accommodate the process described in *Hamdi*, the process it actually afforded al-Marri readily comported with both § 2241 and *Hamdi*, thus including the elements described as essential in *Boumediene*.

The *Boumediene* Court allowed that some process short of that required by § 2241 process could be sufficient. Slip op. at 64 (stating, "we do not hold that an adequate substitute must duplicate § 2241 in

all respects"). It nonetheless found essential in any process employed that (1) the *petitioner* be given the opportunity to submit exculpatory evidence and to supplement the record on review; and (2) the *court* have authority to assess the sufficiency of the government's evidence, to receive the petitioner's exculpatory evidence, to supplement the record, to correct errors in the executive process, and to grant relief, including release of the detainee. Slip op. at 57-58, 63.

The process in this case readily fulfilled these minimum requirements. Indeed, it satisfied all of those imposed by 28 U.S.C. §§ 2241-2243.

Al-Marri was given a detailed 15-page statement of the facts — stated under oath — on which the government was relying. Even though most, if not all, of the facts were within al-Marri's personal knowledge, he elected not to dispute them or present other facts, giving instead only a general denial and a refusal to participate further in the process. Likewise, he did not request that anything further be included in the record. Thus, his challenge amounted to only a legal challenge to the AUMF and the President's right to detain him under the AUMF. Nevertheless, he was given the opportunity to raise factual disputes, and the court would have resolved them with a factual hearing, as it so advised al-Marri. The district court, operating under § 2241, had the full authority to receive evidence from al-Marri and to supplement the record, and it urged al-Marri to respond to the facts.

The court also understood that it had authority to rule that the detainment was illegal as a matter of law. With that authority, it devoted an entire memorandum to the issue, denying al-Marri's legal challenge. Had it sustained al-Marri's arguments, the court, as a habeas court, surely had the authority under § 2241 to fashion appropriate relief, including release. Indeed, it exercised this power at an earlier stage when it sanctioned the government by excluding consideration of classified information. In short, the court's process in this case was fully compliant with the essential process described in *Boumediene*.

In addition, the district court comported fully with the process required by § 2241. Section 2243 requires that al-Marri's custodian be ordered to file an answer (a "return"), "certifying the true cause of the

detention." That order was issued in this case and the government filed an answer, providing the "true cause of the detention."

Section 2243 also requires a hearing at which the detainee is present, "[u]nless the application for the writ and the return present only issues of law." This too was satisfied. Since al-Marri raised no issue of fact, the hearings before the magistrate judge involved only legal arguments.

Section 2243 requires that al-Marri be afforded the opportunity, by affidavit or otherwise under oath, to deny facts or to assert other facts. This opportunity was given him, but al-Marri opted not to take advantage of it.

Finally, § 2243 requires the court to "dispose of the matter as law and justice require." This the court did. In disposing of the matter as law and justice required, the district court accepted the government's facts as true — it had no others before it — and concluded, based on those facts, that as a matter of law al-Marri was legally detained by the President under the AUMF.

Al-Marri received the process described in *Hamdi*, *Boumediene*, and 28 U.S.C. §§ 2241-2243. That he elected not to contest facts to require their further development was *his choice*, not a denial of process. And on his purely legal challenge he received a full hearing with a reasoned disposition.

### III

With respect to the legal question decided by the district court that al-Marri was legally detained under the AUMF based on the facts the government presented, I agree with the opinions of Chief Judge Williams, Judge Wilkinson, and Judge Traxler, which conclude that, based on the Rapp Declaration, the President had the power to detain al-Marri as an enemy combatant under the AUMF and that the President lawfully exercised that power in detaining al-Marri. I specifically join Part II of Judge Traxler's opinion, laying out the reasons.

### IV

Accordingly, I concur in that part of the judgment affirming the district court's conclusion that the President possessed the legal

authority under the AUMF to detain al-Marri as an enemy combatant and that he did so in accordance with the AUMF. I dissent, however, from the decision to vacate the district court's dismissal order and to remand this case to the district court to provide al-Marri with more process to contest his detention. In my judgment, because al-Marri has already received a § 2241 habeas process, such a remand order leads only to duplicative process, unnecessarily protracting the constitutionally fair and adequate process that the district court already provided al-Marri.

Accordingly, I would affirm the judgment of the district court.

DUNCAN, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority of my colleagues today that, if the Government's allegations about al-Marri are true, Congress has empowered the President to detain him as an enemy combatant. However, with *Hamdi* as a guidepost, I am unable to conclude that the process afforded al-Marri thus far was insufficient. Indeed, the government's evidence, in the form of the Rapp Declaration, was far more detailed than that proffered in *Hamdi*. Further, as noted by Chief Judge Williams and Judge Niemeyer, the magistrate judge and the district court in fact accommodated al-Marri's only specific request—that the Rapp Declaration be substantially declassified to provide him with better notice of the factual basis for his detention. In the face of the Rapp Declaration's specific and comprehensive allegations (which, as Chief Judge Williams and Judge Niemeyer point out, relate to matters uniquely within al-Marri's knowledge), it is al-Marri's unilateral and absolute refusal to participate in the incremental process suggested by *Hamdi* that warrants affirmance. For that reason, with due respect for the varying views presented by my colleagues, I also concur in the separate opinion authored by Chief Judge Williams.